UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------- x

MARINA STAJIC,

                              Plaintiff,

               -against-

THE CITY OF NEW YORK, BARBARA SAMPSON,
in her individual capacity, and TIMOTHY
KUPFERSCHMID, in his individual capacity.

                              Defendants.

------------------------------------------------------------------------- X

**PLAINTIFF'S STATEMENT
PURSUANT TO LOCAL
CIVIL RULE 56.1**

16-CV-1258 (GHW)

       Plaintiff Marina Stajic ("Plaintiff" or "Stajic"), pursuant to Federal Rule of Civil Procedure

56(c), Local Civil Rule 56.1(b) and the Individual Practices of Hon. Gregory H. Woods, submits

this statement in response to the statement of purportedly undisputed material facts submitted by

defendants City of New York, Barbara Sampson and Timothy Kupferschmid.[1]  Statements that are

admitted below are admitted only for purposes of defendants' motion and not for trial or any other

purpose.  Moreover, plaintiff does not concede the materiality of any of defendants' statements.

Plaintiff's responses to defendants' factual assertions are set forth below in bold.  Plaintiff's

additional statement of material issues of fact that present genuine issues to be tried begins at

paragraph 213 below.

---

[1]     The documents referred to herein are attached as exhibits to the accompanying Declaration
of Kevin Mintzer in Opposition to Defendant's Motion for Summary Judgment, dated July 10,
2017 ("Mintzer Dec."), the Declaration of Marina Stajic, dated June 27, 2017 ("Stajic Dec."), or
as Exhibits to the Declaration of Paul Marks ("Marks Dec.), submitted by defendants.  Excerpts
of the depositions of all witnesses are referred to with the person's last name, followed by "Dep.
_" and are attached as Exhibits A through I of the Mintzer Dec. Additional citations are to the
Declaration of Barry Scheck dated June 26, 2017 ("Scheck Dec."), also submitted herewith.

Background: the Office of the Chief Medical Examiner of the City of New York

   1. The Office of the Chief Medical Examiner ("OCME") of the City of New York was established effective January 1, 1918.  See Chapter 284 of the Laws of New York State of 1915.

  **Plaintiff's Response:  Admit.**

   2. OCME is an independent office within the New York City Department of Health and Mental Hygiene.  See New York City Charter §557(a).

  **Plaintiff's Response:  Admit.**

   3. The head of OCME is the Chief Medical Examiner of the City of New York, appointed by the Mayor of the City of New York.  See New York City Charter §557(a).

  **Plaintiff's Response:  Admit.**

   4. The Chief Medical Examiner has the powers and duties as may be provided by law with respect to the bodies of persons dying from criminal violence, by accident, by suicide, suddenly, when in apparent health, when unattended by a physician, in a correctional facility or in any unusual or suspicious manner or where an application is made pursuant to law for a permit to cremate a person.  See New York City Charter §557(f)(1).

  **Plaintiff's Response:  Admit.**

   5. The Chief Medical Examiner may, to the extent permitted by law, provide forensic and related testing and analysis, and ancillary services, in furtherance of investigations concerning persons both alive and deceased, including but not limited to: performing autopsies, performing DNA testing and other forms of genetic testing and analysis; obtaining samples and exemplars, performing pathology, histology and toxicology testing and analysis, and determining the cause and manner of injuries and/or death.  See New York City Charter, §557(f)(3).

  **Plaintiff's Response:  Admit.**

6.      The Chief Medical Examiner may appoint and remove such deputy chief medical examiners, medical examiners, medical investigators, lay medical investigators, scientific experts and other officers and employees as may be provided for in the budget.  See New York City Charter, §557(c).

**Plaintiff's Response:  Admit.**

7.      OCME employs approximately 30 Medical Examiners, who perform autopsies.  See http://www1.nyc.gov/site/ocme/services/autopsy.page.

**Plaintiff's Response: Admit.**

8.      OCME's Division of Laboratories is comprised of four forensic laboratories: Forensic Biology, Forensic Toxicology, Histology, and Molecular Genetics. See http://www1.nyc.gov/site/ocme/services/laboratories.page.

**Plaintiff's Response: Admit.**

9.      The Forensic Biology Laboratory performs serology and DNA testing on physical evidence from criminal cases within the City of New York.  It also performs testing associated with missing persons, unidentified remains and the ongoing efforts to identify victims of the September 11, 2001 attack on the World Trade Center.  See http://www1.nyc.gov/site/ocme/services/department-of-forensic-biology.page.

**Plaintiff's Response: Admit.**

10.     The primary mission of the Forensic Toxicology Laboratory is post mortem analysis to determine the absence or presence of drugs and their metabolites or other toxic substances in human fluids and tissues and to evaluate their role as a determinant or contributory factor in the cause and manner of death. The laboratory also performs analysis on a limited number of cases submitted by law enforcement agencies with the purpose of determining the absence or

presence of ethanol and other drugs and evaluates their role in modifying human performance or behavior (primarily as related to operation of motor vehicles and victims of alleged sexual assault). See   http://www1.nyc.gov/site/ocme/services/toxicology-technical-manuals.page   (Mission Statement).

**Plaintiff's Response: Admit.**

11.   The Histology Laboratory performs microscopic examination of cells and tissues to assist the medical examiners in determining the cause and manner of death.   See http://www1.nyc.gov/site/ocme/services/histology.page.

**Plaintiff's Response: Admit.**

12.   The Molecular Genetics Laboratory helps medical examiners investigate certain sudden unexpected natural deaths in apparently healthy individuals. The laboratory provides postmortem molecular diagnostic testing to search for gene changes that explain sudden deaths, and to alert surviving family members so that loved ones at high risk for inherited disease can be tested and treated.   See http://www1.nyc.gov/site/ocme/services/molecular-genetics.page.

**Plaintiff's Response: Admit.**

**Plaintiff's appointment as Director of OCME's Forensic Toxicology Laboratory**

13.   Plaintiff, Marina Stajic, was born in 1950.   See Exhibit "A, ¶ "12."[2]

**Plaintiff's Response: Admit.**

14.   Plaintiff obtained her Ph.D. in Forensic Toxicology in 1977.   See Exhibit "A," ¶12.

**Plaintiff's Response: Admit.**

---

[2] Unless otherwise indicated, all exhibits referred to herein are annexed to the Declaration of Paul Marks, dated June 2, 2017.

15.     On April 1, 1986, plaintiff was appointed as Director of OCME's Forensic Toxicology Laboratory.  <u>See</u> Exhibit "A," ¶16.

**Plaintiff's Response: Admit.**

16.     When she was appointed as Director of OCME's Forensic Toxicology Laboratory, plaintiff had approximately nine years of post-Ph.D. forensic toxicology experience. <u>See</u> Exhibit "A," ¶¶12, 16.

**Plaintiff's Response: Admit.**

17.     Plaintiff's responsibilities as Director of OCME's Forensic Toxicology Laboratory included: (1) providing administrative, scientific and technical operational management of the laboratory; (2) overseeing training of personnel in the laboratory; (3) supervising all Forensic Toxicology Laboratory analyses in connection with deaths under investigation; (5) supervising casework and evaluation of toxicological findings; (6) implementing analytical methodologies related to forensic toxicology; (7) coordinating the activities of the Forensic Toxicology Laboratory with OCME medical examiners, the New York City Police Department, and the District Attorneys' Offices of the five counties comprising the City of New York; and (8) serving as an expert witness in forensic toxicology.  <u>See</u> Exhibit "A," ¶21.

**Plaintiff's Response: Admit, although defendant has omitted one of the responsibilities listed in the complaint: formulating and implementing the forensic toxicology operational policies, goals, and objectives. (Stajic Dec. ¶ 12)**

18.     When she was appointed as Director of OCME's Forensic Toxicology Laboratory, plaintiff was 36 years old.

**Plaintiff's Response: Admit.**

19.    Dr. Elliott Gross was the Chief Medical Examiner of the City of New York at the time of plaintiff's appointment as Director of OCME's Forensic Toxicology Laboratory. See Exhibit "B," at 7:24 through 8:2.

**Plaintiff's Response: Admit.**

20.    Dr. Gross was plaintiff's immediate supervisor from April 1986 until he was dismissed by Mayor Koch in October 1987.  See Exhibit "B," at 8:10-11, 112:12-15.

**Plaintiff's Response: Admit.**

21.    After Dr. Gross was discharged by Mayor Koch, Dr. Beverly Leffers became Acting Chief Medical Examiner, and plaintiff's immediate supervisor.  See Exhibit "B," at 8:11-13.

**Plaintiff's Response: Admit.**

22.    In 1989, Dr. Charles Hirsch was appointed by Mayor Edward I. Koch to succeed Dr. Gross as Chief Medical Examiner of the City of New York.

**Plaintiff's Response: Admit.**

23.    Dr. Hirsch became plaintiff's immediate supervisor after his appointment as Chief Medical Examiner.  See Exhibit "B," at 8:13-14.

**Plaintiff's Response: Admit.**

Defendant Barbara Sampson joins OCME in 1998 and is appointed as Chief Medical Examiner of the City of New York in December 2014

24.    In 1998, defendant Barbara Sampson started at OCME as a Fellow in Forensic Pathology.  See  Exhibit "C," at 11:19 through 12:12.

**Plaintiff's Response: Admit.**

25.    Defendant Sampson's first position at OCME was City Medical Examiner Level I.  See Exhibit "C," at 12:17.

**Plaintiff's Response: Admit.**

26.     In September 1999, after passing the examination for certification by the American Board of Forensic Pathology, defendant Sampson became a City Medical Examiner Level II.  See Exhibit "C," at 13:6-18.

**Plaintiff's Response: Admit.**

27.     In 2007, defendant Sampson was promoted to the position of First Deputy Chief Medical Examiner by Chief Medical Examiner Hirsch.  See Exhibit "C," at 14:4-9.

**Plaintiff's Response: Admit.**

28.     As First Deputy Chief Medical Examiner, Dr. Sampson became plaintiff's immediate supervisor.  See Exhibit "B," at 8:15-17; Exhibit "C," at 17:4-13.

**Plaintiff's Response: Admit.**

29.     In February 2013, Dr. Hirsch retired as Chief Medical Examiner of the City of New York due to health issues.  See Exhibit "C," at 17:4-13.

**Plaintiff's Response: Admit.**

30.     Upon the retirement of Dr. Hirsch in February 2013, Dr. Sampson was appointed as Acting Chief Medical Examiner of the City of New York.  See Exhibit "C," at 17:4-13.

**Plaintiff's Response: Admit.**

31.     Upon the appointment of Dr. Sampson as Acting Chief Medical Examiner in February 2013, Dr. Jason Graham, the Deputy Chief Medical Examiner in charge of the Manhattan Office, was appointed by Dr. Sampson as Acting First Deputy Chief Medical Examiner. See Exhibit "D," at 14:18-20, 19:7-23.

**Plaintiff's Response: Admit.**

32.     As Acting First Deputy Chief Medical Examiner, Dr. Graham became plaintiff's immediate supervisor.  See Exhibit "D," at 25:20 through 26:8.

**Plaintiff's Response: Admit.**

33.     In December 2014, Mayor Bill de Blasio appointed Dr. Sampson as permanent Chief Medical Examiner of the City of New York.  See Exhibit "C," at 17:16-20; 60:20-23.

**Plaintiff's Response: Admit.**

The New York State Commission on Forensic Science and plaintiff's membership on the Commission

34.     Effective August 2, 1994, Article 49B of the New York State Executive Law established the New York State Commission on Forensic Science ("CFS") and a DNA Identification Index.  See New York Executive Law §995-a.

**Plaintiff's Response: Admit.**

35.     The CFS is charged with, among other responsibilities, developing minimum standards and a program of accreditation for all forensic laboratories in New York State, including establishing minimum qualifications for forensic laboratory directors and other personnel, and approval of forensic laboratories for the performance of specific forensic methodologies.  See New York Executive Law §995-b(1).

**Plaintiff's Response: Admit, subject to other provisions, limitations and exceptions as set forth in the statute.**

36.     The New York Executive Law defines "forensic laboratory" and "forensic DNA laboratory" for the purposes of Article 49B as laboratories operated by the State or local unit of government.  See New York Executive Law §995(1) and §995(2).

**Plaintiff's Response: Admit, subject to other provisions and limitations set forth in the statute.**

37.     The CFS consists of fourteen members: the Commissioner of the New York State Department of Criminal Justice Services ("DCJS"), who is the Chair of the CFS, the Commissioner of the New York State Department of Health (or his or her designee), and twelve members appointed by the Governor.  See New York Executive Law §995-a(1)(a) and (b).

**Plaintiff's Response: Admit.**

38.     Of the twelve members of the CFS appointed by the Governor, five members must be public employees or public officials, and one of those five members must be the director of a forensic laboratory located in New York State.  See New York Executive Law §995a-(2)(a) through (j).

**Plaintiff's Response:  Admit in part. Under the statute, at least five members of the Commission appointed by the governor must be public employees or public officials, but there may be more than five public employees or public officials among the twelve gubernatorial appointments. The Commission currently has 10 members who are public employees or public officials. (*See* http://criminaljustice.ny.gov/pio/boards/index.html (last accessed July 9, 2017))**

39.     Of the members of the CFS appointed by the Governor, each member is appointed to a three year term, and any member appointed by the Governor may be reappointed for additional three year terms.  See New York Executive Law §995-a(3).

**Plaintiff's Response: Admit.**

40.     New York Executive Law §995-a(6) provides that no member of the CFS shall be disqualified from holding any public office or employment, nor shall he or she forfeit any

such office or employment by reason of his or her appointment as a member of the CFS.  See New York Executive Law §995-a(6).

**Plaintiff's Response: Admit, although refer the Court to the statute itself for the complete text of N.Y. Executive Law § 995-a(6).**

41.     New York Executive Law directs the CFS to, among other responsibilities, establish a subcommittee on forensic DNA laboratories and forensic DNA testing.  See Executive Law §995(b)(13)(a).

**Plaintiff's Response: Admit, although plaintiff assumes this paragraph is meant to refer to N.Y. Executive Law § 995-b(13)(a).**

42.     The DNA subcommittee of the CFS assesses and evaluates all DNA methodologies proposed to be used for forensic analysis, makes reports and recommendations to the CFS, and makes binding recommendations for adoption by the CFS addressing minimum scientific standards to be utilized in conducting forensic DNA analysis including, but not limited to, the examination of specimens, population studies and methods employed to determine probabilities and interpret test results.  See Executive Law §995-b(13)(b).

**Plaintiff's Response: Admit, although refer the Court to the statute itself for the complete text of N.Y. Executive Law § 995-b(13)(b).**

43.     In 2004, Governor George Pataki appointed plaintiff as the member of the CFS required to be the director of a forensic laboratory in New York State.  See Exhibit "A," ¶30.

**Plaintiff's Response: Admit.**

44.     Plaintiff was reappointed to the CFS by Governor Eliot Spitzer in 2007, by Governor David Paterson in 2010, and by Governor Andrew Cuomo in 2013.  See Exhibit "A," ¶33.

**Plaintiff's Response: Admit**

45.     On September 9, 2005, the DNA Subcommittee of the CFS unanimously approved the use by OCME of Low Copy Number ("LCN") DNA testing in forensic case work without any threshold limits or limitations.  See Exhibit "E."

**Plaintiff's Response: Admit in part, deny in part. The October 6, 2005 letter cited by defendants reflects that the DNA Subcommittee approved OCME's use of LCN, but the letter does not reflect whether the vote was unanimous. Nor does the letter reflect whether the DNA Subcommittee imposed any threshold limits or limitations, or whether OCME had made any prior representations or agreement regarding those matters.**

46.     On October 6, 2005, the DNA Subcommittee of the CFS informed the CFS of the Subcommittee's September 9, 2005 vote to approve the use by OCME of LCN DNA testing. See Exhibit "E."

**Plaintiff's Response: Admit**

47.     At a public meeting of the CFS on December 6, 2005, Dr. Mechthild Prinz, the Director of OCME's Department of Forensic Biology, made a presentation in support of OCME's request that the CFS approve the implementation of LCN DNA testing by OCME.  See Exhibit "F."

**Plaintiff's Response: Admit**

48.     At the December 6, 2005 CFS meeting, a motion was made to approve OCME's use of LCN DNA testing.   The motion passed by a vote of seven to three, with plaintiff as one of the seven members of the CFS voting in favor of the motion.  See Exhibit "G."

**Plaintiff's Response: Admit.**

OCME discovers and reports significant errors by Serrita Mitchell, a technician in OCME's Forensic Biology Laboratory

49.     On July 7, 2011, OCME made the first of four reports of corrective actions to the American Society of Crime Laboratory Directors/Laboratory Accreditation Board ("ASCLD/LAB"), as well as other entities, concerning significant errors made by Serrita Mitchell, a technician in the Department of Forensic Biology's DNA laboratory.  The corrective action was initiated after it was discovered that Mitchell had prepared two serology reports that contained incorrect conclusions.  In one case, she reported that no blood was found on an item of evidence; upon re-examination by a second analyst, the item of evidence tested positive for blood.  In the second case, she reported that no semen was found; upon re-examination by a second analyst, the item of evidence tested positive for semen. See Exhibit "H," bates stamp Nos. S00938-S00939.

**Plaintiff's Response: Admit. In addition to the corrective action report on January 7, 2011, corrective action reports from OCME to ASCLD/LAB were sent on March 28, 2012, June 27, 2012 and on January 24, 2013. (Marks Dec. Ex. K at 21-24)**

50.     OCME removed Mitchell from casework, assigned her to administrative tasks, and later suspended her.  OCME also initiated disciplinary proceedings seeking to terminate Mitchell's employment, and she resigned from OCME in November 2011.  See Exhibit "H," bates stamp Nos. S00940-S00941.

**Plaintiff's Response: Admit.**

51.     OCME decided to re-examine all cases for the period from 2001 to early 2011 in which Mitchell had reported "negative" serology findings.  As her work was limited to the examination of sexual assault kits, OCME's re-examination focused on any additional items, such as underwear, included in the sexual assault kits, to target the type of evidence that Mitchell was examining. See Exhibit "H," bates stamp Nos. S00940-S00941.

**Plaintiff's Response: Admit.**

52.    OCME's re-examination of the sexual assault kits began in July 2011 and concluded in January 2013.  See Exhibit "H," bates stamp Nos. bates stamp Nos. S00940-S00954.

**Plaintiff's Response: Admit in part. According to a letter from OCME to ASCLD/LAB, dated January 29, 2013, the "corrective action" had concluded as of the date of the letter (i.e. January 29, 2013), but the letter does not state when OCME's re-examination of the sexual assault kits was completed. (Marks Dec. Ex. H at S00944)**

53.    A total of 877 of Mitchell's cases were re-examined and/or re-inventoried by OCME.  The re-inventory of the cases revealed discrepancies in the contents of 24 sexual assault kits and documentation errors on the inventory sheet of 50 sexual assault kits.  At the conclusion of the corrective action, OCME re-associated all evidence items with their proper cases and all documentation errors were corrected.  See Exhibit "H," bates stamp Nos. S00950-S00954.

**Plaintiff's response: Admit that OCME reported the above information to ASCLD/LAB.**

54.    Of the 147 cases in which Mitchell reported negative serology findings, OCME's re-examination produced a positive result in 37 cases.  In nine of those cases, a CODIS-eligible[3] profile was developed, and two of these profiles were determined to have probative DNA profiles, or investigative leads, which could have enabled the earlier arrest and prosecution of the offender.  See Exhibit "H," bates-stamp Nos. S00950-S00954.

---

[3] CODIS is the Combined DNA Index System and is the term used to describe the Federal Bureau of Investigation's program of support for criminal justice DNA databases as well as the software used to run these databases. The National DNA Index System ("NDIS") is considered one part of CODIS, the national level, containing the DNA profiles contributed by federal, state, and local participating forensic laboratories.

**Plaintiff's Response: Admit that OCME reported the above information to ASCLD/LAB.**

55.     On January 24, 2013, Chief Medical Examiner Charles Hirsch suspended the Director of OCME's Department of Forensic Biology, Dr. Prinz, and one of the Department of Forensic Biology's two Deputy Directors, Patricia Wojtowicz, who had served as a Deputy Director since 2008.  See Exhibit "I."

**Plaintiff's Response: Admit. Prinz and Wojtowicz were suspended following the publication of an article New York Times on January 10, 2013, concerning the corrective action related to Mitchell.  (Marks Dec. Exhibit K at 24)**

56.     Upon the suspension of Dr. Prinz, OCME Chief of Staff Barbara Butcher became the Interim Director of the Department of Forensic Biology.  See Exhibit "I."

**Plaintiff's Response: Admit.**

57.     On January 28, 2013, Chief Medical Examiner Charles Hirsch terminated the employment of Deputy Director Patricia Wojtowicz.  See Exhibit "J."

**Plaintiff's Response: Admit.**

58.     In January 2013, the New York State Inspector General's Office opened an investigation into Serrita Mitchell's errors in the examination of sexual assault kits, which had been the subject of corrective actions by OCME that it reported to ASCLD/LAB and other entities. See Exhibit "K," p. 1.

**Plaintiff's Response: Admit.**

59.     The investigation by the New York State Inspector General's Office culminated in a Report issued in December 2013 entitled "Investigation into the New York City Office of Chief Medical Examiner: Department of Forensic Biology." See Exhibit "K."

**Plaintiff's Response: Admit.**

60.     In February 2013, OCME issued a Request for Information, then a Request for Proposal for consultation services to review and evaluate the management and operational structure, quality assurance practices, and administrative policies of the Department of Forensic Biology.  See Exhibit "L," p. 1; Exhibit "M," at 22:10 through 23:15.

**Plaintiff's Response: Admit.**

61.     Sorenson Forensics, LLC of Salt Lake City, Utah, a private Forensic DNA Laboratory, submitted a bid in response to OCME's Request for Proposal, which was accepted, See Exhibit "M," at 23:16 through 24:14.

**Plaintiff's Response: Admit.**

62.     From 2007 to 2013, defendant Kupferschmid was employed by Sorenson Forensics. See Exhibit "M," at 19:15-23.

**Plaintiff's Response: Admit.**

63.     Defendant Kupferschmid was a "scientific founder" of Sorenson Forensics. He approached the company with a proposal and staff to conduct forensic DNA casework, which involves analyzing the biological evidence recovered from crime scenes and generating DNA profiles from that evidence and comparing it to known individuals in the case whether they are victims or suspects.  See Exhibit "M," at 20:1-25.

**Plaintiff's Response: Admit in part. Although Kupferschmid claimed to be a "scientific founder" at Sorenson, he also acknowledged that the prior to his joining the company, Sorenson was a genomics company that did contract research, paternity testing and missing persons work. (Kupferschmid Dep. at 20)**

64. By the time that defendant Kupferschmid left Sorenson Forensics, the staff increased to approximately 30, which were under his direct or indirect supervision. See Exhibit "M," at 21:16 though 22:9.

**Plaintiff's Response: Admit in part. Kupferschmid said that he supervised 25-30 individuals when he left Sorenson. (Kupferschmid Dep. at 21-22)**

65. In March and April 2013, a three-person team from Sorenson Forensics, led by defendant Kupferschmid, conducted a review and evaluation of OCME's Forensic Biology Laboratory. See Exhibit "L," pp. 2-3, which included on-site assessments and interviews of Dr. Prinz and other employees of the Department of Forensic Biology. Id., p. 2; Exhibit "M," at 24:4 through 27:9.

**Plaintiff's Response: Admit in part. Kupferschmid and a colleague visited OCME's Forensic Biology Laboratory from March 4 through March 9, 2013; Kupferschmid and a different colleague made a second visit from March 18 through March 22, 2013. (Marks Dec. Ex. L at S01039) Kupferschmid met with Prinz for about one hour total. (Kupferschmid Dep. 24-25)**

66. On April 19, 2013, the remaining Deputy Director of OCME's Forensic Biology Laboratory, Dr. Theresa Caragine, resigned in connection with OCME's determination that she had failed to follow laboratory protocol regarding resolution of disagreements between analysts in two separate cases. As a result of Caragine's resignation, the New York State Inspector General expanded its investigation to include Caragine's conduct, and, in its December 2013 Report, found that Caragine had, as OCME previously determined, ignored that laboratory protocol. See Exhibit "K, p. 1.

**Plaintiff's Response: Admit in part. Sampson had already decided to terminate Caragine's employment before she offered her resignation. (Sampson Dep. 140)**

67.     On May 2, 2013, Sorenson Forensics issued its Final Report and an Executive Summary and Recommendations.  See Exhibit "L."

**Plaintiff's Response: Admit.**

68.     The May 2, 2013 Final Report of Sorenson Forensics, recommended, among other things, that: "Leadership must change, and a new management team with appropriate management skills should be appointed."  See Exhibit "L," p. 12.

**Plaintiff's Response: Admit.**

69.     On May 3, 2013, Dr. Prinz, who had been suspended since January 24, 2013, resigned as Director of OCME's Department of Forensic Biology. See Exhibit "N."

**Plaintiff's Response: Admit.**

70.     If Dr. Prinz had not resigned, defendant Sampson would have informed her that her employment with OCME could not continue.  See Exhibit "C," at 138-15 through 139:13.

**Plaintiff's Response: Admit.**

Defendant Kupferschmid's appointment as Director of OCME's Forensic Biology Laboratory

71.     After the resignation of Dr. Prinz, OCME posted the position of Director of Forensic Biology.  Defendant Kupferschmid applied for the position in mid-May 2013.  See Exhibit "M," at 37:5 through 38-18.

**Plaintiff's Response: Admit in part. Kupferschmid formally applied for the director of forensic biology position about one week after Prinz resigned on May 2, 2013. (Kupferschmid Dep. 38) However, Kupferschmid expressed interest in the position, which he called his "dream job" (Kupferschmid Dep. 45) during one of his on-site visits to OCME while working for Sorenson in March 2013.  Barbara Butcher, then OCME's chief and staff**

and the interim head of the forensic biology laboratory, had asked Kupferschmid for recommendations for a new director of OCME's forensic biology laboratory if OCME needed to hire one. Kupferschmid responded: "Besides me?" and named several other potential candidates. (Kupferschmid Dep. 33-34)

72.     Approximately six persons, including defendant Kupferschmid, applied in response to the posting for the position of Director of OCME's Forensic Biology Laboratory.  See Exhibit "C," at 94:15-23.

**Plaintiff's Response: Deny. The cited deposition excerpt does not support the facts asserted.**

73.     In late May or early June 2013, defendant Kupferschmid interviewed for the position of Director of the Forensic Biology Laboratory, with a panel from OCME, including OCME Chief Staff Barbara Butcher, Special Counsel Mimi Mairs, and Eugene Lien, the Technical Leader of the Department of Forensic Biology.  See Exhibit "M," at 40:16 through 41:22.

**Plaintiff's Response: Admit.**

74.     Defendant Kupferschmid met with Dr. Sampson on the same day as the panel interview.  See Exhibit "M," at 41:23 through 43:16.

**Plaintiff's Response: Admit.**

75.     Dr. Sampson believed that, because defendant Kupferschmid had served as a consultant in the review of the Forensic Biology Laboratory, there might be an appearance of a conflict of interest in hiring him as the Director of the Laboratory, but she did not believe that an actual conflict of interest existed.  See Exhibit "C," at 84:12.

**Plaintiff's Response: Admit in part, deny in part.  Sampson acknowledged to the Commission that there was an appearance of impropriety in the hiring of Kupferschmid, not that there "might" be. (Marks Dec. Ex. P at NYC_E00001601)**

76.     As to any such possible conflict of interest, defendant Sampson consulted with the OCME General Counsel, Jody Lipton, who opined that there was no conflict of interest, and also with Deputy Mayor Linda Gibbs, who also did not believe a conflict of interest existed and so informed defendant Sampson.  See Exhibit "C, at 84:12-25.

**Plaintiff's Response: Admit in part. Sampson's statements regarding the substance of what Lipton and Gibbs purportedly told her are inadmissible hearsay; there is no non-hearsay basis for those statements to be admitted.**

77.     In June 2013, OCME offered defendant Kupferschmid the position of Director of OCME's Forensic Biology Laboratory, and he started at OCME in that capacity in late July 2013.  See Exhibit "M,, at 42:22 through 42:5, 49:23 through 50:2.

**Plaintiff's Response: Admit, assuming deposition citations should be 42:22-43:5 and 49:23-50:2.**

Plaintiff's conversation with defendant Sampson in June or July 2013 concerning the hiring by OCME of defendant Kupferschmid.

78.     Between the date that the decision was made to offer the position of Director of the Forensic Biology Laboratory to defendant Kupferschmid and the date that he started at OCME, plaintiff had a conversation with defendant Sampson in defendant Sampson's office in which plaintiff stated that she thought that there might be a conflict of interest in the hiring of defendant Kupferschmid.  See Exhibit "B," at 27:3 through 29:13, 33:14-22; Exhibit "C," at 83; 12-21.

**Plaintiff's Response:   Admit in part. This is an incomplete account of the conversation. During a meeting in Sampson's office, Sampson informed plaintiff about Kupferschmid's hiring as director of the forensic biology laboratory. In response, Stajic raised whether there was a conflict of interest in hiring Kupferschmid for the position shortly after he authored a memorandum as a consultant in which he called for new management in the laboratory. Stajic believed there was a conflict of interest in hiring Kupferschmid under the circumstances, and she believed that that other members of the Commission would have the same concern.  (Stajic Dep. 27-31)**

79.     According to plaintiff, "in those days, I was often just walking into Dr. Sampson's office and we would have informal meetings and chats.  So, I didn't go there specifically to discuss that [plaintiff's view that there might be a conflict of interest in the hiring of defendant Kupferschmid], but while we were talking, she told me that they offered the job to Mr. Kupferschmid." See Exhibit "B," at 28:5-13.  Plaintiff "always felt that I could just walk into her office and bring up any issues." See Exhibit "B," at 62:20-21.

**Plaintiff's Response: Admit that these are both quotations from plaintiff's deposition, but the second quotation is a sentence taken out of context from an answer that had nothing to do with plaintiff's discussion with Sampson about hiring Kupferschmid. (Stajic Dep. at 62-63)**

80.     According to plaintiff, her conversation with Dr. Sampson concerning a possible conflict of interest in the hiring of defendant Kupferschmid was a "private conversation with Dr. Sampson." See Exhibit "B," at 35:25 through 36:3.

**Plaintiff's Response: Admit.**

81.     In response to plaintiff's statement during the conversation that is referred to in ¶82 above, defendant Sampson said to plaintiff that she did not believe that there was a conflict of interest in the hiring of defendant Kupferschmid as Director of OCME's Forensic Biology Laboratory.  See Exhibit "B," at 29: 3-10; Exhibit "C," at 82:1 through 87:20.

**Plaintiff's Response: Admit. Sampson also told plaintiff that she consulted with OCME's general counsel about the conflict of interest question. (Stajic Dep. 29)**

82.     According to plaintiff, her statement to Dr. Sampson about a potential conflict of interest in the hiring of defendant Kupferschmid was "if anything, that was a minor part of the reason why I believe I was dismissed."  See Exhibit "B," at 34:5-7, 19-20.

**Plaintiff's Response:  Admit that plaintiff believes that her to statement to Sampson about a conflict of interest was a minor factor in her termination as compared to the opinions she expressed at Commission meetings. (Stajic Dep. 35-36)**


The August 22, 2013 CFS Executive Session

83.     On August 22, 2013, a meeting of the CFS was held, during which the Chair of the CFS, Michael Green, requested "a motion to enter Executive Session to discuss information relating to a specific investigation which could jeopardize the investigation if disclosed or that may lead to promotion, demotion, discipline, suspension dismissal or removal of a particular person. A motion was made by Dr. Corrado, seconded by Dr. Stajic, and unanimously approved.  The Commission then entered Executive Session."  See Exhibit "O."; Exhibit "P, at 2:13-20.

**Plaintiff's Response: Admit.**

84.     Pursuant to New York Public Officers Law §102(3), "Executive session" "means that portion of a meeting not open to the general public."

**Plaintiff's Response: Admit.**

85.    With respect to the subject of the executive session, the Chair of the CFS stated: "it was basically called at the request of the Commission Members.  We did receive correspondences [sic] indicating serious concerns regarding the Office of the Chief Medical Examiner, specifically, the Forensic Biology Laboratory.  So this meeting is in response to those communications and it's to address the Serrita Mitchell Corrective Action, the CODIS upload Corrective Action and also personnel actions involving Laboratory Management that occurred at that Laboratory recently."  See Exhibit "P," at 4:22-5:6.

**Plaintiff's Response: Admit that the quoted statement was part of Commission chair Michael Green's introduction to the executive session on August 22, 2013. (Marks Dec. Ex. P at NYC_E00001551)**

86.    The Chair of the CFS also stated that "[a]n IG [New York State Inspector General's Office] investigation into those issues in this matter has already been discussed in Executive Session.  I should indicate that we did invite the IG to attend this meeting and they're not going to attend this meeting and they're no [sic] here today."  See Exhibit "P," at 5: 8-10.

**Plaintiff's Response: Admit.**

Plaintiff's participation during the appearance of defendant Sampson at the August 22, 2013 CFS Executive Session.

87.    Four persons appeared at the August 22, 2013 CFS executive session: Acting Chief Medical Examiner Dr. Barbara Sampson, OCME Chief of Staff Barbara Butcher former Director of OCME's Forensic Biology Laboratory Mechthild Prinz, and the Director of OCME's Forensic Biology Laboratory, Timothy Kupferschmid. See Exhibit "P."

**Plaintiff's Response: Admit.**

88.    Dr. Sampson was the first OCME official to appear at the August 22, 2013 CFS executive session.  See Exhibit "P," at 9-91.

**Plaintiff's Response: Admit.**

89.    During the appearance by defendant Sampson at the August 22, 2013 CFS executive session, plaintiff made one statement: "Can I just say, I used to report directly to Dr. Hirsch. Until this Executive Committee was formed."  See Exhibit "P," at 32:7-9.

**Plaintiff's Response: Admit that this was the only on-the-record statement that plaintiff made during Sampson's appearance at the executive session.**

90.    According to plaintiff, her statement during the appearance by defendant Sampson at page 32:7-9 of the transcript of the August 22, 2013 CFS executive session played no role in Dr. Sampson's decision to terminate her employment on  April 9, 2015.  See Exhibit "B," at 43:20  through 44:15-16.

**Plaintiff's Response: Admit that plaintiff does not believe the statement that she made during Sampson's appearance at the executive session played a role in her dismissal from OCME.**

Plaintiff's participation during the appearance of by OCME Chief of Staff Barbara Butcher at August 22, 2013 CFS Executive Session.

91.    Barbara Butcher, the OCME Chief of Staff, was the second OCME official to appear at the August 22, 2013 CFS executive session.  See Exhibit "P," at 93-240.

**Plaintiff's Response: Admit.**

92.    Plaintiff made five statements during the appearance of Ms. Butcher at the August 22, 2013 CFS executive session.  Plaintiff's first statement was:: "What I remember is this, Mecki did have a Deputy Director position before Pat.  So Pat was hired to replace her [sic] but my question was because I didn't have this knowledge before.  If Dr. Hirsch was so unhappy with Mecki, MEcki [sic] was given additional responsibilities, she was put in charge of the evidence

department which is one of the busiest departments.  She was also given a significant raise.  Why would all that happen if he were unhappy with her as a manager?"  See Exhibit "P," at 156:17-25.

**Plaintiff's Response: Admit that plaintiff said these words at the executive session, but defendants fail to provide the context necessary to understand their meaning.   During the executive session, the Commission sought information about, among other subjects, the reason that OCME leadership suspended and forced out Prinz as the director of the forensic biology laboratory. Members of the Commission expressed concerned that Prinz had been suspended as a political reaction to the New York Times article that had been published concerning a corrective action that had been ongoing for many months.  (Marks Dec. Ex. P at NYC_E00001660-61, NYC_E00001706-07) Butcher claimed that Prinz was a weak manager and that Hirsch, the former chief medical examiner, had been dissatisfied with Prinz's managerial performance and that he had required that Prinz hire a deputy to run the department, which led to the hiring of Patricia Wojtowicz. (Marks Dec. Ex. P at NYC_E00001662-64, NYC_E00001701-02) Stajic's comments cast doubt on the truthfulness of Butcher's statement by pointing out that Hirsch had assigned Prinz additional responsibilities and a raise.  Stajic also pointed out that, contrary to Butcher's statement that she and Hirsch had required Prinz to hire a deputy for the department, Prinz already had a deputy before Wojtowicz joined OCME.  (Stajic Dep. 46-47, 49-50)**

93.     Plaintiff alleges that one of the reasons that her employment was terminated on April 9, 2015 is because she made the statements at page 156:17-25 of the transcript of the August 22, 2013 CFS executive session.  See Exhibit "B," at 46:1-8.

**Plaintiff's Response: Admits that plaintiff testified that the statement quoted in paragraph 93 above contributed to her dismissal.**

94.     The basis of plaintiff's allegation that her statements at page 156:17-25 of the transcript of the August 22, 2013 CFS executive session is one of the reasons that her employment was terminated on April 9, 2015 is her belief that her statements contradicted Barbara Butcher's statements at page 155:3-8 of the transcript of the August 22, 2013 CFS executive session.  See Exhibit "B," at 46:9 through 47:5.

**Plaintiff's Response: Admit in part, deny in part. Plaintiff testified that she believed that questioning and contradicting Butcher at the executive session about the circumstances of Prinz' separation was part of the reason she was ultimately dismissed.  Stajic did not say that the only statement of Butcher that she had questioned or contradicted was on page 155:3-8 of the transcript of the August 22, 2013 CFS executive session.  (Stajic Dep. 49-51)**

95.     The second statement by plaintiff during the appearance of Ms. Butcher at the August 22, 2013 CFS executive session was: "But he was reporting to Mecki."  See Exhibit "P," at 157:11.

**Plaintiff's Response:  Plaintiff admits that she said the words quoted above to Butcher at the executive session.**

96.     At her deposition, plaintiff did not answer the following question as to whether she claimed that the statement at page 157:11 above was one of the reasons that her employment was terminated on April 9, 2015.: "Do you claim in this action that your statement on page 157, line 11 was one of the reasons that your employment with the New York City OCME was terminated in April of 2015?"  See Exhibit "B," at 48:13-16.

**Plaintiff's Response:  Deny. Plaintiff's counsel objected to the question quoted above. Following the objection, defendant's counsel elected to ask a different question to plaintiff.**

97.     The third statement made by plaintiff during the appearance by Ms. Butcher at the August 22, 2013 CFS executive session was: "I was just wondering why if you feel that somebody is not a good manager, add on more managerial duties.  I mean, evidence is a lot of, it's a big responsibility."  See Exhibit "P," at 157:13-16.

**Plaintiff's Response:  Plaintiff admits that she said the words quoted above to Butcher at the executive session.**

98.     Plaintiff alleges that one of the reasons that her employment was terminated on April 9, 2015 is her statements at page 157:13-16 of the transcript of the August 22, 2013 CFS executive session.  See Exhibit "B," at 49:17 through 50:5.

**Plaintiff's Response: Admit that plaintiff testified the statement quoted in paragraph 93 above contributed to her dismissal.  However, plaintiff also testified that "whole context" of her question to Butcher contributed to her being fired.  (Stajic Dep. 43, 49-51)**

99.     The basis of plaintiff's allegation that her statement at page 157:13-16 of the transcript of the August 22, 2013 CFS executive session constitute one of the reasons that her employment was terminated on April 9, 2015 is: "because I criticized - -um, it appeared that I criticized what Dr. Hirsch did, and, also, maybe more important, I, um, was questioning things that Ms. Butcher said."  See Exhibit "B," at 50:6-16.

**Plaintiff's Response:  Deny. Plaintiff testified, directly before the words quoted above, that her statement at 157:13-16 of the executive session was "a continuation" of the statement she had made on 156:20-25. (Stajic Dep. at 50) Plaintiff also testified that "whole context" of her question to Butcher contributed to her being fired.  (Stajic Dep. 43, 49-51)**

100.     At her deposition, plaintiff testified that during the period of time that plaintiff served as Director of the Forensic Toxicology Laboratory and Barbara Butcher served as

the Chief of Staff of OCME, plaintiff did not express any disagreements with any actions or statements of Ms. Butcher.   See Exhibit "B," at 57:24 through 58:11.

**Plaintiff's Response: Deny. Plaintiff testified she could not recall expressing any disagreement to Butcher about Butcher's statements or actions at OCME during the period that Butcher was chief of staff.  (Stajic Dep. 57-58) In context, this testimony was not meant include Stajic's disagreement with Butcher at the Commission's August 22, 2013, executive session. (Stajic Dep. 56-57)**

101.   The fourth statement made by plaintiff during the appearance by Ms. Butcher at the August 22, 2013 CFS executive session was: "Yeah but that was after Mecki was already."  See Exhibit "P," at 157:21-22.

**Plaintiff's Response:  Plaintiff admits that she said the words quoted above to Butcher at the executive session, along with a missing word "gone or suspended" at the end of the sentence. (Stajic Dep. 50 and Plaintiff Response to ¶ 103, infra)**

102.   Plaintiff testified at her deposition that "there seems to be a word missing at the end of the sentence [at page 157:21-22 of the transcript of the August 22, 2013 CFS executive session].  I believe what I said was that was after Mecki was already gone or suspended."  See Exhibit "B," at 50:17-23.

**Plaintiff's Response:  Admit.**

103.   According to plaintiff, the statement at page 157:21-22 of the transcript of the August 22, 2013 CFS executive session was not**,** in and of itself, one the reasons that her employment was terminated on April 9, 2015: "I don't think that it was that particular question, but it was the whole context of my question, my question to Ms. Butcher."  See Exhibit "B," at 50:24 through 51:7.

**Plaintiff's Response:  Admit that plaintiff did not believe that she was fired because of the quoted eight words on page 157:21-22, and she believed it was necessary to consider the "whole context" of her questions to Butcher. (Stajic Dep. 50-51; see also Plaintiff's Response to ¶¶ 93, 97 100, *supra*)**

104.   The fifth and final statement made by plaintiff during the appearance by Ms. Butcher at the August 22, 2013 CFS executive session was: "No, I don't remember, I'm not on the Executive Committee.  I just know that it was decided by the Executive Committee and then we were told at the Management meeting where it was announced.  I really exactly [sic]." See Exhibit "P," at 158:4-8.

**Plaintiff's Response:  Admit that plaintiff said the words quoted above to Butcher at the executive session, although the last sentence of transcription should have read "I don't remember exactly." (Stajic Dep. 52)**

105.   Plaintiff alleges that one the reasons that her employment was terminated on April 9, 2015 is her statements at page 158:4-8 of the transcript of the August 22, 2013 CFS executive session.  See Exhibit "B," at 52:3 through 52:18.

**Plaintiff's Response: Admit that plaintiff testified that the statement quoted in paragraph 105 above contributed to her dismissal. Plaintiff has alleged that all her statements at the executive session, considered in context, led to her dismissal. (*See* Plaintiff's Response to ¶¶ 93, 97 100, 103, *supra*)**

106.   The basis of plaintiff's allegation that her statement at 158:4-8 of the transcript of the CFS August 22, 2013 executive session is one of the reasons that her employment was terminated on April 9, 2015 is "because it resulted in the question by Mr. Green, um, asking Ms. Butcher if she felt that Dr. Prinz was a bad manager, why didn't she raise that at the executive

committee of the OCME when Dr. Prinz was given additional managerial duties." See Exhibit "B," at 52:19 through 53:3.

**Plaintiff's Response: Admit that plaintiff's statement led to a follow up question by Green, who was the chair of the Commission. Deny that plaintiff's response on pages 52:19 through 53:3 purports to be a complete account of the reasons why Stajic was retaliated against because of her comments at the August 22, 2013 executive session.**

107.    Plaintiff alleges that her statement at page 158:4-8 of the transcript of the August 22, 2013 executive session prompted the following question by CFS Chair Green: "Did you as a member of the Executive Committee when the decision was made to move the evidence area from Dr. Prinz raise concerns, I think she's a bad manager, I think it's a bad idea to do this?" See Exhibit "P, at 158: 9-13; Exhibit "B," at 53:4-7.

**Plaintiff's Response: Admit.**

Plaintiff's participation during the appearance of former OCME Director of the Forensic Biology Laboratory Mechthild Prinz at the August 22, 2013 CFS Executive Session.

108.    Dr. Mechthild Prinz, the former Director of OCME's Department of Forensic Biology, was the third person to appear at the August 22, 2013 CFS executive session. See Exhibit "P," at 240-289.

**Plaintiff's Response: Admit.**

109.    Plaintiff made three statements during the appearance by Dr. Prinz at the August 22, 2013 CFS executive session.  The first statement made by plaintiff was: "I would just like to say that I miss you very much.  I feel that I'm in a different position form [sic] from the rest of the Commission and find it scary because what you and Theresa were doing I don't think that is a reason to dismiss somebody."  See Exhibit "P, at 286:24 through 287:3.

**Plaintiff's Response: Admit.**

110.    Plaintiff alleges that one of the reasons that her employment was terminated on April 9, 2015 is her statements at 286:24 through 287:3 of the transcript of the August 22, 2013 CFS executive session.  See Exhibit "B," at 53:20 through 54:6.

**Plaintiff's Response: Admit.**

111.    The basis of plaintiff's allegation that her statements at 286:24 through 287:3 of the transcript of the August 22, 2013 CFS executive session is one of the reasons that her employment was terminated on April 9, 2015 is: "Because I said I disagreed with the dismissal - - with the reasons for dismissal of both Dr. Prinz and Dr. Caragine."  See Exhibit "B," at 54:1-8.

**Plaintiff's Response: Admit that plaintiff believes that her expressions of disagreement with the dismissals of Prinz and Caragine is one of the reasons for her dismissal. (Stajic Dep. 54-57) Deny that plaintiff's response on pages 54:1 through 54:8 is a complete account of the reasons why Stajic was retaliated against because of her comments at the August 22, 2013 executive session.**

112.    The second statement made by plaintiff during the appearance by Dr. Prinz at the August 22, 2013 CFS executive session was: "So you were actually told why?"  See Exhibit "P," at 287:12.

**Plaintiff's Response: Plaintiff asked Prinz if she was told why she was suspended. (Stajic Dep. 58-59)**

113.    Plaintiff alleges that one of the reasons that her employment was terminated on April 9, 2015 is her statement at the August 22, 2013 CFS executive session at page  287:12 of the transcript of the executive session.  See Exhibit "B", 59:1-8.

**Plaintiff's Response: Admit that plaintiff believes that this comment at the executive session, among others, contributed to her dismissal. (Stajic Dep. 59)**

114.    The third and final statement made by plaintiff during the appearance by Dr. Prinz at the August 22, 2013 CFS executive session, plaintiff was: "So when you were suspended, your [sic] being suspended because?"  See Exhibit "P," at 287:14-15.

**Plaintiff's Response: Admit.**

115.    Plaintiff alleges that one of the reasons that her employment was terminated on April 9, 2015 is her statement at page 287:14-15 of the August 22, 2013 CFS executive session. See Exhibit "B," at 59:14 -20, 50:5.

**Plaintiff's Response: Admit that plaintiff believes that this comment at the executive session, among others, contributed to her dismissal. (Stajic Dep. 59)**

116.    The basis of plaintiff's allegation that her statements at page 287:12 and page 287:14-15 of the transcript of the August 22, 2013 CFS executive session is one of the reasons that her employment was terminated on April 9, 2015 is that: "Um, because of Dr. Prinz's answer that there was no reason for the suspension and there was no reason, um, that Dr. Wojtowicz was given for being terminated."  See Exhibit "B," at 60:4-13.

**Plaintiff's Response: Admit that plaintiff believes that eliciting the above statement from Prinz contributed to her termination. (Stajic Dep. 60) Deny that plaintiff's response on pages 60:4-13 is a complete account of the reasons why Stajic believed she was retaliated against because of her comments at the August 22, 2013 executive session.**

Plaintiff's participation during the appearance by defendant Timothy Kupferschmid at the August 22, 2013 CFS Executive Session.

117.    Defendant Timothy Kupferschmid, the Director of OCME's Department of Forensic Biology, was the third OCME official, and the last person who appeared at the August 22, 2013 CFS executive session.  See Exhibit "P," at 289-374.

**Plaintiff's Response: Admit.**

118.    Plaintiff did not make any statements during the appearance by defendant Kupferschmid at the August 22, 2013 executive session of the CFS.  See  Exhibit "B," at 66:5-10.

**Plaintiff's Response: Admit that plaintiff did not make any on-the-record comments during Kupferschmid's appearance.**

119.    Plaintiff did not state at any time during the August 22, 2013 CFS executive session that the hiring of defendant Kupferschmid by OCME presented a conflict of interest.  See Exhibit "B," at 66:11-18.

**Plaintiff's Response: Admit.**

Requests by the CFS to the DNA Subcommittee at the March 26, 2014 CFS meeting concerning OCME's use of LCN DNA testing and the DNA Subcommittee's response to  three questions posed to it by the CFS

120.    At the March 26, 2014 meeting of the CFS, the CFS requested that the DNA Subcommittee consider three issues related to LCN testing performed at OCME's Department of Forensic Biology.  See Exhibit "Q;" Exhibit "R," p. 5.

**Plaintiff's Response: Admit**

121.    Specifically, at the March 26, 2014 CFS meeting, the CFS requested from the DNA Subcommittee clarification regarding whether: (1) there was a minimum quantity of DNA that must be present before LCN is employed; (2) the standard operating procedures had changed since the initial approval by the DNA Subcommittee of the CFS and the CFS in 2005; and (3) there has been sufficient validation to support any change(s).  See Exhibit "Q."

**Plaintiff's Response: Admit.**

122.    By letter dated June 2, 2014, the DNA Subcommittee advised the CFS that in response to question one asked by the CFS of the DNA Subcommittee at the March 26, 2014 meeting, the Subcommittee "unanimously found that 'scientifically there was no lower limit in the quantity of DNA that must be present before LCN testing could be employed."  See Exhibit "Q."

**Plaintiff's Response: Admit.**

123.    By letter dated September 16, 2014, the DNA Subcommittee advised the CFS that in response to question two asked by the CFS of the DNA Subcommittee, the Subcommittee concluded that "there have been no substantive changes made to Forensic Biology LCN DNA standard operating procedures since its initial approval in 2005." See Exhibit "S."  The DNA Subcommittee also advised the CFS that in response to question three asked by the CFS of the DNA Subcommittee, the Subcommittee determined that "any changes to instrumentation or software that occurred in the LCN procedure had been sufficiently validated."  Id.

**Plaintiff's Response: Admit.**

September 18, 2014 Order and October 2, 2014 Decision of Judge Victor Marrero following a Daubert hearing in United States v. Morgan determining the admissibility of LCN DNA test results at trial

124.    By Order dated September 18, 2014, in the case of United States v. Morgan, 12-Cr. 223 (VM) in the United States District Court for the Southern District of New York, Judge Victor Marrero, found, after holding a hearing under Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993) in connection with the defendant's motion to exclude any evidence at trial of LCN DNA test results, "that the methods of LCN DNA testing utilized by the New York City Office of the Chief Medical Examiner ("OCME") are sufficiently reliable to satisfy the Daubert standard" and thus denied the defendant's motion to exclude evidence at trial of DNA test results. Judge Marrero further stated that a decision setting forth the Court's reasoning and findings was forthcoming.  See September 18, 2014 Order, 12-Cr 223, Dkt. No. 160.

**Plaintiff's Response: Admit.**

125.    On October 2, 2014, Judge Marrero issued a decision setting forth his reasoning and findings in reaching the determination that the methods of LCN DNA testing that OCME employed are sufficient reliable to meet the Daubert standard.  United States v. Morgan,

53 F. Supp. 3d 732 (S.D.N.Y. 2014), aff'd, No. 15-2696-cr, 2017 U.S. App. LEXIS 712 (2d Cir. Jan. 12, 2017).

   **Plaintiff's Response: Admit.**

   126.   In his October 2, 2014 decision in Morgan, Judge Marrero found admissible at trial OCME's LCN DNA test results from a DNA sample of 14.15 picograms, obtained from a pistol, and where OCME determined that there were at least two contributors and the defendant asserted that there were at least three contributors.  See United States v. Morgan, 53 F.Supp. 3d at 735, 743, 745-46.

   **Plaintiff's Response: Admit and refer the Court to Judge Marrero's decision for the Court's holding.**

   127.   In Morgan, the defendant argued, among other things, that that: "OCME's LCN testing protocols are not supported by their internal validation studies.  More specifically, Morgan argues that the protocols derived from OCME's internal validation studies cannot reliably be applied to a 14.2 pg, degraded, mixed sample when the validation studies tested only pristine samples with two contributors at a minimum of 25 pg."  Morgan, 53 F.Supp. 3d at 741.

   **Plaintiff's Response: Admit that Judge Marrero's decision contains the language quoted above.**

   128.   Judge Marrero discussed OCME's validation studies, as well as the testimony of Dr. Craig O'Connor from OCME, and held that the Government "has clearly established that OCME's validation studies are scientifically valid and bear a sufficient analytical relationship to their protocols."  Morgan 53 F.Supp. 3d at 741, 742-43.

**Plaintiff's Response:  Admit that the words quoted above are contained in Judge Marrero's decision. However, the context of those words make it clear that the Court was not endorsing OCME's LCN program.  The Court wrote:**

> The concerns Morgan raises about the limits of the validation studies OCME conducted, as applied in this case, warrant careful inquiry. Even the most outspoken advocates of LCN testing emphasize the need for caution when interpreting results, particularly as mixed DNA quantities are reduced. *See* Caragine et al., *supra.* The Government, however, has clearly established that OCME's validation studies are scientifically valid and bear a sufficient analytical relationship to their protocols. Thus, Morgan's objections go to the weight to be accorded to the evidence, not to its admissibility.

**Morgan**, 53 F. Supp. 3d at 741.


October 24, 2014 CFS Meeting

129.     A meeting of the CFS was held on October 24, 2014.  During that meeting, the Chair of the CFS asked whether there were any comments with respect to the September 16, 2014 letter from the DNA Subcommittee concerning LCN DNA testing.  See Exhibit "T," bates stamp No. S00015.

**Plaintiff's Response: Admit.**

130.     In response to the CFS Chair's question as to whether there were any comments concerning the September 16, 2014 letter from the DNA Subcommittee, one of the CFS Commissioners, Barry Scheck,  stated that the "principal complaint we are making  . . . has this laboratory [OCME] ever done a validation study on samples, mixtures, [um] as was presented by the case in the southern district of [uh] in that instance, it was, I think, 14 or 16 picograms, I can't recall which, [um] but below 25 picograms with a mixture of [uh] three people, when the only validation study that has ever been published [um], and it wasn't on samples replicating casework

it was on buccal swabs [uh] initially, with 50 picograms with mixtures of two people." See Exhibit "T, bates stamp Nos. S00015-S00016.

**Plaintiff's Response: Admit that the quoted language above is an excerpt from Scheck's comments as reflected in the transcript of the October 24, 2014 meeting of the Commission.**

131.     In connection with the issue of OCME's validation studies for LCN testing, particularly with respect to the "case in the southern district," which was a apparently a reference to the September 18, 2014 Order and the October 2, 2014 decision by Judge Marrero in United States v. Morgan, the following exchange occurred between Mr. Scheck and Eugene Lien, the DNA Technical Leader of OCME's Department of Forensic Biology. Mr. Scheck asked Mr. Lien: "[D]o you have an internal validation study demonstrating that you can get [uh] correct answers on samples replicating casework [uh] at 25 picograms or less with mixtures of more than two people?  Do you have that or not, [um] Mr. Lien?"  Mr. Lien responded: "Yes, we do." See Exhibit "T," bates stamp Nos. S00023-S00024.

**Plaintiff's Response: Admit that, during the October 24, 2014, meeting of the Commission, Scheck asked a question concerning OCME's LCN validation studies and that Lien answered as quoted above.**

132.     After some discussion among CFS members following the exchange between Mr. Scheck and Mr. Lien, Mr. Scheck made a motion with respect to OCME's LCN validation studies.  He moved to have OCME provide its internal validation studies to the CFS, with the studies being made public.  The CFS voted and the motion did not pass, with three members in support, Mr. Scheck, Marvin Schechter and plaintiff, and six members opposed.  See Exhibit "T," bates stamp Nos. S00029-S00035; Exhibit "U," p. 4.

**Plaintiff's Response: Admit, except that Scheck's motion, as proposed, was for OCME to produce the validation study that Lien had identified in response to the question Scheck posed as quoted in paragraph 132. Scheck did not request that OCME produce all of its LCN validation studies.  (Marks Dec. Ex. T S00024-29)**

133.    After the defeat of his first motion, Mr. Scheck made a second motion at the October 24, 2014 CFS meeting with respect to OCME's LCN validation studies.   He moved to have OCME provide its internal validation studies to the CFS without making the studies public. The CFS voted and this second motion also did not pass, with three members in support, Mr. Scheck, Marvin Schechter and plaintiff, and five members opposed (one member was unavailable at the moment of the vote).  See Exhibit "T," bates stamp Nos. S00036-S00040; Exhibit "U," p. 4.

**Plaintiff's Response: Admit.**

134.    Plaintiff alleges that she voted in favor of Mr. Scheck's first motion at the October 24, 2014 CFS meeting because she did not believe that the OCME internal validation studies referred to by Eugene Lien at that meeting existed.  See Exhibit "B," at 80:8-12.

**Plaintiff's Response: Admit in part. Plaintiff voted in favor of Scheck's first motion because she did not believe that the study referred to by Lien existed, she believed that Lien's statement was contrary to the testimony of OCME criminalist Craig O'Connor in a criminal case, and because Stajic "strongly believed that if any kind of study exists in a public laboratory, it should be released to the public in the interests of the public and in the interests of criminal science."  (Stajic Dep. 80-82)**

135.    Plaintiff alleges that one of the reasons she did not believe on October 24, 2014 that the OCME internal validation studies referred to by Eugene Lien at the CFS meeting existed

was because of "the extreme reluctance on Mr. Lien's part to release the study."  See Exhibit "B," at 80:18.

**Plaintiff's Response: Admit.**

136.    Plaintiff alleges that one additional reason she did not believe on October 24, 2014 that the OCME internal validation studies referred to by Eugene Lien at the CFS meeting existed was because she believed that Dr. Craig O'Connor testified in a "criminal case" [presumably United States v. Morgan] that the internal validation studies that Mr. Lien referred at the October 24, 2014 meeting did not exist.  See Exhibit "B," at 80:19 through 81:25.

**Plaintiff's Response: Admit.**

137.    Plaintiff alleges that she voted in favor of Mr. Scheck's first motion at the October 24, 2014 CFS meeting not only because she did not believe that the internal validation studies referred to by Mr. Lien at that meeting existed, but also because she "strongly believed that if any kind of study exists in a public laboratory, it should be released to the public in the interests of the public and in the interests of criminal science."  See Exhibit "B," at 82:3-13.

**Plaintiff's Response: Admit; *see* Plaintiff's Response to ¶ 135, *supra*.**

138.    Plaintiff alleges that the reason she voted in favor of Mr. Scheck's second motion at the October 24, 2014 CFS meeting was "[f]or the same reason that I had for voting in favor of the first motion. I believed that in the interests of science, any validation study that's available should be released."  See Exhibit "B," at 85:19 through 86:1.

**Plaintiff's Response: Admit.**

139.    Plaintiff testified that she has not reviewed any internal validation study by OCME for the use of LCN DNA testing because "[t]hat's not my field of expertise."  See Exhibit "B," at 84:4-9.

**Plaintiff's Response: Admit.**

Legislation creating the Root Cause Analysis process at OCME becomes effective in April 2014

140.    On April 11, 2014, New York City Administrative Code §17-207 entitled "Root cause analysis, office of chief medical examiner", became effective.

**Plaintiff's Response: Admit.**

141.    Administrative Code §17-207(a)(2) defines "Root Cause Analysis" as "a process for investigating the causal factors of significant events that shall focus primarily on systems and processes, not on individual performance or error, and shall identify appropriate corrective action, including strategies to prevent the reoccurrence of a significant event or potential improvements in systems or processes that will decrease the likelihood of a significant event occurring the in the future."

**Plaintiff's Response: Admit.**

142.    Administrative Code §17-207(a)(5) defines "significant event" as "an occurrence in the office of chief medical examiner involving the significant likelihood of an act, error or omission that affects the accuracy, reliability or integrity of the reported results of evidence examination or reported results of analysis.  Such act, error or omission shall include, but not be limited to, any (i) act or acts by an employee of the office of chief medical examiner involving intentional fabrication of work product, evidence examination, analysis or test results; (ii) significant error or errors by an employee or in the office of chief medical examiner, or deficiency in a system or procedure used by such office, that may have affected the accuracy of reported results of evidence examination or the accuracy of the reported results of analysis in one or more cases; (iii) failure by an employee of the office of chief medical examiner to follow such office's protocol that may have affected the accuracy of reported results of evidence examination or the accuracy of the reported results of analysis in one or more cases; or (iv) statement in the course of

testimony by an employee of the office of chief medical examiner that significantly misrepresents or misstates her or his education, experience, training or qualifications, or the reported results of any evidence examination or analysis."

**Plaintiff's Response: Admit.**

143.    In his capacity as the agency's root cause analysis officer, OCME's Quality Assurance Director analyzes events, prepares a summary for the Chief Medical Examiner and makes a recommendation as to whether a root cause analysis is warranted.  See Exhibit "C," at 44:19 through 45:9.

**Plaintiff's Response: Admit. However, the chief medical examiner has the ultimate authority to determine if a non-conforming event rises to the level of being a "significant event," such that a root cause analysis is warranted. (Sampson Dep. 44-45)**

144.    Between April 11, 2014, the effective date of New York City Administrative Code §17-207 and April 9, 2015, the date plaintiff's employment was terminated, five "significant events" under New York City Administrative Code §17-207 occurred in OCME's Forensic Toxicology Laboratory which warranted a root cause analysis.  See Exhibit "V."

**Plaintiff's Response: Deny. The first "significant event" referred to by defendant took place in March 2014, which was before the passage of N.Y.C. Admin. Code § 17-207.  (Marks Dec. Ex V. at D1382) The second and third "significant events" occurred in October and November 2014, but the root cause analysis for both were not completed until April 13, 2015, which was after plaintiff was terminated. (Marks Dec. Ex V. at D480 & D488) The fourth "significant event" took place in January 2015, was not reported until April 7, 2015 (two days before plaintiff was dismissed), and the root cause process memorandum was not completed until June 25, 2015. (Marks Dec. Ex V. at D1277) The fifth "significant event"**

- 40 -

**allegedly occurred on March 3, 2015, but was not reported until May 19, 2015, and the root**

**cause analysis was not completed until May 19, 2015. (Marks Dec. Ex V. at D0516)**

First Significant Event and Root Cause Analysis for the Forensic Toxicology Laboratory

145.    In August 2014, OCME assembled a Root Cause Analysis ("RCA")

Committee pursuant to New York City Administrative Code §17-207 to assess the causal factors

of a significant event which occurred in OCME's Forensic Toxicology Laboratory in March 2014.

See Exhibit "V," bates stamp No. D1381

**Plaintiff's Response:  Admit, except there is no evidence that the RCA committee was**

**"assembled pursuant to New York City Administrative Code § 17-207."**

146.    The RCA Committee issued a Report dated November 19, 2014.  See

Exhibit "V," bates stamp Nos. D1381-D1384.

**Plaintiff's Response:  Admit.**

147.    The significant event that was the subject of OCME's November 19, 2014

RCA Report was the Department of Forensic Toxicology having reported results that showed

levels of sodium in the vitreous humor which were significantly elevated above those which are

commonly seen in post mortem samples or generally considered to be compatible with life in ante

mortem samples, even in states of disease.  See Exhibit "V," bates stamp No. D1381.

**Plaintiff's Response:  Admit.**

148.    In March 2014, a Medical Examiner questioned the vitreous humor results

in a report issued by the Forensic Toxicology Laboratory.  See  Exhibit "V," bates stamp No.

D1382.

**Plaintiff's Response:  Admit.**

149.    In connection with the questioning of the vitreous humor results by a Medical Examiner, the Forensic Toxicology Laboratory suspended vitreous humor testing by OMCE while the root cause of the problem, and any causal factors, where identified and assessed. See Exhibit "V," bates stamp No. D1382.

**Plaintiff's Response:  Admit.**

150.    Beginning in April 2014, all OCME Forensic Toxicology Laboratory cases dating to September 2013, approximately 80 cases, were retested by a commercial laboratory. Although some of the cases that were retested produced non-concordant sodium results when compared to the originally reported data, none of the Medical Examiners at OCME relied on those results to aid in determining the cause and manner of death, and thus there was no impact on cases. See Exhibit "V," bates stamp Nos. D1382-D1383.

**Plaintiff's Response:  Admit.**

151.    The RCA Committee concluded, among other things, that the Forensic Toxicology Laboratory's technical review process was a causal factor to the issuance of a report which contained obvious elevated sodium results and recommended three corrective actions. In particular, the RCA Committee found:

> The Laboratory relies on Medical Examiners to interpret vitreous chemical results, as this requires expertise beyond that of Laboratory personnel.  However, stricter technical review guidelines should be written to promote discussion with the Medical Examiners to ensure that questionable results are reported accurately.  In the instance of the elevated sodium report, the technical reviewer of the report did find that the levels of sodium were elevated far above an expected or normal level.  However, given the Laboratory's policy of relying on the Medical Examiner to be the interpreter of toxicology results, the report was reflexively distributed to the Medical Examiner with no prior discussion.  Only upon questions from the Medical Examiner concerning the accuracy of the elevated sodium levels was the case resubmitted for duplicate testing.

See Exhibit "V," bates stamp No. D1383.

**Plaintiff's Response:  Admit that the RCA Committee recommended three corrective actions. However, before the recommendations were issued, the department of forensic toxicology had already "implemented new analytical procedures, a re-testing workflow, and stricter technical review guidelines are consistent with the recommendations made by the RCA Committee."  (Marks Dec. Ex. V at D1384)**

Second Significant Event and Root Cause Analysis for the Forensic Toxicology Laboratory

152.　　On February 15, 2015, OCME's Quality Assurance Director was informed of an error from October 16, 2014 which resulted in an incorrectly reported result from OCME's Forensic Toxicology Laboratory.  See Exhibit "V," bates stamp No. D0480.

**Plaintiff's Response: Admit, although the RCA Report reflects that the Quality Assurance Director was informed on February 13, 2015. (Marks Dec. Ex. V at D0480)**

153.　　After a review, OCME's Quality Assurance Director determined that the October 16, 2014 error by the Forensic Toxicology Laboratory was a "significant event" within the meaning of New York City Administrative Code §17-207, and OCME assembled a RCA Analysis Committee to identify the causal factors and corrective action to be taken for this event. See Exhibit "V," bates stamp No. D0480.

**Plaintiff's Response: Admit.**

154.　　The RCA Report for Event ID #15-003 describes the error as follows.  On September 15, 2014, a medical examiner submitted samples to the Forensic Toxicology Laboratory for basic drug screening.  Basic drug screening is the procedure designed to screen alkaline drugs in biological specimens using gas chromatography/mass spectrometry ("GC/MS").  On the same day, the medical examiner also emailed the Laboratory and informed it that the

decedent was a known Angel Dust user.  Angel Dust is the street name for Phencyclidine ("PCP").

The laboratory received the samples and scheduled testing.  On October 4, 2014, the laboratory

tested blood from the left pleural cavity by GC/MS (the pleural cavity is a narrow space between

the membranes of the lung and inner chest wall). During processing, the label for the peak labeled

as PCP was deleted by the supervisor.  On October 16, 2014, the Forensic Toxicology Laboratory

issued a report with negative results for PCP for blood from the left pleural cavity. On October 22,

2014, the medical examiner requested that the case be re-opened and that the sample be retested.

In addition to blood from the left pleural cavity, the Forensic Toxicology Laboratory also tested

blood from the heart and brain tissue. This time, all samples were positive for PCP, and second

report was issued on November 21, 2014 reflecting this information. Forensic Toxicology repeated

the testing of all samples that were processed simultaneously with the sample that was reported

incorrectly.  This re-testing was performed in March 2015 and involved 18 cases.  No other

discrepancies were discovered.  See Exhibit "V," bates stamp No. D0481.

**Plaintiff's Response: Admit that the RCA Report describes the error as set forth above.**

155.     The RCA Committee identified the causal factors for the error in Event ID #15-003 and recommended a Corrective Action Plan.  Id., pp. D0482-83.  In addition to the causal factors, the RCA Committee identified several contributing factors, which are those that influence the likelihood of the error to occur, but are not root causes in themselves.  The contributing factors identified by the RCA Committee were "*distractions in the laboratory, staff feeling pressure to process cases,* and *supervisors having too many responsibilities*."  See Exhibit "V," bates stamp Nos. D0482-D0483 (emphasis in original).

**Plaintiff's Response: Admit that the RCA Report identifies causal factors for the error and describes contributing factors as quoted above.**

Third Significant Event and Root Cause Analysis for the Forensic Toxicology Laboratory

156. On February 15, 2015, OCME's Quality Assurance Director was informed of a second error from October 16, 2014, the same date as the second significant event described above, which resulted in an incorrectly reported result from OCME's Forensic Toxicology Laboratory. See Exhibit "V," bates stamp No. D0488.

**Plaintiff's Response: Admit, although the RCA Reports reflects that the Quality Assurance Director was informed on February 13, 2015. (Marks Dec. Ex. V at D0488)**

157. After a review, OCME's Quality Assurance Director determined that the second October 16, 2014 error by the Forensic Toxicology Laboratory was a "significant event" within the meaning of New York City Administrative Code §17-207, and OCME assembled a RCA Committee to identify the causal factors and corrective action to be taken for this event.   See Exhibit "V," bates stamp No. D0488.

**Plaintiff's Response: Admit.**

158. The RCA Report for Event ID #15-004 describes the error as follows.  On September 11, 2014, a medical examiner submitted samples to the Forensic Toxicology Laboratory for basic drug screening. Basic drug screening is the procedure designed to screen alkaline drugs in biological specimens using gas chromatography/mass spectrometry ("GC/MS"). The medical examiner noted on the Forensic Toxicology Request Form that drugs were found at the scene and that "Crystal Meth" is suspected. Crystal Meth is a street name for methamphetamine (an amphetamine class drug). The Laboratory received the samples and scheduled testing.  On

September 15, 2014, the laboratory tested decomposition fluid from the right pleural cavity by enzyme immunoassay ("EI").  The pleural cavity is a narrow space between the membranes of the lung and inner chest wall. The EI result was positive for amphetamines as a class of drugs and the GC/MS test was scheduled. The GC/MS result was negative.  On November 14, 2014, the Forensic Toxicology Laboratory issued a report with negative results for decomposition fluid from the right pleural cavity.  On November 26, 2014, the medical examiner requested that the case be re-opened and that the sample be retested. In addition to the decomposition fluid from the right pleural cavity, the medical examiner requested that brain tissue be tested.  The second round of testing confirmed all samples positive for methamphetamine and a second report was issued on February 13, 2015 reflecting this information.  The Forensic Toxicology Laboratory repeated the testing of all samples that were processed simultaneously with the sample that was reported incorrectly. This re-testing was performed in March 2015 and involved 13 cases. No other discrepancies were discovered.  After reviewing the case, Forensic Toxicology modified its protocol.  See Exhibit "V," bates stamp No. D0489.

**Plaintiff's Response: Admit that the RCA report describes the error as set forth above.**

159.   The Root Cause Analysis Committee identified the causal factors for the error in Event ID #15-004 and recommended a Corrective Action Plan.  See Exhibit "V," bates stamp Nos. D0490-492.  As for Event ID #15-003, the RCA Committee identified the following contributing factors: *distractions in the laboratory, staff feeling pressure to process cases,* and *supervisors having too many responsibilities*."  See Exhibit "V," bates stamp No. D0491 (emphasis in original).

- 46 -

**Plaintiff's Response: Admit that the RCA report identifies causal factors for the error and describes contributing factors as quoted above.**

Fourth Significant Event and Root Cause Analysis for the Forensic Toxicology Laboratory

160.     On April 7, 2015, OCME's Quality Assurance Director was informed of an error from January 30, 2015 which resulted in an incorrectly reported result from OCME's Forensic Toxicology Laboratory.  See Exhibit "V," bates stamp No. D1277.

**Plaintiff's Response: Admit.**

161.     After a review, OCME's Quality Assurance Director determined that the January 30, 2015 error by the Forensic Toxicology Laboratory was a "significant event" within the meaning of New York City Administrative Code §17-207, and OCME assembled a RCA Committee to identify the causal factors and corrective action to be taken for this event.  See Exhibit "V," bates stamp No. D1277.

**Plaintiff's Response: Admit.**

162.     The RCA Report for Event ID #15-007 describes the error as follows.  On December 29, 2014, a medical examiner submitted samples to the Forensic Toxicology Laboratory for basic drug screening. Basic drug screening is the procedure designed to screen alkaline drugs in biological specimens using GC/MS.  The medical examiner noted "substance abuse" and "methadone" on the Forensic Toxicology Request Form. The Laboratory received the samples and scheduled testing.  On December 31, 2014, the Laboratory tested femoral blood and urine by EI and GC/MS. The EI result was positive for cocaine metabolite, benzodiazepines, and methadone and negative for morphine. The laboratory scheduled confirmatory tests by GC/MS for benzodiazepines and methadone but did not schedule a confirmatory test for cocaine. On January

30, 2015, the Forensic Toxicology Laboratory issued a report with positive results for benzodiazepines and methadone only.  On March 24, 2015, the medical examiner requested that the case be re-opened and that the sample be retested. The medical examiner questioned the result since drug paraphernalia was found at the scene, strongly suggesting the possibility of illicit or other additional substances.  In addition to the femoral blood and urine, Forensic Toxicology also tested vitreous humor.  This time, in addition to benzodiazepines and methadone, all samples were found to be positive for morphine and cocaine. A second report was issued on April 2, 2015 reflecting the new information. See Appendix B for a complete event chronology.  The Forensic Toxicology Laboratory reviewed and verified that the appropriate confirmatory tests were scheduled for all cases analyzed by involved personnel on December 31, 2014. This review was conducted between May 6, 2015 and May 14, 2015 and involved 36 cases. No other scheduling errors were discovered.  See Exhibit "V," bates stamp No. D1278.

**Plaintiff's Response: Admit that the RCA report describes the error as set forth above.**

163.    The RCA Committee identified the causal factors for the error in Event ID #15-007 as "*1.  The scheduling process does not verify that all confirmatory tests have been scheduled" and  that "2. The final review procedure does not verify that all confirmatory tests have been scheduled" and that "3. The laboratory software is antiquated and is not integrated with the laboratory equipment*."  See Exhibit "V," bates stamp No. 1280 (emphasis in original) and recommended a Corrective Action Plan.  See Exhibit "V," bates stamp Nos. D1279-1282.  In addition, as for Event ID #15-003 and Event ID #15-004, the RCA Committee identified the following contributing factors: "*distractions in the laboratory, staff feeling pressure to process*

*cases, and supervisors having too many responsibilities*." See Exhibit "V," bates stamp No. D0491 (emphasis in original).

**Plaintiff's Response: Admit that the RCA report identifies causal factors for the error as quoted above. Deny that the contributing factors for Event No. 15-007 are quoted accurately. (Marks Dec. Ex. V at D1280)**

Fifth Significant Event and Root Cause Analysis for the Forensic Toxicology Laboratory

164.    On May 19, 2015, OCME's Quality Assurance Director was informed of an error from March 3, 2015 which resulted in an incorrectly reported result from OCME's Forensic Toxicology Laboratory.  See Exhibit "V," bates stamp No. D0516.

**Plaintiff's Response: Admit.**

165.    After a review, OCME's Quality Assurance Director determined that the March 3, 2015 error by the Forensic Toxicology Laboratory was a "significant event" within the meaning of New York City Administrative Code §17-207, and OCME assembled a RCA Committee to identify the causal factors and corrective action to be taken for this event.  See Exhibit "V," bates stamp No. D01516.

**Plaintiff's Response: Admit.**

166.    The RCA report for Event ID #15-008 describes the error as follows.  On December 10, 2014, a medical examiner submitted samples to Forensic Toxicology for comprehensive drug screening.  Comprehensive drug screening involves testing for the presence of multiple drugs in blood and other submitted specimens. The Laboratory received the specimens and scheduled the appropriate tests. On December 19, 2014, a criminalist performed the extraction for the barbiturates batch. That individual was unable to run the liquid chromatography sequence

since he was scheduled for vacation. A second criminalist was assigned to run the liquid chromatography sequence, process and review the data. However, the second criminalist was unable to complete the review because he was transferred to another section of the laboratory. On December 30, 2014, the Assistant Director reviewed the results, controls and quality control data. On March 2, 2015, the laboratory reported a positive result for pentobarbital, 8.0 mg/L by liquid chromatography in femoral blood.  On March 9, 2015, the medical examiner requested analysis of gastric contents. The medical examiner requested this analysis because the positive pentobarbital result was a significant factor in determining the cause and manner of death. While analyzing the gastric contents, the Forensic Toxicology Laboratory did not detect any pentobarbital. The femoral blood was retested and pentobarbital was not detected. At this point, the Forensic Toxicology Laboratory discovered that during the initial analysis of femoral blood, a decomposition peak was mistakenly identified as pentobarbital. On May 19, 2015, the Forensic Toxicology Laboratory issued an amended report.  See Exhibit "V," bates stamp No. D0517.

**Plaintiff's Response: Admit that the RCA report describes the error as set forth above.**

167.    The RCA Committee identified the causal factors for the error in Event ID #15-008 and recommended a Corrective Action Plan.  See Exhibit "V," bates stamp Nos. D0518-D0521.  The RCA Committee also identified the following contributing factors: "*supervisors having too many responsibilities, lack of a protocol for the handoff of cases in the middle of review*, and a *lack of awareness regarding the impact that decomposition has on toxicology analysis*." See Exhibit "V," bates stamp No. D0519 (emphasis in original).

**Plaintiff's Response: Admit that the RCA report identifies causal factors for the error and describes contributing factors as quoted above.**

Appointment of Defendant Kupferschmid as OCME's Chief of Laboratories

168.    In late December 2014, after her appointment as permanent Chief Medical Examiner, defendant Sampson promoted defendant Kupferschmid to the position of Chief of Laboratories.  See Exhibit "M," at 51:17-23.

**Plaintiff's Response: Admit.**

169.    As Chief of Laboratories, defendant Kupferschmid also retained his position as Director of OCME's Forensic Biology Laboratory and now supervises all four OCME forensic laboratories: Forensic Biology, Forensic Toxicology, Histology and Molecular Genetics. See Exhibit "M," at 67:11 through 68:12.

**Plaintiff's Response: Admit.**

170.    Upon becoming Chief of Laboratories in December 2014, defendant Kupferschmid became plaintiff's immediate supervisor.  See Exhibit "M," at 169: 9-21.

**Plaintiff's Response: Admit.**

171.    During a meeting in early January 2015, defendant Kupferschmid asked plaintiff and the two Deputy Directors of OCME's Forensic Toxicology Laboratory, Elizabeth Marker and William Dunn, when they planned to retire.  See  Exhibit "M," at 182:19 through 184:1; Exhibit "B," at 135:11-15.

**Plaintiff's Response: Admit.**

172.    Defendant Kupferschmid explained the reasons why he asked plaintiff, Dr. Marker and Mr. Dunn about their retirement plans: "Because it's good management.  I need to know, you know, who is in it for the long term.  If I need to replace certain people, do I need to

replace one person or all three of the top people." See Exhibit "M" at 184:19 through 185:6. "I needed to plan for the future." Id., at 188:3.

**Plaintiff's Response: Deny. A reasonable jury could conclude that Kupferschmid's inquiry about retirement was motivated by age discrimination, not concerns about succession planning. When Kupferschmid met with Stajic, Marker, and Dunn for the first time in early January 2015 as the chief of laboratories, the first question he asked them is when they planned to retire. (Stajic Dep. 90-91) Stajic and Dunn had never said anything to him about retirement, but because of their years of service and their age, he believed it was an appropriate question to ask. (Kupferschmid Dep. 185-86)**

**Kupferschmid's explanation for his inquiry is implausible. When Kupferschmid asked the question, he claims that he wanted Stajic to remain with OCME. (Kupferschmid Dep. 187-88) However, approximately one month later, in February 2015, Kupferschmid recommended to Sampson that Stajic be terminated. (Kupferschmid Dep. 195) According to Kupferschmid, nothing happened between January and February 2015 that caused him to change his opinion about whether Stajic should remain with OCME. (*Id.*)   Rather, Kupferschmid claims that he made his recommendation about Stajic's dismissal based on comments allegedly made about Stajic in executive committee meetings during 2014 and on her purported reputation at OCME for being difficult and a poor communicator. (*Id.* at 195-96) However, Kupferschmid himself did not find Stajic to be difficult to get along with, and her communications with him were entirely cordial. (*Id.* at 182, 251)**

173.    Plaintiff testified that she encouraged one OMCE to retire: Katerina Sztendera, who had over 40 years of service. See Exhibit "B," at 92:17 through 93:8.

**Plaintiff's Response: Admit that Stajic encouraged Sztendera to retire. Stajic was personally close Sztendera and thought she would financially benefit from retiring. Stajic also knew that because of medical issues, Sztendera was having difficulty commuting to OCME's offices from Queens. (Stajic Dec. ¶ 38)**

The termination of plaintiff's employment on April 9, 2015

174.    On April 9, 2015, at a meeting in defendant Kupferschmid's office attended by defendant Sampson, defendant Kupferschmid, OCME Human Resources Director Nancy Romero and plaintiff, defendant Sampson informed plaintiff that the direction of the agency was changing and that plaintiff's services would no longer be required.  See Exhibit "C," at 204:8-17; Exhibit "B," at 100:4 through 101:12.

**Plaintiff's Response: Admit in part. On April 9, 2015, Sampson told Stajic "we are going in a different direction and your services are no longer required." Stajic was then given a form to sign reflecting that she resigned. Stajic asked if she would be permitted to retire, and Sampson said yes. Stajic also asked about the reason for the decision, and Romero advised Sampson not to answer that question. Sampson followed Romero's advice. Stajic was then allowed to return to her office, which was in a different building. After about 15-20 minutes in which Stajic informed members of her staff about her dismissal, the head of OCME's security department arrived and asked Stajic to leave. (Stajic Dep. 101-104)**

175.    At the April 9, 2015 meeting, plaintiff asked if she would be allowed to retire, and Dr. Sampson responded the affirmative to plaintiff's request.  See Exhibit "C," at 204:12-17; Exhibit "B," at 102:6-9. On April 10, 2015 plaintiff filed retirement papers with the

New York City Employees' Retirement System ("NYCERS"), and is receiving a pension.  <u>See</u>
Exhibit "B," at 103:4-11; 116:16-18.

      **Plaintiff's Response: Admit.**


The factors in Defendant Sampson's decision to terminate plaintiff's employment

      176.    Defendant Sampson viewed plaintiff's work as a scientist to be excellent,
<u>see</u> Exhibit "C," at 18:3-6, but over a period of several years, Dr. Sampson became increasingly
dissatisfied with plaintiff's management of the Forensic Toxicology Laboratory, which culminated
in an event (described below) that for Dr. Sampson, was the "straw that broke the camel's back"
<u>See</u> Exhibit "C," at 49:13-15, and made it clear to her [Dr. Sampson] that "we could not work
together." <u>See</u> Exhibit "C," at 50:24-through 51:4.

      **Plaintiff's Response: Deny. It is not true that Sampson "over a period of several years
became increasingly dissatisfied with plaintiff's management of the Forensic Toxicology
Laboratory." A jury could reject defendants' assertion based on the following
circumstances: 1) Sampson never told Stajic that there was anything wrong with her
performance or that she needed to improve, even though Sampson's normal practice is tell
employees under her supervision when she is dissatisfied with their performance (Sampson
Dep. 78-79); 2) Sampson never consulted with OCME's human resources department about
Stajic's purported performance problems, including Sampson's hand-picked head of human
resources (Sampson Dep. 34-35, 58-60)  3) Sampson never told Stajic's direct supervisor to
document Stajic's performance problems or to counsel Stajic to improve (Sampson Dep. 57,
77); 4) Stajic never received a performance review, warning, memorandum, email, or other
writing reflecting that OCME's leadership was dissatisfied with her management of the**

laboratory (Stajic Dec.¶ 20); 5) Stajic was never told by Graham or Kupferschmid or any they were dissatisfied with her job performance (Stajic Dec.¶¶ 17-19);  6) Sampson asserts that Stajic's deficient job performance was regularly discussed at executive team meetings (Sampson Dep. 34-35), but according to Dina Maniotis, OCME's executive deputy commissioner for administration and finance, Stajic's performance was not discussed at executive team meetings (Maniotis Dep. 96-100); 7) on August 22, 2013, Sampson told the Commission that "all" of the OCME laboratories "always exceeded every expectation that Dr. Hirsch ever had and certainly that I had." (Marks Dec. Ex. P at NYC_E00001584); and 8) OCME represented to the Commission, several days after Stajic's termination, that Stajic's separation had nothing to do with the quality of her work (Scheck Dec. ¶ 14)

Additionally, Sampson has falsely described a conversation with Stajic that she says "broke the camel's back" regarding Stajic's employment, as described below. (*See* ¶ 191, *infra*)

177.    One factor identified by Dr. Sampson that cause her to have a negative assessment of plaintiff's performance was obtaining information from plaintiff: "[w]e had very difficult time getting information from her and her attitude was very, bordering on hostile sometimes."  See Exhibit "C," at 59:11-13; see also Exhibit "C," at 18:16.

Plaintiff's Response: Deny. Neither Sampson nor any of Stajic's supervisors ever expressed to plaintiff that OCME was dissatisfied with how she communicated information or that her attitude was "bordering on hostile." (Stajic Dec. ¶¶ 16, 21) There is also no document of any kind corroborating these claims. Moreover, Stajic's final supervisor, Kupferschmid, testified that he had no difficulty communicating with Stajic and found her

to be cordial in their discussions. (Kupferschmid Dep. at 182, 251) Sampson said that she and Stajic were "friendly" during the period Stajic reported to her. (Sampson Dep. 180-81)

178.     According to defendant Sampson, Dr.  Hirsch experienced a similar problem in eliciting information from plaintiff about cases and the operations of the Forensic Toxicology Laboratory.  See Exhibit "C," at 38:9-11, 38:14-16.

**Plaintiff's Response: Deny. Hirsch never told Stajic that he had any complaint with how she communicated information. (Stajic Dec. ¶ 16) The final performance review that Hirsch completed for Stajic in 1997 stated that Stajic provided "excellent consulting service for the NYPD and all of the New York City District Attorney offices."  (Stajic Dec. ¶ 15 Ex. A at D0009) Hirsch died in April 2016, and his purported out-of-court statements, as recounted by Sampson, are inadmissible hearsay if offered for their truth. A jury could conclude that Hirsch, who supervised Stajic directly or indirectly for approximately 25 years (Stajic Dec. ¶ 14), must have thought well enough of her performance to have her serve in such a significant position for that period.**

179.     Another factor identified by defendant Sampson that caused her to have a negative assessment of plaintiff's performance was a "major increase in the turnaround time" in the Forensic Toxicology Laboratory that occurred in 2011 or 2012.  See Exhibit "C," at 18:23-25.

**Plaintiff's Response: Deny. Stajic and OCME management had for many years sought to be improve the turnaround time of the toxicology laboratory, but this issue had nothing to do with Stajic's dismissal.  For approximately 10 years before OCME dismissed Stajic, she had requested more resources for the Toxicology Laboratory to reduce turnaround times. (Stajic Dec. ¶ 35; Sampson Dep. 232) Sampson, Graham and Kupferschmid had agreed with Stajic that the laboratory should be allocated more**

**resources, but they said that there was not sufficient money in budget to do so. (Stajic Dec. ¶**

**35; Sampson Dep. 232) Moreover, the turnaround times for the toxicology laboratory had**

**substantially improved well before Stajic was fired; indeed, Sampson regarded the**

**toxicology turnaround times in 2014 and 2015 as acceptable (Sampson Dep. 29-30) This is**

**consistent with the published statistics that OCME provided to the for the Mayor's annual**

**management report, which reflect that the median time to complete toxicology cases for fiscal**

**years 2014 and 2015 – a period starting in July 2013 and ending in June 2015 – was**

**substantially below target in the two years before OCME fired Stajic. (Sampson Dep 248-50;**

**Mintzer Dec. Ex. J)**

180.       Dr. Hirsch found the increase in turnaround time in 2011 or 2012 in the Forensic

Toxicology Laboratory unacceptable and told defendant Sampson to tell plaintiff to fix the

problem.  See Exhibit "C," at 18:23 through 19:3.

**Plaintiff's Response: Admit that Dr. Hirsch wanted to improve the turnaround times**

**in the Toxicology Laboratory in 2011 and 2012, but deny that he believed that Stajic was at**

**fault for those statistics, or that this issue had anything to do with Stajic's dismissal from**

**OCME in April 2015, which was more than two years after Hirsch left OCME. (*See***

**Plaintiff's Response to ¶¶ 179 & 180)**

181.       As instructed by Dr. Hirsch, defendant Sampson told plaintiff to fix the problem

with the turnaround time, but the turnaround time did not improve. See Exhibit "C," at 19:13-

20:13.

**Plaintiff's Response: Admit that Hirsch wanted to improve the turnaround times in**

**the toxicology laboratory, but deny that Sampson ever told Stajic that she had to "fix" the**

**problem. Rather, Stajic and Sampson agreed that, given the existing demands of the office,**

**it appeared that it would be necessary for OCME to allocate more resources to the toxicology laboratory to reduce the turnaround times. However, OCME did not have sufficient money in its budget to increase the resources allocated to the laboratory. (Stajic Dec. ¶ 36)**

182.    Because the problem with turnaround time in the Forensic Toxicology Laboratory in 2011 or 2012 did not improve, Dr. Hirsch instructed defendant Sampson to make the following changes to significantly reduce the workload in the laboratory: (1) not to require toxicology tests on every single autopsy case, and to allow the medical examiners to decide if a particular case did not need toxicology; and (2) in those cases in which toxicology tests were conducted, instead of conducting a comprehensive toxicology test in every case, to establish a basic screening test that covered most of the drugs that OCME identifies at an autopsy, and to conduct  more comprehensive tests only if the medical examiner decided it was necessary.  See Exhibit "C," at 19:13 through 20:16.

**Plaintiff's Response:  Admit that OCME implemented the practices described above to reduce the workload of the forensic toxicology laboratory. These changes were consistent with the practices of other public forensic laboratories around the United States. Neither Sampson nor Hirsch ever said or suggested to Stajic that OCME was adopting these changes because of any deficiency in her performance. Moreover, the laboratory has continued to operate under these policies after Stajic was dismissed and replaced.  (Stajic Dec.¶¶ 35-36)**

183.    Another factor identified by defendant Sampson that caused her to have a negative assessment of plaintiff's performance was plaintiff's poor working relationship with the medical examiners. Defendant Sampson testified that the medical examiners did not feel comfortable in discussing their cases with the Forensic Toxicology Laboratory, because "[t]hey

found it to be, [with] Dr. Stajic in particular, a somewhat hostile environment not open to scientific discussion about the findings in the laboratory." See Exhibit "C," at 18:17-22, 23:2-9.

**Plaintiff's Response: Deny. Plaintiff had a good working relationship with the medical examiners at OCME. (Stajic Dep. 138) Plaintiff was not informed of any complaints by the medical examiners concerning her working relationship with them. (Stajic Dec. ¶¶ 16-19; Graham Dep. 61) Nor have defendants produced any documentation concerning such complaints. (Graham Dep. 59-61) A reasonable jury could conclude that, if there were in fact widespread complaints by the medical examiners concerning the toxicology laboratory over the course of plaintiff's 29-year tenure, at least some of those complaints would have been shared with plaintiff or documented.**

184.     Dr. Graham, the First Deputy Chief Medical Examiner, testified that "the medical examiners generally had a hesitation to approach Dr. Stajic with cases because of the interaction that was involved and the function that she was playing was less of a forensic toxicology consultant than that of a technician.  There was - - it seemed an adversarial relationship with the lab being led by Dr. Stajic amongst many of the medical examiners and this was affecting casework."  See Exhibit "D," at 58:12-22.

**Plaintiff's Response: Deny. In the nearly two years that Graham supervised plaintiff, he never informed her of any complaints by the medical examiner or his purported observation that the medical examiners were hesitant to approach Stajic with cases. (Graham Dep. 60-61, 95-98; Stajic Dec. ¶ 18; *see also* Plaintiff's Responses to ¶ 185, *supra*)**

185.     Dr. Graham identified and named nine medical examiners who complained to him about plaintiff.  See Exhibit "D," at 58:22 through 59:6.

**Plaintiff's Response: Deny. Graham's testimony about complaints purportedly made by medical examiners is inadmissible hearsay. There is no non-hearsay purpose for admitting Graham's testimony about the complaints because there is no evidence that Graham shared the complaints with Sampson. Even if Graham's testimony about purported complaints by medical examiners were admissible, a jury could disbelieve Graham for the reasons discussed above. (*See* Plaintiff's Response to ¶¶ 184-185, *supra*)**

186.     Defendant Sampson also testified that medical examiner fellows, medical doctors participating in an advanced training program of great importance to her and to OMCE, reported a negative experience with plaintiff: "Every year the medical examiner fellows, the fellows in training would go up to toxicology and have sometimes it was a three-day course. It got shorter, it got longer at different periods and that was something I was a program director responsible for training for so many years. That was something that was very important to me and the fellows most of the time didn't have a very good experience up there. So that's something we talked about that how to make that laboratory experience better. Her response to me was that for the most part the medical examiners just weren't interested in toxicology. So it wasn't going to get any better." See Exhibit "C," at 174:3-16.

**Plaintiff's Response: Deny. Sampson never informed Stajic that she believed the medical examiner fellows did not have a good experience in the toxicology laboratory, or that she believed that Stajic's contribution to the program was deficient. (Stajic Dec. ¶22) Moreover, Sampson did not testify that the experience of the medical examiner fellows in the toxicology laboratory had anything to do with her decision to dismiss Stajic.**

187.     An additional factor identified by defendant Sampson was that in her assessment, plaintiff failed to make the Forensic Toxicology Laboratory more efficient. Defendant

Sampson testified that "there are things that I think she could have done to make the lab more efficient without additional resources and in fact in one situation there was an offer made by a group called RX Stat.  It is a group that's responsible for overseeing drug overdose [sic] that's prescription medication – particularly it started out with prescription medication adverse consequences and deaths and they offered to me to give any resources that OCME needed to help our support of the toxicology lab because they wanted to get our results faster than they were and I instructed Dr. Stajic at that point to write for these positions.  She needed to write a justification and she never did that and then when I followed up with her asking her why she hadn't done that, she said well, it was only a grant position.  It would last for two years and then go away." See Exhibit "C," at 234:3-21.

**Plaintiff's Response: Deny. Sampson never said to Stajic that she believed that the toxicology laboratory was not operating efficiently or that Stajic was not doing enough to improve efficiencies in the laboratory. (Stajic Dec. ¶ 23) Stajic did not fail to follow Sampson's instruction for pursuing a grant, including the grant from RX Stat. (*Id.*) Sampson also did not testify that the efficiency of the toxicology laboratory had anything to do with her decision to dismiss Stajic.**

188.    Further with respect to the issue of efficiency of the Forensic Toxicology Laboratory defendant Sampson testified that that "I think that just overall the lab, well, was not running as efficiency [sic] as it could have been.  There were within the laboratory a lot of people who were only trained to do one particular thing instead of being cross trained to do multiple things." See Exhibit "C," at 234:4-9.

**Plaintiff's Response: Deny. (*See* Plaintiff's Response to ¶ 187, *supra*)**

189.     Another factor identified by defendant Sampson that was critical to her decision to terminate plaintiff's employment were deficiencies in plaintiff's management of the Forensic Toxicology Laboratory that were further revealed by several root cause analyses that were conducted into errors made by the laboratory, and plaintiff's reaction to one of those errors. Although the errors made by the Forensic Toxicology Laboratory that were the subject of the root cause analyses, were not, in and of themselves, the reason that defendant Sampson terminated plaintiff's employment, see Exhibit "C," at 222:20-24, defendant Sampson testified that "[i]In the root cause analysis [sic] there are discussion of these problems some of which are reflected in the – or reflect on the culture that existed between the toxicology lab and the medical examiners themselves." See Exhibit "C," at 55:12-16.

**Plaintiff's Response: Deny the first sentence of this paragraph, as there is no evidence cited to support it. Admit that the laboratory mistakes reflected in the root cause analysis memoranda had "nothing to do with plaintiff's termination." (Sampson Dep. 222). Deny that the root cause memoranda have any discussion about the purported "culture that existed between the toxicology lab and the medical examiners." (Marks Dec. Ex. V)**

190.     Defendant Sampson testified that one of the first issues came to light as a result of a root cause analysis, one that was conducted in 2014 about errors in the results of tests of the vitreous. See Exhibit "V," bates stamp Nos. D1381-D1384; Exhibit "C," at 48:7-11. "We understand that the lab was getting very out of wack [sic] results at one point and it was necessary to perform a root cause analysis to analyze why that was happening. As part of that it became very clear that the lab were [sic] reporting these results that were clearly abnormal, something wrong and the attitude from the laboratory was that that was really the medical examiner's problem. They just do the tests and the medical examiners need to analyze the results. Of course, that is true to

some extend [sic] but we both felt that this was really, should be a collaborative process.  Clearly there was a problem going on that needed to be addressed.  It was not purely medical examiner problem nor a toxicology problem.  We needed to solve the problem together.  So this was - -t his attitude that this is on the medical examiners was a big problem for Dr. Graham and for me."  See Exhibit "C," at 48:12 through 49:6.

**Plaintiff's Response:  Deny.  The root cause analysis that defendants claim reflects "one of the first issues" with Stajic was completed on November 19, 2014, approximately than 4 1/2 months before defendants terminated Stajic's employment. (Marks Dec. Ex. V at D1381) Contrary to Sampson's claim that the analysis reflects Stajic's unwillingness to work collaboratively with the medical examiners, it demonstrates the opposite. One of the recommendations of the root cause analysis committee in this case was that the forensic toxicology laboratory should adopt "stricter technical review guidelines . . .  to promote discussions with the Medical Examiners to ensure that questionable results are reported accurately." (*Id.* at D1383) As reflected in the report, the forensic toxicology laboratory embraced this concept. Indeed, the laboratory had already implemented steps to address this concern *before* the RCA Analysis Report was issued. As stated in the Report:**

> **As of the date of this report, the Department of Forensic Toxicology has implemented . . . stricter technical review guidelines that are consistent with the recommendations made by the RCA Committee . . . [T]he technical review procedures now require a laboratory manager to discuss the case, when certain conditions are met, with the medical examiner to determine how elevated sodium results from vitreous humor should be reported.**

**(*Id.* at D1384) There is no evidence that Stajic was opposed to collaborating with the medical examiners regarding the issue discussed in RCA Report or with respect to any other issue.**

**Nor is there any evidence supporting the assertion that this issue was part of the reason that Stajic was dismissed by defendants.**

191.     For defendant Sampson, there was a "straw that broke the camel's back" with respect to her decision to discharge plaintiff:

> We had a root cause analysis that involved a case where there was clearly a white powder at the scene, very suspicious for drugs, and the toxicology came back essentially negative.  The medical examiner questioned this because of the scene, didn't make sense.  There was no other good cause of death.  And when the lab looked again indeed, there was cocaine in the specimen.  So obviously, to me obviously a root cause analysis had to be performed because we had a report that did not contain the positive cocaine result when indeed subsequent testing showed that there was cocaine in that specimen.  I called Dr. Stajic about this and asked for an explanation and she said well, you know that she didn't really think this needed a root cause analysis and I said what do you mean.  This is clearly an incorrect report went out and she said well, it is not really incorrect.  I said what do you mean?  There was cocaine in his system.  It is not in the report.  And she said well, it doesn't say there is no cocaine in the system.  It just doesn't report the cocaine that that was in fact there.  And when I hear that my jaw dropped and it became absolutely clear to me that with that kind of attitude to think that a report like that didn't need a root cause analysis, that I could not go forward with her as the head of the toxicology laboratory.  There was – I needed transparency there.  I needed willingness to adhere to this root cause analysis which was producing such great results in the forensic biology lab and also in the toxicology lab.  So much improvement in our system and really that was what, you know, was like I said the straw that broke the camel's back that we could not work together and move the agency in the direction which I needed it to go.

See Exhibit "C," at 48:7-25, 49:2-25, 51, 2-4; Exhibit "V," bates stamp Nos. D1277-D1286.

**Plaintiff's Response: Deny. Sampson initially testified that her conversation with Stajic concerning a potential root cause analysis for a missed cocaine finding took place "a few months" before Stajic was fired on April 9, 2015 and was the "straw that broke the camel's back." (Sampson Dep. 50-51)  Sampson later testified that the conversation was only when she "start[ed]" to consider terminating Stajic.  (Sampson Dep. 74-75)**

In fact, the conversation in question did not occur until *after* Sampson had already decided to fire Stajic. In the testimony quoted by defendants above, Sampson claims that she called Stajic about the toxicology laboratory's error after "subsequent testing showed that there was cocaine in that specimen." (Sampson Dep. 49-50) According to the RCA report, the medical examiner on the case did not ask for re-testing of the sample blood, urine and tissue until March 24, 2015 (Marks Dec. Ex. V. at D1278, D1284), and the toxicology laboratory did not re-issue its report with the corrected cocaine finding until April 2, 2015. (*Id.*) Thus, Sampson and Stajic did not discuss whether a root cause analysis should be conducted regarding the newly confirmed cocaine finding until on or after April 2, 2017. (Sampson Dep. 50-51; Stajic Dec. ¶ 34) However, by March 30, 2015, Sampson had already decided to terminate Stajic's employment. (Maniotis Dep.  166-168; Mintzer Dec. Ex. K; Sampson Dep. 74) Accordingly, Sampson's conversation with Stajic about undertaking an RCA for the missed cocaine finding could not have been a contributing factor in the decision to terminate Stajic's employment.

Sampson has also misstated the substance of her conversation.  Stajic did not suggest to Sampson that the toxicology laboratory's initial report was accurate. (Stajic Dec. ¶ 34) Rather, Stajic noted that toxicology laboratory did not make a scientific error because its initial testing did find that cocaine was present in the sample; instead, as Stajic observed, the error was in the laboratory's failure to schedule a confirmatory test for cocaine, as it had with respect to other drugs that were identified in the sample. (*Id.*)  Stajic also noted that the missing cocaine finding was not reported out of the agency because the medical examiner had noted the possible discrepancy and ordered re-testing. (*Id.*) Sampson did not express any concern with any of Stajic's comments during the call. (*Id.*)

192.    Defendant Sampson further testified: "What bothered me so much was her telling me that that report was not really incorrect.  You have a piece of paper that doesn't say that cocaine is present that would – if the medical examiner had not questioned that that would have gone out incorrectly the cause of death would have been entirely missed." See Exhibit "C," at 238:7-13.

**Plaintiff's Response: Deny.  As discussed above, Stajic did not defend the accuracy of the initial report. Nor was Sampson upset or "bothered" during their discussion. (See Plaintiff's Response ¶ 191, *supra*)**

April 15, 2015 CFS Executive Session

193.    On April 10, 2015, defendant Kupferschmid telephoned Brian Gestring of the CFS and advised him that plaintiff had retired.  See Exhibit "M," at 229:20 through 230:11.

**Plaintiff's Response: Admit.**

194.    In the April 10, 2015 telephone call between defendant Kupferschmid and Brian Gestring of the CFS, defendant Kupferschmid also inquired about plaintiff's status on the CFS because plaintiff was no longer a director of a forensic laboratory.  See Exhibit "M," at 230:9-16.

**Plaintiff's Response:  Admit in part. In their call on April 10, 2015, Kupferschmid said to Gestring that Stajic's retirement from OCME "means [Stajic] is not on the Commission any more, right?" (Gestring Dep. 89; Mintzer Dec. Exs. L & M)**

195.    On April 15, 2015, Brian Gestring of the CFS telephoned defendant Kupferschmid and advised him that the CFS wished to speak in executive session with representatives of OCME about plaintiff.  See Exhibit "M," at 223:8-19.

**Plaintiff's Response: Admit.**

196.     On April 15, 2015, a meeting of the CFS was held.  The minutes of the CFS April 15, 2015 meeting state that the Chair of the CFS, Michael Green, requested "a motion to enter Executive Session to discuss information relating to a current investigation or matters that may lead to the appointment, promotion, demotion, discipline or suspension of a particular person. A motion was made by Dr. Corrado, seconded by Scott McNamara and unanimously approved. The Commission then entered Executive Session."  See Exhibit  "W."

**Plaintiff's Response: Admit.**

197.     Defendant Kupferschmid and Florence Hutner, the General Counsel of OCME, attended the April 15, 2015 CFS executive session on behalf of OCME.  See Exhibit "M," at 228:6-11.

**Plaintiff's Response: Admit.**

198.     Plaintiff, still a member of the CFS, also attended the April 15, 2015 CFS executive session and spoke to the CFS about the termination of her employment.  See Exhibit "B," at 142:1-16.

**Plaintiff's Response: Admit.**

199.     Plaintiff does not remember if she told her fellow members of the CFS at the April 15, 2015 executive session her belief as to why her employment with OCME was terminated. See Exhibit "B," at 142: 18-21.

**Plaintiff's Response: Admit.**

200.     At the April 15, 2015 CFS executive session, members of the CFS asked defendant Kupferschmid and Ms. Hutner about the circumstances of the termination of plaintiff's employment by OCME.  See Exhibit "M," at 228:12-17.

**Plaintiff's Response: Admit.**

201.      At the April 15, 2015 CFS executive session, OCME informed the CFS that it was not going to discuss personnel matters and that the termination of plaintiff's employment had nothing to do with the quality of the work product of the Forensic Toxicology Laboratory.  See Exhibit "M," at 228:25 through 229:12.

**Plaintiff's Response: Admit in part. OCME also said to the Commission that Stajic's termination was unrelated to quality of *her work*. (Scheck Dec. ¶ 14 (emphasis added)) When OCME's witnesses were specifically asked whether Stajic's dismissal was related to her work on the Commission, Hutner and Kupferschmid did nothing to dispel that concern. (Scheck Dec. ¶ 17)**

202.      At the April 15, 2015 CFS executive session, plaintiff was not present during the appearance of defendant Kupferschmid and Ms. Hutner.  See Exhibit "B," at 141: 22-23; Exhibit "M," at 237:23 through 238:3.

**Plaintiff's Response: Admit.**

203.      Plaintiff remained as a member of the CFS until December 2015.  See Exhibit "B," at 142: 25 through 143:1.

**Plaintiff's Response: Admit.**

The appointment of Dr. Gail Cooper as Director of OCME's Forensic Toxicology Laboratory

204.      In May 2015, Dr. Gail Cooper applied for the position of the Director of OCME's Forensic Toxicology Laboratory. See Exhibit "X."

**Plaintiff's Response: Admit.**

205.      Dr. Cooper was one of four applicants whom were interviewed for the position of Director of OCME's Forensic Toxicology Laboratory.  See Exhibit "M," at 71:25 through 72:12, 239:10-23.

**Plaintiff's Response: Admit that Kupferschmid states that he interviewed four individuals for the director of toxicology position.**

206.      Dr. Cooper received a Ph.D. in Forensic Toxicology in 1999.  See Exhibit "X."

**Plaintiff's Response: Admit that Cooper has stated on her resume that she received a Ph.D. in Forensic Toxicology in 1999.**

207.      At the time Dr. Cooper applied for the position of Director of OCME's Forensic Toxicology Laboratory, she had approximately 15 years of post-Ph.D experience in forensic toxicology, including experience in International Organization for Standardization ("ISO") accreditation.  See Exhibit "X"; Exhibit "M," at 240:11-17.

**Plaintiff's Response: Admit that Cooper has represented on her resume that she had approximately 15 years of post-Ph.D. experience in forensic toxicology.**

208.      At the time of her application to OCME, Dr. Cooper was approximately 42 years old.  See Exhibit "B," at 131:13-15.

**Plaintiff's Response: Defendant has previously admitted that Cooper was approximately 41 years old when she was offered employment with OCME.  (Mintzer Dec. Ex. N, Defendants' Answer ¶ 74)**

209.      On July 15, 2015, OCME offered the position of Director of the Forensic Toxicology Laboratory to Dr. Cooper and she accepted the offer on July 17, 2015.  See Exhibit "Y."

**Plaintiff's Response: Admit.**

210.      Dr. Cooper became the Director of OCME's Forensic Toxicology Laboratory in February 2016.  See Exhibit "B," at 131:8-12.

**Plaintiff's Response: Admit.**

211.     Plaintiff believes that Dr. Cooper was qualified "on paper" to be the Director of OCME's Forensic Toxicology Laboratory, but does not believe that "she had extensive experience in postmortem toxicology." See Exhibit "B," at 131:19-23.

**Plaintiff's Response: Admit.**

212.     Plaintiff alleges that she believes that age was a factor in the decision to terminate her employment because Dr. Cooper "was much younger than I am with a lot less experience," and because when defendant Kupferschmid became her direct supervisor, he asked plaintiff about her retirement plans, See Exhibit "B," at 131:1-5 135:11-15.

**Plaintiff's Response: Admit in part. Plaintiff alleges that Cooper's age and experience level, as well as Kupferschmid's retirement inquiries, support the conclusion that age was a factor in the decision to terminate her employment. (Stajic Dep. 131, 135) However, Stajic was not asked at her deposition to provide all the reasons she believes that age was a factor in her dismissal from OCME.**

Plaintiff, pursuant to Local Civil Rule 56.1(b) and the Individual Practices of Hon. Gregory H. Woods, submits this additional statement of material issues of fact that present genuine issues to be tried:

A.     Stajic's Background

213.     Stajic is a 67-year-old woman.  She was born in Yugoslavia in 1950. (Stajic Dec. ¶ 2)

214.     Stajic earned her Bachelor of Science degree in Chemistry from the University of Novi Sad in 1972.  That same year, after receiving her undergraduate degree, Stajic was permitted to immigrate to the United States.  (Stajic Dec. ¶ 3)

215.     Stajic earned a Ph. D. in Forensic Toxicology from the University of Maryland in 1977. (Stajic Dec. ¶ 4)

216.     From 1973 to 1977, Stajic had worked as a toxicologist for Central Laboratories of Associated Maryland Pathologists in Timonium, Maryland. (Stajic Dec. ¶ 5)

217.     Stajic was a toxicologist for the Commonwealth of Virginia, Bureau of Forensic Science from 1977 to 1986.  (Stajic Dec. ¶ 6)

218.     Stajic is a past president of the American Academy of Forensic Sciences, one of the leading forensic science organizations in the country.  She is also a member of the Society of Forensic Toxicologists, The International Association of Forensic Toxicologists, and a past president of the Mid-Atlantic Association of Forensic Scientists. (Stajic Dec. ¶ 7)

219.     Stajic has been a diplomate of the American Board of Forensic Toxicology ("ABFT") since 1980 and a fellow since 2015.  She has served as a director of the ABFT Board since 1986 and is also a past president of that organization. (Stajic Dec. ¶ 8)

220.     Stajic frequently lectures and provides expert testimony in the field of forensic toxicology.  She was appointed Adjunct Associate Professor of Forensic Medicine (Toxicology) at New York University Medical Center in 1987 and Clinical Professor at PACE University, Dyson College of Arts and Sciences, Forensic Sciences Program, in 2010. (Stajic Dec. ¶ 9)

221.     Stajic has received multiple awards from the American Academy of Forensic Sciences. She has also served on the editorial board of the Journal of Forensic Sciences for nearly 30 years and she has authored or co-authored over 58 scientific articles and presentations over a 40-year period. (Stajic Dec. ¶ 10)

B.     Stajic's Employment with OCME

222.     In 1986, OCME hired Stajic as the director of its forensic toxicology laboratory. (Stajic Dec. ¶ 11)

223.     Stajic's duties as the director of the forensic toxicology laboratory included the following: 1) providing administrative, scientific and technical operational management of the laboratory; 2) overseeing training of laboratory personnel; 3) formulating and implementing the laboratory's operational policies, goals, and objectives; 4) supervising all toxicology analyses for deaths under investigation; 5) supervising casework and evaluation of toxicological findings; 6) implementing analytical methodologies related to forensic toxicology; 7) coordinating activities of the forensic toxicology laboratory with medical examiners, the New York City Police Department, and district attorneys' offices; 8) serving as an expert witness in forensic toxicology. (Stajic Dec. ¶ 12)

224.     Stajic did not have any duties at OCME related to the OCME's forensic biology laboratory, which is a separate laboratory from the forensic toxicology laboratory with different leadership and staff. (Stajic Dec. ¶ 13; Kupferschmid Dep. 148-49) The two laboratories are in different buildings. (*Id.*)

225.     Stajic did not have any responsibilities for formulating OCME policy outside of the forensic toxicology laboratory, and she did not have any responsibility for formulating or enforcing OCME's conflict of interest policies. (Stajic Dec. ¶ 25)

226.     Stajic reported to then-chief medical examiner Charles Hirsch from 1989 until 2007; to then-first deputy chief medical examiner Barbara Sampson from 2007 until February 2013; to first deputy chief medical examiner Jason Graham from February 2013 through December

2014; and to chief of laboratories Timothy Kupferschmid from January 2015 until the termination of her employment on April 9, 2015. (Stajic Dec. ¶ 14)

227.    The most recent performance evaluation that Stajic received at OCME before her termination was in February 1997. (Stajic Dec. ¶ 15 & Ex A) The overall rating that Hirsch assigned to Stajic for that review was "fully meets requirements."  Hirsch's complete comments were as follows:

> Under very difficult economic pressures and in spite of loss of experienced staff due to early retirement, Dr. Stajic has done an excellent job maintaining productivity and reliability in the toxicology laboratory. She takes a great challenge in preparing the toxicology laboratory for mandated accreditation by July 1, 1997 in the face of laboratory construction and staff turnover. She has my continued respect and gratitude.
>
> Dr. Stajic also provides excellent consulting services for the NYPD and all of the New York City District Attorney Offices. She is highly regarded as an expert witness in the criminal justice system.

(*Id.*)

228.    During the period in which Stajic reported to Hirsch, he regularly told her that she was doing a good job in managing the toxicology laboratory. Hirsch never told Stajic that he was dissatisfied with any aspect of her performance, including communicating with him or OCME's medical examiners. (Stajic Dec.¶ 16)

229.    Stajic had a positive and close working relationship with Sampson when Stajic reported to her directly. Although Sampson never completed a written performance evaluation for Stajic, she regularly told Stajic that her performance was good and that she appreciated Stajic's work. At no point did Sampson ever say or suggest to Stajic that her performance was deficient. (Stajic Dec. ¶ 17)

230.     In the less than two-year period that Stajic reported to Graham, his managerial style toward Stajic was very "hands off."  Graham did not attend regular meetings of the toxicology staff and he met with Stajic approximately once every 1-2 months. Stajic's relationship with Graham was cordial. Graham never told Stajic that he believed that her performance was deficient in any respect or that the medical examiners – or anyone else – had complained about her. (Stajic Dec. ¶ 18)

231.     Stajic reported to Kupferschmid for only a few months before her employment was terminated. During that time, he did not express any concerns about Stajic's job performance. (Stajic Dec. ¶ 19)

232.     In or about February 2013, the American Academy of Forensic Science awarded Stajic its Distinguished Fellow Award, which is given to only 1 or 2 forensic scientists in the country on an annual basis. OCME announced Stajic's award on its internal website, noting that the agency had never in its history had an employee win this award. (Stajic Dec. ¶ 24)

C.     OCME's Executive Team

233.     From 2007 to the present, the chief medical examiner has held weekly executive team meetings with members of the senior leadership of the agency. (Sampson Dep. 35)

234.     The purpose of the executive team meetings is to develop and institute policy and procedures for the agency, to make management decisions and to review progress of major projects, to find solutions to problematic areas, and to develop new initiatives for the agency. (Butcher Dep. 75)

235.     The persons attending the OCME's executive team meeting have changed over time, but the meetings have always included the chief medical examiner, the first deputy chief

medical examiner, the general counsel of OCME, and the director of the forensic biology laboratory. (Sampson Dep. 35-36)

236.    Dina Maniotis was hired by OCME in November 2013 to be the agency's deputy commissioner of administration and finance. In that job, Maniotis oversaw human resources, finance, and procurement. (Maniotis Dep. 26-28) Maniotis has attended the weekly executive team meetings from the beginning of her employment with OCME. (Maniotis Dep. 69-70)

237.    Stajic was never a member of the executive team that met weekly with of the chief medical examiner. (Stajic Dec. ¶ 25)

238.    While serving as chief medical examiner, Sampson, like her predecessor Hirsch, has been available to discuss concerns about OCME's operations with members of the community. (Stajic Dec. ¶ 37) For example, Sampson has met with families of decedents who had questions about autopsies. (Id.) She also has met with families of September 11 victims who had questions about ongoing efforts to identify lost loved ones. (*Id.*) In addition, Sampson has met with members of the orthodox Jewish community who are interested in making sure that autopsies did not violate their community's religious beliefs. (*Id.*)

239.    The City's website permits any citizen to "send a message to Barbara A. Sampson M.D.-Ph.D. Chief Medical Examiner." http://www.nyc.gov/html/mail/html/mailocme.html (last accessed July 8, 2017)

D.    Stajic's Membership on the New York State Commission on Forensic Science

240.    In 2004, Governor Pataki appointed Stajic to serve on the Commission on Forensic Science. (Stajic Dec. ¶ 26)

241.   Stajic's appointment to the Commission was neither sponsored by nor endorsed by OCME. No one at OCME had any role in Stajic becoming a member of the Commission. (Stajic Dec. ¶ 27)

242.   Stajic's appointment to the Commission was renewed by Governor Spitzer in 2007, Governor Patterson in 2010, and Governor Cuomo in 2013. (Stajic Dec. ¶ 28) No one from OCME had any involvement in any of these reappointments. (*Id.*)

243.   Throughout Stajic's tenure on the Commission, she abstained from commenting or voting on issues that directly related to OCME's forensic toxicology laboratory. (Stajic Dec. ¶ 29)

244.   Stajic did participate in discussions and votes related to OCME's work that did not involve the forensic toxicology laboratory, including matters relating to DNA testing and the work of the forensic biology laboratory. (Stajic Dec. ¶ 29)

245.   After Sampson became the acting chief medical examiner in February 2013, Sampson asked Stajic if she abstained from voting on the Commission on matters related to OCME's forensic biology laboratory. This was the first time that the chief medical examiner had ever inquired directly to Stajic about her work on the Commission. (Stajic Dec. ¶ 30)

246.   Stajic replied to Sampson that it depended on the specific issue before the Commission, but that Stajic generally voted on matters related to the forensic biology laboratory because her duties at the OCME were not related to that laboratory. (*Id.*)

247.   In 2013 or 2014, Sampson discussed with the executive team her belief that Stajic should recuse herself on all OCME-related matters that come before the Commission. (Sampson Dep. 134-35)

248.    Neither Sampson nor anyone else from OCME ever suggested to Stajic that she should recuse herself from participating on all Commission matters that concerned OCME.  (Stajic Dec. ¶ 31)

E.    Changes in the Leadership of the Forensic Biology Laboratory

249.    On January 10, 2013, the *New York Times* published a front-page article regarding the long-standing corrective action being undertaken in OCME's forensic biology laboratory. (*See* ¶¶ 49-52, supra) The headline of the story was "New York Examines Over 800 Rape Cases for Possible Mishandling of Evidence." (Mintzer Dec. Ex. O)

250.    On January 24, 2013, OCME suspended the director of OCME's department of forensic biology, Mechthild Prinz, and one of the department of forensic biology's two deputy directors, Patricia Wojtowicz. (Marks Dec. Ex. I)

251.    In or about March 2013, OCME hired a consultant, Sorenson Forensics, to assess the performance of the forensic biology laboratory. (Kupferschmid Dep. 22-24) Kupferschmid worked for Sorenson and was the lead consultant on the project. (Kupferschmid Dep. 22-24; Marks Dec. Ex. L at S01035)

252.    Approximately two years before OCME hired Sorenson, Kupferschmid had been part of a team of scientists that audited OCME's forensic biology laboratory as part of re-accrediting process for ASCLD/LAB. (Kupferschmid Dep. 17-19) That audit found no out-of-the-ordinary issues and the forensic biology laboratory was reaccredited. (*Id.*)

253.    During one of Kupferschmid's on-site visits to OCME while working for Sorenson in March 2013, Barbara Butcher, asked Kupferschmid if he had any recommendations if OCME needed to hire a new director for the forensic biology laboratory. Kupferschmid responded: "Besides me?" and listed several other potential candidates. (Kupferschmid Dep. 33-34)

254.     On May 2, 2013, Kupferschmid issued his final report, which recommended that OCME replace the leadership of the forensic biology laboratory, including Prinz. (Kupferschmid Dep. 27-30)

255.     On May 3, 2013, Prinz, who had been suspended since January 24, 2013, resigned as director of OCME's forensic biology laboratory. (Marks Dec. Ex. N)

256.     Kupferschmid formally applied for director of forensic biology position about one week after Prinz resigned. (Kupferschmid Dep. 38)

257.     OCME formally offered Kupferschmid the position of director of forensic biology in June 2013. (Kupferschmid Dep. 42-43)

258.     After OCME offered Kupferschmid the position, during a meeting in Sampson's office, Sampson informed Stajic about Kupferschmid's hiring. In response, Stajic inquired whether there was a conflict of interest in hiring Kupferschmid for the position shortly after he authored a memorandum as a consultant in which he called for new management in the forensic biology laboratory. (Stajic Dep. 27-28)

259.     Stajic raised this issue because, having read the Sorenson report, plaintiff believed it would be a conflict of interest to offer the laboratory director position to the person who just recommended that the laboratory's management be replaced. (Stajic Dep. 28-29) Stajic believed that other members of the Commission would have the same concern. (Stajic Dep. 31)

260.     Sampson replied to plaintiff that she did not think hiring Kupferschmid would constitute a conflict of interest, and that she consulted with OCME's general counsel about the issue. (Stajic Dep. 29)

F.      Commission Oversight of the Changes in Forensic Biology Laboratory

261.    On August 22, 2013, the Commission held a special executive session meeting to discuss developments with OCME's forensic biology laboratory.  The Commission requested that Sampson, Butcher and Kupferschmid appear. (Mintzer Dec. Ex. P)

262.    Two days before the executive session, Sampson advised members of her staff attending the session that "[w]e must answer their questions fully and honestly while remaining sweet (the last point is a tip from Dr. Hirsch on testifying in general)." (Mintzer Dec. Ex. Q)

263.    During the executive session, various commissioners asked questions to OCME witnesses about, among other issues: the circumstances of Prinz's suspension and resignation (Marks Dec. Ex. P at NYC_E00001585-65, NYC_E00001625-26, NYC_E00001708-09); Kupferschmid authoring a critical report about the management of the forensic biology laboratory when he had in 2011 been part of a team that approved the accreditation of the laboratory (*id.* at NYC_E00001598-99, NYC_E00001836-40); and the selection of Kupferschmid as the director of the forensic biology laboratory.  (*Id.* at NYC_E00001626-28)

264.    As Stajic expected, commissioners also expressed concern about the appearance of a conflict of interest in Kupferschmid co-authoring a report calling for new leadership at the forensic biology laboratory and then seeking the vacated position soon after his report was issued. (Marks Dec. Ex. P at NYC_E00001851-59)

265.    During the executive session, Stajic made statements reflecting her view that Prinz had been forced out of her position unfairly and that OCME's leadership, particularly Butcher, had not accurately described the circumstances of Prinz's removal.  (*See* Plaintiff's Response to ¶¶ 87-116 *supra)*

266.    During the executive session, Sampson stated to the Commission that the forensic biology laboratory has "always exceeded every expectation that Dr. Hirsch ever had and certainly that I had. I think that is true for all of our laboratories across the board." (Marks Dec. Ex. P at NYC_E00001584)

267.    Sampson believed that several of the commissioners during executive session had questioned her judgment and integrity. (Sampson Dep. 106) Sampson believed that commissioners Barry Scheck, Peter Neufeld, Marvin Schechter and chair Michael Green were adversarial and spoke to her in a "lawyer tone." (*Id.*)

268.    Upon leaving the executive session, Kupferschmid sent an email to Sampson, Bucher and other colleagues under the subject heading "Commish inquisition" stating in full: "At best they [the Commission] painted me to be an incompetent buffoon who does not know how to conduct a management review. At worst I am an unethical, immoral ass who schemed with OCME to oust Mecki [Prinz] and get her job." (Mintzer Dec. Ex. R at NYC_E00000007)  Several minutes later, Kupferschmid followed up with another email stating "I'm sure the two Barbaras [Sampson and Butcher] seem even worse than I do." (*Id.* at NYC_E00000006)

269.    As reflected in the email, Kupferschmid was deeply upset after the executive session, which he regarded as an "inquisition" and a "distraction." (Kupferschmid Dep. 92-94)

270.    Butcher responded to Kupferschmid's emails by referring to the executive session as an "insane hearing."  (Mintzer Dec. Ex R at NYC_E00000006)

271.    Butcher felt that she was treated inappropriately during the executive session, and that at times there was antipathy and hostility towards her she could not understand.  (Butcher Dep. 88-91)

272.     The day after the executive session, Butcher wrote to OCME attorney Mimi Mairs that Stajic had behaved "badly" during the hearing. (Mintzer Dec. Ex. R at NYC_E00000006)

273.     Butcher told Sampson that Stajic had been hostile and condescending to her at the executive session, and that Stajic should have recused herself from participating. (Butcher Dep. 99-100)

274.     Within a week of the executive session, Sampson and Butcher spoke to Kupferschmid and expressed unhappiness about the session, including Stajic's participation. Kupferschmid explained: "[Sampson and Butcher] were unhappy with the entire [hearing] process. [Stajic] was part of the process. So by the transitive property they were upset with [Stajic] as well." (Kupferschmid Dep. 99-100)

275.     In the same discussion, Sampson or Butcher informed Kupferschmid that Stajic believed his hiring was a conflict of interest. (Kupferschmid Dep. 101-02)

276.     Sampson and Butcher told Kupferschmid that Stajic's views about his appointment were contrary to one of OCME's core values, which is "agency first." (Kupferschmid Dep. 102-03)

277.     On September 13, 2013, the Commission sent a letter to Catherine Leahy-Scott, the Inspector General of New York State, concerning some of the issues discussed at the executive session of August 22, 2013. (Mintzer Dec. Ex. S) The inspector general's office was then in the process of investigating issues concerning OCME's forensic biology laboratory. (See Plaintiff's Response to ¶¶ 58-59, *supra*)

278.     The Commission's letter to the inspector general was signed by chairperson Green, but it was sent on behalf of the entire Commission. Each of the commissioners' names appeared on the letter, including Stajic's. (Mintzer Dec. Ex. S)

279.    On October 2, 2013, the Commission sent a letter to Mayor Michael Bloomberg, which was substantially similar in content to the letter it had sent to the inspector general. Like the previous letter, chairperson Green signed on behalf of the entire Commission. Each of the commissioners' names appeared on the letter, including Stajic's. (Mintzer Dec. Ex. T at NYC_E00000002-4)

280.    The final paragraph of the Commission's letter to the Mayor states as follows:

> While our review into these events will continue, we thought it important to inform you of our concerns. We hope that that the search for, and selection of, a permanent Chief Medical Examiner will result in the merit-based selection of a first-rate scientist. This is imperative since the Chief Medical Examiner will ultimately have to review and resolve the controversy surrounding the sweeping personnel changes at the OCME which appear, from our review, to have been made without sufficient basis.

(*Id.* at NYC_E00000004)

281.    Sampson and Butcher received a copy of the Commission's letter to the mayor. (Sampson Dep. 146-49; Butcher Dep. 143-44)

282.    Sampson was troubled by the letter. Sampson understood the final paragraph of the letter to be a suggestion that the mayor appoint someone other than herself to be the permanent chief medical examiner, which she found "hurtful." (Sampson Dep. 146-149)

283.    After Butcher received the Commission's letter to the mayor, she sent an email to deputy mayor Linda Gibbs, with a copy to Sampson, in which she described the August 22, 2013, executive session as an "interrogation." Butcher also wrote that the letter to the mayor appeared to be a "retaliatory strike on our agency and leaders." (Mintzer Dec. Ex. T at NYC_E00000001)

284.    After the executive session on August 22, 2013, Stajic's relationship with Sampson changed noticeably. Sampson had always been cordial and friendly with Stajic over the many years they had worked together. After the executive session, Sampson became cold and curt toward

Stajic. When Stajic came into her office to discuss work matters, Sampson was unwelcoming to Stajic. (Stajic Dep. 62-63)

285.    On December 17, 2013, Mimi Mairs, a lawyer for OCME, distributed a copy of the complete transcript of the August 22, 2013, to individuals in the Mayor's office, several members of the New York City Law Department, as well Sampson, Butcher and OCME General Counsel Jody Lipton. (Mintzer Dec. Ex. U; Butcher Dep. 168-72)

286.    On January 10, 2014, Butcher distributed another copy of August 22, 2013, executive session transcript to Sampson, Kupferschmid and Mairs.  (Mintzer Dec. Ex. V; Butcher Dep. 172-175)

G.    OCME's Reaction to Stajic's Votes for Disclosure of OCME Low Copy DNA Study

287.    The most common form of forensic DNA testing is short tandem repeat analysis ("STR").  When a sample contains large amounts of DNA – more than 16 cells worth – the sample can be tested using "high template" STR procedures. (Mintzer Dec. Ex. W at 8)

288.    From approximately 2006 through December 2016, OCME utilized an STR testing method known "low template," "high sensitivity," or "low copy number" ("LCN") DNA testing on samples containing less than 100 picograms of DNA, or less than approximately 16 cells worth of DNA.  (*Id.* at 8, 14; Lien Dep. 68-69)

289.    High template DNA testing requires amplifying DNA from a sample over 28 cycles, but LCN testing requires 31 amplification cycles. (Lien Dep. 68)

290.    OCME discontinued its use of LCN DNA testing program as of January 1, 2017. (Lien Dep. 69)

291.    Although OCME's use of LCN DNA testing in criminal case was approved by the Commission's DNA Subcommittee, its use has remained controversial in the forensic science and legal communities. (Sampson Dep. 155-56; Kupferschmid Dep. 122)

292.    In *People v. Collins*, 15 N.Y.S.3d 564 (N.Y. Sup. Ct. 2015) ("*Collins*"), the Court held that OCME's LCN testing was not generally accepted in the relevant scientific community and declined to admit the results of LCN testing in evidence in a criminal case. *Id.* at 576.

293.    The Court in *Collins* issued its decision after a lengthy hearing.  The Court initially announced its decision orally on November 7, 2014, and, following re-argument, issued a written decision on July 2, 2015. *Collins*, 15 N.Y.S.3d at 582-83.

294.    OMCE has not publicly disclosed the internal validations studies it conducted for its LCN DNA program. (Kupferschmid Dep. 133-34; Sampson Dep. 156-57) OCME claims that releasing those studies would lead to confusing and misunderstanding among the public. (*Id.*)

295.    On October 24, 2014, the Commission met and discussed, among other subjects, OCME's LCN DNA program. (*See* ¶ 129, *supra*)

296.    Following the October 24, 2014 meeting of the Commission, in which Stajic voted in favor of commissioner Scheck's motions to have OCME disclose certain of its LCN internal validation studies (*see* ¶¶ 132-33, *supra*), senior employees of OCME communicated about Stajic's votes.  (Sampson Dep. 159-64; Kupferschmid Dep. 150-56; Lien Dep. 111-136)

297.    Immediately after October 24, 2014 meeting, Lien sent an email to Kupferschmid and Mairs with the subject heading "LCN" that stated:

> LCN was a hot topic. Grilled for 30 minutes, it seemed. Had 2 motions to produce validation for the Commission but was vote down. 3 members voted yes: the 2 defense lawyers and our own Marina. Gotta love it.

(Mintzer Dec. Ex. X)

298.    Kupferschmid forwarded Lien's email to Sampson. Sampson replied: "Hold me down." (*Id.*) By using this expression, Sampson meant to convey that she was upset enough about Stajic's votes to hurt someone and needed to be held back. (Sampson Dep. 163-64)

299.    Later that day, Mairs replied to Lien's email quoted above as follows: "Huh? Marina voted for FBio to be compelled to produce validation of LCN? To whom? Post mortem on Monday please." (Mintzer Dec. Ex. Y)

300.    The same day, Lien responded to Mairs:

> Scheck made 2 motions: 1) That the OCME produce LCN Validation documents to the Commission and the Commission will make the validation PUBLIC. 2) That the OCME produce LCN Validation documents to the Commission and it will NOT be made public. Both motions were DEFEATED 3-6 [sic]. You would think that the 3 people FOR the motions would be the defense lawyers, but only 2 were present (Neufeld was absent). Marina was the 3rd vote FOR us producing the validation.

(Mintzer Dec. Ex. Y)

301.    Mairs replied, referring to Stajic: "She sucks." (Mintzer Dec. Ex. Y)

302.    Lien agreed that Stajic "sucked" for voting as she did.  (Lien Dep. 134-36, 139)

303.    Kupferschmid discussed Stajic's votes with Lien and Meredith Rosenberg, another OCME employee in the Forensic Biology Laboratory. Each of them felt that Stajic's votes were "odd." (Kupferschmid Dep. 151)

304.    Lien also discussed Stajic's vote with Sampson, who felt disappointment that Stajic voted as she did. (Sampson Dep. 164-65)

305.    Kupferschmid was also upset by Stajic's votes. (Kupferschmid 149-50)

H.     Kupferschmid Becomes Stajic's Supervisor

306.     In or about late-December 2014, Sampson promoted Kupferschmid to a newly created position, chief of laboratories. In that role, Kupferschmid became Stajic's direct supervisor. (Kupferschmid Dep. 51, 68)

307.     Kupferschmid had no experience in toxicology when he became Stajic's supervisor. (Kupferschmid Dep. 68, 162-163)

308.     Kupferschmid met with Stajic and her two deputy directors, Elizabeth Marker and William Dunn, for the first time as the chief of laboratories in early January 2015. (Stajic Dep. 90-91)

309.     At the meeting, the first question Kupferschmid asked is when they each planned to retire. (Stajic Dep. 90-91) Stajic said she had no plans to retire. (*Id.*)

310.     Stajic and Dunn had never said anything to Kupferschmid about retirement, but because of their years of service and their age, Kupferschmid believed it was an appropriate question to ask. (Kupferschmid Dep. 185-86)

311.     At the time Kupferschmid asked the question, Kupferschmid claims that he wanted Stajic to remain with OCME. (Kupferschmid Dep. 187-88)

312.     Approximately one month later, in February 2015, Kupferschmid recommended to Sampson that Stajic be terminated. (Kupferschmid Dep. 195)

313.     According to Kupferschmid, nothing transpired between January and February 2015 that caused him to change his opinion about whether Stajic should remain with OCME. (*Id.*)

314.     Kupferschmid claims that he made his recommendation about Stajic's dismissal based on comments allegedly made about Stajic in executive committee meetings during 2014 and based on Stajic's reputation at OCME for being difficult to get along with. (*Id.* at 195-96)

315.    Kupferschmid did not find Stajic to be difficult to get along with, and her communications with him were entirely cordial. (*Id.* at 182, 251)

316.    Stajic is the only manager who Kupferschmid recommended firing since he joined OCME. (*Id*. at 218)

I.    Termination of Stajic's Employment with OCME

317.    Sampson claims that she began to consider the possibility of terminating Stajic's employment when she had a conversation with Stajic about undertaking a root cause analysis for a cocaine finding that the forensic toxicology laboratory initially did not report correctly. (Sampson Dep. 74-75)

318.    According to Sampson, she decided that Stajic should be terminated after a series of discussions with her executive team about Stajic in 2013 through 2015.  (Sampson Dep. 68-75)

319.    Sampson claims that her executive team reached a "consensus" that Stajic should be separated in March 2015, and at that point Sampson made the decision to terminate Stajic's employment. (Sampson Dep. at 74-75)

320.    There are no notes, emails, memoranda or writings reflecting the executive team had any conversations about Stajic's performance or employment status. (Sampson Dep. 72-73) OCME general counsel Florence Hutner began attending the executive team meetings in late 2014 and took notes at the meetings she attended, but those notes do not reflect any discussion about Stajic's performance or the possibility of terminating her employment. (Mintzer Dec. Ex. CC)

321.    In fact, according to Maniotis, the executive team did not discuss Stajic's job performance or the possibility of terminating her employment at any time after Maniotis joined OCME in November 2013.  (Maniotis Dep. 26-28, 69-70, 96-98) Maniotis was responsible for

overseeing human resources and would have paid close attention to any discussion about the potential termination of a senior manager. (Maniotis Dep. 172)

322.    The first time that Maniotis spoke with Sampson about Stajic was when Sampson informed her that Stajic was not meeting "operational management expectations for the laboratory" and requested that Maniotis find out the appropriate process to separate Stajic. (Maniotis Dep 98-99)

323.    On March 30, 2015, Maniotis sent an email to Nancy Romero, the Assistant Commissioner of Human Resources, asking "What is Marina's underlying civil service title?" Mintzer Dec. Ex K)

324.    Maniotis sent this email to Romeo within a day of when Sampson informed Maniotis about her decision to terminate Stajic's employment. (Maniotis Dep. 168-69; Mintzer Dec. Ex K)

325.    On March 31, 2015, Romero responded to Maniotis as follows: "Marina has no underlying title. I contacted DCAS. They said you can move forward with the plan. She is a manager at will and has no rights." (Mintzer Dec. Ex. K)

326.    The "plan" referred to was the plan to terminate Stajic's employment. (Maniotis Dep. 169)

327.    On April 2, 2015, the OCME Forensic Toxicology Laboratory issued an amended report correcting the laboratory error that eventually became the subject of root cause analysis report number 15-007.  (*See* ¶ 162, *supra*; Marks Dec. Ex. V. at D1278, D1284)

328.    Sampson and Stajic discussed whether a root cause analysis was required for this error after the amended toxicology report was issued.  (Stajic Dec. ¶ 34; Sampson Dep. 49-50)

This conversation occurred after Sampson had already decided to fire Stajic. (*See* ¶¶ 162, 191 and Plaintiff's Responses)

329.     In or about March or early April 2015, Sampson met with deputy mayor Lilliam Barrios-Paoli at City Hall. Sampson told Barrios-Paoli that she planned to terminate Stajic's employment.  During the same conversation, Sampson "reminded" Barrios-Paoli that Stajic was on the Commission, in case there were any repercussions from Stajic's dismissal.  (Sampson Dep. 198-200)

330.     Sampson decided to terminate Stajic's employment without ever having told Stajic that she was dissatisfied with Stajic's attitude or how she ran the forensic toxicology laboratory. (Sampson Dep. 78-79)

331.     Sampson's normal practice is to inform an employee under her supervision when she is dissatisfied with his or her performance so that the employee has a chance to improve. (*Id.*)

332.     Sampson claims she chose not to inform Stajic of her dissatisfaction because she was convinced that Stajic was never going to change. (*Id.* at 78-79, 174-75) At her deposition, Sampson explained her reasoning as follows:

> Q. Is it your practice when an employee under your supervision is not performing in a way that you want them to perform to tell them what they are doing wrong?
>
> A. Yes.
>
> Q. Why is that your practice?
>
> A. Because you hope by educating the employee and setting the expectations that they will improve their performance.
>
> Q. And do you do that with your employees?
>
> A. I do.
>
> Q. Is there a reason why you never told Dr. Stajic about any of the concerns that you identified about her performance?

A. Yes. Because they were not really about her performance. As I said, she is an excellent scientist. The lab was getting accredited by the American Board of Forensic Toxicology. It is more about attitude, culture and the direction that the agency was going in. I was convinced that having known Marina since 1998 when I joined the Medical Examiner's Office, that this was her personality. This is how she ran the lab and no matter what I did to counsel her this was not going to change.

Q. But in fact you didn't do anything to counsel her; isn't that true?

A. I felt that this was an irreparable situation.

Q. So you determined it was an irreparable situation despite the fact that you never brought these issues to her attention; that's your testimony?

A. I decided that it was an irreparable situation and that she had to go.

Q. Even though you never brought those issues to her attention; yes or no Ma'am?

A. Yes.

(*Id.* at 78-79)

333.    Sampson, Kupferschmid and Romero informed plaintiff that her services were no longer required on April 9, 2015. (Stajic Dep. 101)

334.    OCME did not provide Stajic any prior notice of the decision to terminate her employment.  (*Id.*; Sampson Dep. 201)

335.    After defendants informed plaintiff that her employment was ending, they permitted her to return to her office. (Stajic Dep. 103-05)

336.    After about 20 minutes, OCME had a security guard instruct Stajic that she needed to leave the building immediately. (*Id.*)

337.    In contrast to defendants' termination of Stajic, when Barbara Butcher was informed by Sampson that she would not be able to continue in her position, Butcher was given weeks of notice of her termination and even afforded the opportunity to go on medical leave. (Sampson Dep. 132-33)

J.    Commission's Executive Session of April 15, 2015

338.    On April 10, 2015, Kupferschmid called Brian Gestring to advise the Commission that Stajic had retired and was no longer the director of OCME's Toxicology Laboratory. In the same call, Kupferschmid asked whether Stajic's retirement from OCME "means [Stajic] is not on the Commission any more, right?" (Gestring Dep. 89; Mintzer Dec. Exs. L & M)

339.    On April 15, 2015, the Commission held a regularly scheduled public meeting. After that meeting, the Commission went into executive session. The purpose of the executive session was to ask OCME about the circumstances of Stajic's termination. (Scheck Dec. ¶ 11)

340.    Before the executive session, Scheck and other commissioners were concerned that OCME's decision to terminate Stajic was related to her vote in favor of Scheck's motions to have OCME disclose its LCN validation study. (Scheck Dec. ¶ 12)

341.    Kupferschmid and OCME general counsel Florence Hutner appeared at the April 15, 2015, executive session on behalf of OCME. (Scheck Dec. ¶ 13)

342.    During the executive session, Scheck asked the OCME witnesses whether Stajic's dismissal was related to how she did her job. Hutner responded, in substance, that Stajic's separation had nothing to do with the quality of her work in the forensic toxicology laboratory. (Scheck Dec. ¶ 14; Green Dep. 20)

343.    Scheck then asked why Stajic was fired. Hutner said that OCME would not comment further about the reasons for personnel decisions. (Scheck Dec. ¶ 15)

344.    At some point in the executive session, more than one commissioner expressed concerns about whether Stajic was fired in retaliation for her work on the Commission, specifically her recent votes regarding OCME's disclosure of the low copy DNA internal validation study identified by Lien. (Scheck Dec. ¶ 16)

345.    The responses of Kupferschmid and Hunter did nothing to dispel the Commission's concern that Dr. Stajic's change in employment status was in retaliation for her role as a member of the Commission." (Scheck Dec. ¶ 17; Mintzer Dec. Ex. L)

346.    After the executive session on April 15, 2015, Sampson sent an email to deputy mayor Lilliam Barrios-Paoli. The email read, in relevant part:

> The executive session went alright. The head of the Commission Mark Green asked repeatedly for details about Dr. Stajic, and we did not offer any which "left a bad taste in his mouth". That was the worst of it. We reiterated that we had no question about Dr. Stajic's integrity or the quality in the lab.

(Mintzer Dec. Ex. Z)

347.    On April 22, 2015, the Commission requested that the inspector general investigate the circumstances of Stajic's dismissal from OCME. (Mintzer Dec. Ex. L; Green Dep. 26)

348.    On April 27, 2015, the inspector general responded to the Commission and declined to investigate Stajic's termination because it was beyond the inspector general's jurisdiction. (Mintzer Dec. Ex. AA; Green Dep. 27-28)

349.     On June 29, 2015, the Commission sent a letter to the inspector general, renewing its request for an investigation into Stajic's dismissal from OCME. (Mintzer Dec. Ex. M; Green Dep. 28-30)

350.    The Commission's June 29, 2015 letter states, in part: "Clearly it is problematic to the statutory goals of the commission if, indeed, a commissioner is forced to resign from employment because of his or her opinions." (Mintzer Dec. Ex. M)

351.    In explaining the meaning of this sentence, Green, the chair of the Commission testified:

> [I]f commissioners are going to be able to make meaningful decisions and the decisions of the commission are going to mean anything, people should be able to exercise their independent judgment free of any threat of retaliation and they should be free to make the decisions or the votes that they feel are warranted based on the facts and circumstances presented to them. And if they are not, they could be problematic for the commission, because we could get decisions that are not based on the facts that we have in front of us.

(Green Dep. 34-35)

352.    On December 17, 2015, the Inspector General sent a letter to the Commission stating that she had referred the matter to the New York City Department of Investigation and considered the matter closed.  (Mintzer Dec. Ex. BB; Green Dep. 35-36)

353.    The New York City Department of Investigation never responded to the referral from the New York State Inspector General.  (Green Dep. 36)

354.    During Stajic's service on the Commission, it occasionally received comments or complaints from members of the public about matters within its jurisdiction. These communications sometimes prompted the Commission to discuss and respond to the issues raised. (Stajic Dec. ¶ 39)

355.    Stajic was replaced as a member of the Commission in December 2015. (Stajic Dec. ¶ 28)

New York, New York
July 10, 2017

THE LAW OFFICE OF
KEVIN MINTZER, P.C.

By: _____

Kevin Mintzer
1350 Broadway – Suite 1400
New York, New York 10018
Tel: (646) 843-8180
km@mintzerfirm.com

ALTERMAN & BOOP LLP
By: Daniel L. Alterman
99 Hudson Street – 8th Floor
New York, New York 10013
Tel: (212) 226–2800
dalterman@altermanboop.com

*Attorneys for Plaintiff Marina Stajic*