UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X

MARINA STAJIC, :
:
Plaintiff, :
:
-against- :
:
THE CITY OF NEW YORK, BARBARA :
SAMPSON, *in her individual capacity,* and TIMOTHY :
KUPFERSCHMID, *in his individual capacity,* :
:
Defendants. :
--------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/27/2018

1:16-cv-1258-GHW

MEMORANDUM OPINION
AND ORDER

GREGORY H. WOODS, United States District Judge:

## I.    INTRODUCTION

Plaintiff Marina Stajic is an accomplished forensic scientist.  For over 29 years, she served as the Director of the Forensic Toxicology Laboratory (the "FTL") for the New York City Office of the Chief Medical Examiner ("OCME").  In 2004, Plaintiff was independently appointed by the Governor to serve on the New York State Commission on Forensic Science ("CFS" or the "Commission").  The CFS is a fourteen-member body charged with, among other things, developing minimum standards and a program of accreditation for all forensic laboratories in New York State.

During a series of CFS meetings in 2014, Plaintiff took positions that were perceived by Barbara Sampson and Timothy Kupferschmid, two of her superiors at the OCME, to be critical of or adverse to the OCME.  Shortly thereafter, Plaintiff was fired.  She alleges that her termination was in retaliation for the statements she made as a member of the CFS.

Plaintiff filed this lawsuit against the City of New York, Dr. Sampson, and Mr. Kupferschmid, asserting claims for First Amendment retaliation, retaliation under the New York State Constitution, violation of New York Executive Law § 995-a(6), and age discrimination under

the New York City Human Rights Law. Defendants now move for summary judgment on each of those claims. For the reasons set forth below, the motion is granted in part and denied in part.

## II. BACKGROUND[1]

### A. Structure and Function of the OCME

The OCME is an independent office within the New York City Department of Health and Mental Hygiene. Pl.'s Response to Defs.' Rule 56.1 Statement (Dkt. No. 112) ("Pl.'s 56.1"), ¶¶ 1, 2.[2] It is led by the Chief Medical Examiner of the City of New York (the "CME"), who is appointed by the mayor. *Id.* ¶ 3. Among other things, the CME has the authority to appoint and remove OCME employees, including medical examiners and scientific experts. *Id.* ¶ 6.

The OCME's Division of Laboratories comprises four forensic laboratories: Forensic Biology, Forensic Toxicology, Histology, and Molecular Genetics. *Id.* ¶ 8. Each laboratory conducts a different type of testing. The FTL, of which Plaintiff was the Director, primarily performs post-mortem analysis to determine the cause and manner of death. *Id.* ¶ 10.

In 2007, the CME began holding weekly executive team meetings with members of the OCME's senior leadership. Defendants' Response to Plaintiff's 56.1(b) Statement of Additional Material Facts (Dkt. No. 117) ("Defs.' 56.1"), ¶ 233.[3] The purpose of the executive team meetings was to develop and institute policy and procedures for the agency, to make management decisions, to review progress of major projects, to find solutions to problematic areas, and to develop new initiatives for the agency. *Id.* ¶ 234. Attendees included the CME and the deputy commissioner of

---

[1] The following facts are drawn from the parties' Local Civil Rule 56.1 Statements in connection with the instant motion and are undisputed or taken in the light most favorable to Plaintiff, unless otherwise noted.

[2] Plaintiff's Response to Defendants' Rule 56.1 Statement contains both the assertions of the moving party and the responses of the non-moving party.

[3] Defendants' Response to Plaintiff's Rule 56.1 Statement contains both the assertions of the moving party and the responses of the non-moving party.

administration and finance, Dina Maniotis. *Id.* ¶ 236. Plaintiff was never a member of the executive team. *Id.* ¶ 237.

## B. Plaintiff's Background and Career at OCME

Plaintiff was born in 1950. She obtained her Ph.D. in Forensic Toxicology in 1977. Pl.'s 56.1 ¶¶ 13, 14. She was appointed Director of the FTL on April 1, 1986, when she was 36 years old and had approximately nine years of post-Ph.D. forensic toxicology experience. *Id.* ¶¶ 15, 16, 18. As the Director of the FTL, Plaintiff's responsibilities included: providing administrative, scientific, and technical operational management of the laboratory; overseeing training of personnel in the laboratory; supervising all FTL analyses in connection with deaths under investigation; supervising casework and evaluation of toxicological findings; implementing analytical methodologies related to forensic toxicology; coordinating the activities of the FTL with OCME medical examiners, the New York City Police Department, and the District Attorneys' Offices of the five counties composing the City of New York; and serving as an expert witness in the area of forensic toxicology. *Id.* ¶ 17. According to Plaintiff, she was also responsible for formulating and implementing the FTL's operational policies, goals, and objectives, though she did not have any responsibility for formulating OCME policy outside of the FTL and she did not have any responsibility for formulating or enforcing OCME's conflict of interest policies. *Id.*; Defs.' 56.1, ¶¶ 223, 225. The parties agree that Plaintiff did not have any responsibilities related to the OCME's Forensic Biology Laboratory (the "FBL"), which is a separate laboratory, in a different building, with different leadership and staff. Defs.' 56.1 ¶ 224.

Plaintiff had several immediate supervisors during her tenure as Director of the FTL, culminating with defendant Dr. Sampson. Pl.'s 56.1 ¶¶ 19-33. Plaintiff's last performance evaluation before her termination took place nearly 18 years earlier, in February 1997. *Id.* ¶ 227. At the time, her supervisor was then-CME Dr. Charles Hirsch. *Id.* ¶¶ 226, 227. The rating assigned to Plaintiff in that review was "fully meets requirements." *Id.* ¶ 227. According to Defendants, the

"fully meets requirements" rating corresponded to a "3" and the highest rating available was a "5 (Exceptional)". *Id.* ¶ 227. According to Plaintiff, Dr. Hirsch never told her that he was dissatisfied with any aspect of her performance. *Id.* ¶ 228.

### C. The Structure and Function of the CFS, and Plaintiff's Appointment to the CFS

In addition to her role at the OCME, Plaintiff served as a commissioner on the CFS. The CFS is tasked with, among other things, developing minimum standards and a program of accreditation for all forensic laboratories in New York State, including establishing minimum qualifications for forensic laboratory directors and other personnel, and approving forensic laboratories for the performance of specific forensic methodologies. Pl.'s 56.1 ¶ 35. Of the fourteen members of the CFS, twelve are appointed by the Governor. *Id.* ¶ 37. Of those twelve appointees, at least five must be public employees or officials, and one of those members is required to be the director of a forensic laboratory located in New York State. *Id.* ¶ 38. The Governor's appointees serve a three-year term and may be reappointed for additional three-year terms. *Id.* ¶ 39.

Plaintiff was appointed to the CFS by Governor George Pataki in 2004 as the member of the CFS required to be the director of a forensic laboratory in New York State, and she was reappointed three times thereafter. *Id.* ¶¶ 43, 44. Plaintiff's appointment and reappointments to the CFS were neither sponsored nor endorsed by the OCME. Defs.' 56.1 ¶ 241. In fact, no one at the OCME had any role in Plaintiff's becoming a member of the CFS or in any of her reappointments. *Id.* ¶¶ 241, 242. Furthermore, no one from the OCME ever suggested to Plaintiff that she should recuse herself from participating in all CFS matters concerning the OCME. *Id.* ¶ 248.

### D. Dr. Sampson's Background and Career at OCME

Dr. Sampson, the CME responsible for the decision to terminate Plaintiff, began her career at OCME in 1998. Pl.'s 56.1 ¶ 24. By 2007, Dr. Hirsch had promoted Dr. Sampson to the position of First Deputy Chief Medical Examiner. *Id.* ¶ 27. At that time, Dr. Sampson became Plaintiff's immediate supervisor. *Id.* ¶ 28.

After Dr. Hirsch retired in February 2013, Dr. Sampson was appointed Acting Chief Medical Examiner of the City of New York, a position which became permanent in 2014.  *Id.*  ¶¶ 29, 30, 33. As CME, Dr. Sampson, like Dr. Hirsch before her, has been available to discuss concerns about OCME's operations with members of the community.  Defs.' 56.1 ¶ 238.  In addition, Defendants maintain that the City's website allows any person or entity in the world to send a message to Dr. Sampson; Plaintiff agrees that any "citizen" can do so.  *Id.* ¶ 239.

**E.  Errors Discovered at the OCME's Forensic Biology Laboratory**

On July 7, 2011, the OCME made the first of four reports to the American Society of Crime Laboratory Directors/Laboratory Accreditation Board and other entities, concerning errors made by a technician in the Department of Forensic Biology's DNA laboratory, Serrita Mitchell.  Pl.'s 56.1 ¶ 49.  The OCME removed Ms. Mitchell from casework and eventually suspended her.  The OCME also initiated disciplinary proceedings against Ms. Mitchell, who resigned in November 2011.  *Id.* ¶ 50.  The OCME has reported that between July 2011 and January 2013, it re-examined and/or re-inventoried a total of 877 of Ms. Mitchell's cases.  *Id.* ¶¶ 52, 53.  The investigation was the subject of a January 10, 2013 *New York Times* front-page article bearing the headline, "New York Examines Over 800 Rape Cases for Possible Mishandling of Evidence."  Defs.' 56.1 ¶ 249.  Also in January 2013, the New York State Inspector General's Office opened an investigation into the matter, culminating in a report issued in December 2013.  Pl.'s 56.1 ¶¶ 58, 59.

On January 24, 2013, then-CME Dr. Hirsch suspended the director of the OCME's Department of Forensic Biology, Dr. Mechthild Prinz, and one of that department's two Deputy Directors, Patricia Wojtowicz, who had served as a Deputy Director since 2008.  *Id.*  ¶ 55.  OCME

Chief of Staff Barbara Butcher became the Interim Director of the Department of Forensic Biology. *Id.* ¶ 56. On January 28, 2013, Dr. Hirsch terminated Wojtowicz's employment. *Id.* ¶ 57.[4]

The following month, in February 2013, the OCME solicited proposals for consultation services to review and evaluate the Department of Forensic Biology's management and operational structure, quality assurance practices, and administrative policies. *Id.* ¶ 60. The OCME accepted a bid from Sorenson Forensics, LLC, a private forensic DNA laboratory ("Sorenson Forensics"), of which Mr. Kupferschmid was a "scientific founder"; he had been employed by Sorenson Forensics since 2007. *Id.* ¶¶ 61-63. This was not the first time that the OCME had engaged Sorenson Forensics. The firm had conducted a favorable accreditation audit of the FBL in 2010. Defs.' 56.1, ¶ 252.

In March and April 2013, a three-person team from Sorenson Forensics, led by Mr. Kupferschmid, conducted a review and evaluation of the FBL. Pl.'s 56.1 ¶ 65. During the investigation, in March 2013, Ms. Butcher asked Mr. Kupferschmid if he had any recommendations in the event that OCME needed to hire a new director for the FBL. Defs.' 56.1 ¶ 253. Mr. Kupferschmid replied, "Besides me?" and listed several other potential candidates. *Id.*

On May 2, 2013, Sorenson Forensics issued a final report, which recommended, among other things, that the "[l]eadership [of the FBL] must change, and a new management team with appropriate management skills should be appointed." Pl.'s 56.1 ¶¶ 67, 68. The "leadership" included Dr. Prinz, the Director of the FBL. Defs.' 56.1 ¶ 254. The next day, Dr. Prinz resigned.

---

[4] On April 19, 2013, the remaining Deputy Director of the FBL, Dr. Theresa Caragine, resigned in connection with the OCME's determination that she had failed to follow laboratory protocol regarding the resolution of disagreements between analysts in two separate cases. Pl.'s 56.1 ¶ 66. As a result, the New York State Inspector General expanded its investigation to include Dr. Caragine's conduct as well. *Id.*

Pl.'s 56.1 ¶ 69.  If she had not resigned, Dr. Sampson would have terminated her employment.  *Id.* ¶ 70.

After Dr. Prinz resigned, the OCME issued a job posting for the position of Director of the FBL.  *Id.* ¶ 71.  Mr. Kupferschmid formally applied for the position approximately one week after Dr. Prinz resigned.  Defs.' 56.1, ¶ 256.  In late May or early June 2013, Mr. Kupferschmid interviewed for the position with a panel from OCME; he also met with Dr. Sampson.  Pl.'s 56.1 ¶¶ 73, 74.  Dr. Sampson consulted with the OCME General Counsel and Deputy Mayor Linda Gibbs regarding any potential conflict of interest in hiring Mr. Kupferschmid.  *Id.* ¶ 76.  In June 2013, the OCME offered Mr. Kupferschmid the position of Director of OCME's FBL, and he began working at OCME in that capacity in late July 2013.  *Id.* ¶ 77.

### F.  Plaintiff's 2013 Statement to Dr. Sampson Regarding Hiring of Mr. Kupferschmid

Between the date on which the decision was made to offer Mr. Kupferschmid the position of Director of the FBL and the date that he actually started working at OCME, Plaintiff had a conversation with Dr. Sampson in Dr. Sampson's office.  Pl.'s 56.1 ¶ 78.  Plaintiff characterizes the meeting with Dr. Sampson as a "private conversation"; she testified: "In these days, I was often just walking into Dr. Sampson's office and we would have informal meetings and chats.  So, I didn't go there specifically to discuss [Mr. Kupferschmid], but while we were talking, she told me that they offered the job to Mr. Kupferschmid."  *Id.* ¶¶ 79, 80.  In response, Plaintiff asked whether there was a conflict of interest in hiring Mr. Kupferschmid shortly after he authored a report calling for new management in the FBL (the "2013 Statement to Dr. Sampson" or the "2013 Statement").  *Id.* ¶ 78.  According to Plaintiff, she believed that there was a conflict of interest in hiring Mr. Kupferschmid, and she believed that other members of the CFS would share her concern.  *Id.*  Defendants agree that Plaintiff told Dr. Sampson that she thought there might be a conflict of interest in hiring Mr. Kupferschmid.  *Id.*  The parties dispute whether Dr. Sampson told Plaintiff that she had consulted with the OCME's general counsel about the potential conflict.  Defs.' 56.1 ¶ 260.

**G. August 22, 2013 CFS Executive Session**

That summer, the CFS requested that Dr. Sampson, Mr. Kupferschmid, and Ms. Butcher attend a meeting of the CFS on August 22, 2013. Defs.' 56.1 ¶ 261. On August 20, 2013, in an email sent to Mr. Kupferschmid, Ms. Butcher, and two other OCME employees, Dr. Sampson advised, "[w]e must answer their questions fully and honestly while remaining sweet (the last point is a tip from Dr. Hirsch on testifying in general)." *Id.* ¶ 262.

On August 22, 2013, a meeting of the CFS was held during which the Chair of the CFS requested "a motion to enter Executive Session to discuss information relating to a specific investigation which could jeopardize the investigation if disclosed or that may lead to promotion, demotion, discipline, suspension dismissal [sic] or removal of a particular person." Pl.'s 56.1 ¶ 83. New York Public Officer Law § 102(3) provides that an "Executive Session" is "that portion of a meeting not open to the general public. *Id.* ¶ 84. A motion was made, seconded by Plaintiff, and unanimously approved. *Id.* ¶ 83. The CFS then entered into an executive session (the "Executive Session"). *Id.*

As part of the CFS Chair's introduction to the Executive Session, he explained that the CFS had "receive[d] correspondences [sic] indicating serious concerns regarding the [OCME], specifically the [FBL]," and that the CFS meeting was called to address those communications and "personnel actions involving Laboratory Management that occurred at that Laboratory recently." *Id.* ¶ 85.

During the Executive Session, four people appeared: Dr. Sampson, Ms. Butcher, Dr. Prinz, and Mr. Kupferschmid. *Id.* ¶ 87. During the Executive Session, the commissioners asked questions concerning, among other things, the circumstances of Dr. Prinz's suspension and resignation; Mr. Kupferschmid's authorship of a critical report about the management of the FBL when he had only a few years before been part of a team that approved the accreditation of that laboratory; and the selection of Mr. Kupferschmid as the Director of the FBL. Defs.' 56.1 ¶ 263. According to Plaintiff, during the Executive Session, the CFS was seeking information about, among other

subjects, the reason why the OCME leadership suspended and "forced out" Dr. Prinz, including any connection to the *New York Times* article.  Pl.'s 56.1 ¶ 92.

Plaintiff maintains that during the Executive Session, Ms. Butcher characterized Dr. Prinz as a "weak manager" and said that, as a result, the OCME had to hire a deputy "to run the department," which led to the hiring of Patricia Wojtowicz.  *Id.*  In response, Plaintiff made the following five statements:

i. "What I remember is this, Mecki did have a Deputy Director position before Pat.  So Pat was hired to replace her [sic] but my question was because I didn't have this knowledge before.  If Dr. Hirsch was so unhappy with Mecki, MEcki [sic] was given additional responsibilities, she was put in charge of the evidence department which is one of the busiest departments. She was also given a significant raise. Why would all that happen if he were unhappy with her as a manager?" Pl.'s 56.1 ¶ 92.
ii. "But he was reporting to Mecki."  Pl.'s 56.1 ¶ 95.
iii. "I was just wondering why if you feel that somebody is not a good manager, add on more managerial duties.  I mean, evidence is a lot of, it's a big responsibility."  Pl.'s 56.1 ¶ 97.
iv. "Yeah but that was after Mecki was already." (Plaintiff testified at her deposition that "there seems to be a word missing at the end of the sentence [at page 157:21-22 of the transcript of the CFS executive session].  I believe what I said was that was after Mecki was already [gone or suspended]."  Pl.'s 56.1 ¶¶ 101-02.
v. "No, I don't remember, I'm not on the Executive Committee.  I just know that it was decided by the Executive Committee and then we were told at the Management meeting where it was announced."  Pl.'s 56.1 ¶ 104.

The Court will refer to these statements, collectively, and together with the statements identified below, as the "CFS Statements."  According to Plaintiff, the CFS Statements "cast doubt on the truthfulness of Butcher's statement by pointing out that Hirsch had assigned Prinz additional responsibilities and a raise" and "contrary to Butcher's statement that she and Hirsch had required Prinz to hire a deputy for the department, Prinz already had a deputy before Wojtowicz joined OCME."  *Id.*  In addition, the parties agree that Plaintiff's final statement, that she was not on the Executive Committee, prompted the Chair of the CFS to ask Ms. Butcher a follow-up question, which cast further doubt on Ms. Butcher's statements to the CFS.  *Id.* ¶ 106.  According to Plaintiff, this undermined Ms. Butcher, and contributed to the decision to terminate Plaintiff in April 2015.  *Id.* ¶¶ 106, 107.

Plaintiff also made the following three statements during the appearance of Dr. Prinz at the Executive Session:

i. "I would just like to say that I miss you very much. I feel that I'm in a different position form [sic] from the rest of the Commission and find it scary because what you and Theresa were doing I don't think that is a reason to dismiss somebody." Pl.'s 56.1 ¶ 109.

ii. "So you were actually told why?" Pl.'s 56.1 ¶ 112.

iii. "So when you were suspended, your [sic] being suspended because?" Pl.'s 56.1 ¶ 114.

According to Plaintiff, these expressions of disagreement with the dismissal of Dr. Prinz and Dr. Caragine were also reasons for Plaintiff's termination. *Id.* ¶ 111.

Plaintiff did not make any statements when Dr. Sampson appeared. During her deposition in this case, Dr. Sampson testified that the CFS commissioners "asked a lot of tough questions regarding my judgment and I felt also questioning my integrity to some degree." Defs.' 56.1 ¶ 267.

Mr. Kupferschmid testified during his deposition in this case that a "couple of hours after" the Executive Session he sent an email to Dr. Sampson, Ms. Butcher, and other colleagues with the subject heading, "Commish inquisition," which stated: "At best they [the Commission] painted me to be an incompetent buffoon who does not know how to conduct a management review. At worst I am an unethical, immoral ass who schemed with OCME to oust Mecki [Dr. Prinz] and get her job." *Id.* ¶ 268. He followed up several minutes later with another email that read, "I'm sure the two Barbaras [Sampson and Butcher] seem even worse than I do." *Id.* Mr. Kupferschmid further testified during his deposition in this case that he was "deeply upset" following the August 22, 2013 Executive Session and viewed it as an "inquisition" and "a distraction," and that Dr. Sampson and Ms. Butcher were "unhappy with the entire process. [Plaintiff] was part of the process. So by the transitive property they were upset with her as well." *Id.* ¶¶ 269, 274. He further testified that within a week after the August 22, 2013 CFS Executive Session, either Dr. Sampson or Ms. Butcher told him about Plaintiff's 2013 Statement to Dr. Sampson. *Id.* ¶ 275. Dr. Sampson and Ms. Butcher told Mr. Kupferschmid that Plaintiff's views about his appointment were contrary to one of OCME's core values, which is "agency first." *Id.* ¶ 276.

Ms. Butcher responded to Mr. Kupferschmid's post-Executive Session emails, referring to the Executive Session as an "insane hearing." *Id.* ¶ 270. Ms. Butcher felt she was treated inappropriately during the Executive Session and that at times there was antipathy and hostility towards her that she could not understand. *Id.* ¶ 271. The day after the Executive Hearing, Ms. Butcher wrote to OCME attorney Mimi Mairs that Plaintiff had behaved "badly" during the Executive Session. *Id.* ¶ 272. Ms. Butcher also told Dr. Sampson that Plaintiff had been hostile and condescending to her at the Executive Session, and that Plaintiff should have recused herself from participating. *Id.* ¶ 273.

After the Executive Session, the CFS sent letters to the New York Inspector General's Office concerning some of the issues that had been discussed. *Id.* ¶ 277. A similar letter was sent on October 2, 2013 to then-Mayor Michael Bloomberg. *Id.* ¶ 279. Each of the commissioners' names appeared on the letterhead, including Plaintiff's. *Id.* The final paragraph of the letter to the mayor was as follows:

> While our review into these events will continue, we thought it important to inform you of our concerns. We hope that the search for, and selection of, a permanent Chief Medical Examiner will result in the merit-based selection of a first-rate scientist. This is imperative since the Chief Medical Examiner will ultimately have to review and resolve the controversy surrounding the sweeping personnel changes at the OCME which appear, from our review, to have been made without sufficient basis.

*Id.* ¶ 280. Dr. Sampson and Ms. Butcher received a copy of this letter. *Id.* ¶ 281. Dr. Sampson was troubled by it and understood its final paragraph to be a suggestion that the mayor appoint someone other than herself to be the permanent CME, which she found "hurtful." *Id.* ¶ 282. After Ms. Butcher received the CFS's letter to the mayor, she sent an email to Deputy Mayor Linda Gibbs, with a copy to Dr. Sampson, in which she described the Executive Session as an "interrogation" and wrote that the CFS's letter to the mayor appeared to be a "retaliatory strike on our agency and leaders." *Id.* ¶ 283. Plaintiff testified

at her deposition in this case that "at some point after this executive session in August, [Dr. Sampson] became very cold and curt" towards Plaintiff. *Id.* ¶ 284.

### H. October 24, 2014 CFS Votes

On October 24, 2014, the CFS held a meeting during which the Chair of the CFS asked whether any members had comments concerning a September 16, 2014 letter from the CFS's DNA Subcommittee relating to certain issues surrounding DNA testing at the Department of Forensic Biology. Pl.'s 56.1 ¶ 129; *see also id.* ¶¶ 120-123. One of the CFS Commissioners, Barry Scheck, responded, asking, in relevant part, whether the OCME had "ever done a validation study on samples, mixtures" in connection with the type of DNA testing discussed in the letter. *Id.* ¶ 130. After Mr. Scheck was told by Eugene Lien, the DNA Technical Leader of OCME's Department of Forensic Biology, that the internal validation study existed, *id.* ¶ 131, Mr. Scheck moved to have the OCME provide its internal validation studies to the CFS, with the studies being made public. *Id.* ¶ 132. The parties dispute whether the motion related to all such studies, or the one study that had been identified by Mr. Lien. *Id.* In any event, the motion did not pass. *Id.* Only three members voted in favor of the motion, including Plaintiff. *Id.*

Mr. Scheck then made a second motion, this time to have the OCME provide its internal validation studies to the CFS without making the studies public. *Id.* ¶ 133. Again the motion did not pass, with only three members in favor, again including Plaintiff. *Id.* The Court will refer to Plaintiff's votes, collectively, as the "CFS Votes."

Following the October 24, 2014 CFS meeting, senior employees of OCME communicated about Plaintiff's votes. Defs.' 56.1 ¶ 296. Mr. Lien sent an email to Mr. Kupferschmid and Ms. Mairs immediately after the meeting, writing: "Grilled for 30 minutes, it seemed. Had 2 motions to produce validation for the Commission but was vote [sic] down. 3 members voted yes: the 2 defense lawyers and our own Marina [Stajic]. Gotta love it." *Id.* ¶ 297. Mr. Kupferschmid forwarded the email to Sampson, who replied: "Hold me down." *Id.* ¶ 298. The parties dispute

whether this response referred only to Plaintiff's votes. *Id.* Dr. Sampson testified at her deposition that she "thought it was upsetting that three Commission members had voted to have this released when we had fulfilled the process required by the Forensic Science Commission with the validation studies, and you know, I was not happy about it." *Id.* The parties agree, however, that Dr. Sampson "felt disappointment that Stajic voted as she did." *Id.* ¶ 304. Plaintiff asserts that Mr. Kupferschmid was also upset by Plaintiff's votes, though Defendants assert that he was only "briefly upset," meaning a "few days." *Id.* ¶ 305

Ms. Mairs sent a response to Mr. Lien directly. Mr. Lien summarized the meeting for Ms. Mairs, writing, in relevant part, "You would think that the 3 people FOR the motions would be the defense lawyers, but only 2 were present . . . . Marina [Stajic] was the 3rd vote FOR us producing the validation." *Id.* ¶ 300. Ms. Mairs replied, referring to Plaintiff, "She sucks." *Id.* ¶ 301. Mr. Lien agreed. *Id.* ¶ 302.

According to Plaintiff, she voted in favor of the first motion because she did not believe that the study to which Mr. Lien referred existed, Pl.'s 56.1 ¶ 134, and because she believed that if "any kind of study exists in a public laboratory, it should be released to the public and in the interests of criminal science." *Id.*; *see also id.* ¶¶ 136-38.

### I. Mr. Kupferschmid's Appointment as OCME's Chief of Laboratories

Dr. Sampson was appointed permanent CME in late December 2014. Shortly thereafter, she promoted Mr. Kupferschmid to the newly-created position of Chief of Laboratories. Pl.'s 56.1 ¶ 168; Defs.' 56.1 ¶ 306. In that role, Mr. Kupferschmid became the supervisor of all four OCME forensic laboratories. Pl.'s 56.1 ¶ 169. He also retained his position as the Director of the FBL. *Id.*

By virtue of his role as Chief of Laboratories, Mr. Kupferschmid became Plaintiff's immediate supervisor. *Id.* ¶ 170. During a meeting in early January 2015, Mr. Kupferschmid asked Plaintiff and the two Deputy Directors of the FTL when they planned to retire. *Id.* ¶ 171. According to Defendants, Mr. Kupferschmid wanted to "plan for the future" and know "who is in it

for the long term." *Id.* ¶ 172. From December 2014 until April 9, 2015, when Mr. Kupferschmid was Plaintiff's supervisor, he did not express any concerns to Plaintiff about her job performance. Defs.' 56.1 ¶ 231.

### J. The Decision to Terminate Plaintiff's Employment

On April 9, 2015, Plaintiff attended a meeting in Mr. Kupferschmid's office along with Dr. Sampson, Mr. Kupferschmid, and OCME Human Resources Director Nancy Romero. Pl.'s 56.1 ¶ 174. According to Defendants, Dr. Sampson "informed plaintiff that the direction of the agency was changing and that plaintiff's services would no longer be required." *Id.* According to Plaintiff, after Dr. Sampson told her "we are going in a different direction and your services are no longer required" Plaintiff was given a form to sign reflecting that she resigned. *Id.* Plaintiff asked if she would be permitted to retire and Dr. Sampson answered in the affirmative. *Id.* ¶¶ 174, 175. Plaintiff returned to her office, in a different building, and, according to Plaintiff, about 15-20 minutes later, the head of OCME's security department arrived and asked her to leave. *Id.* ¶ 174. The following day, Plaintiff filed retirement papers with the New York City Employees' Retirement System. She is receiving a pension. *Id.* ¶ 175.

The parties sharply dispute the reasons underlying the decision to terminate Plaintiff's employment. According to Defendants, "over a period of several years, Dr. Sampson became increasingly dissatisfied with plaintiff's management of the FTL." *Id.* ¶ 176. One reason Dr. Sampson gave at her deposition for her negative assessment of Plaintiff's performance was that "[w]e had very [sic] difficult time getting information from [Plaintiff] and her attitude was very, bordering on hostile sometimes." *Id.* ¶ 177. Next, according to Dr. Sampson, her predecessor, Dr. Hirsch, had experienced a similar problem eliciting information from Plaintiff. *Id.* ¶ 178. Dr. Sampson also testified at her deposition that there was a "major increase in the turnaround time" in Plaintiff's laboratory that occurred in 2011 or 2012. *Id.* ¶ 179. At Dr. Hirsch's instruction, Dr. Sampson told Plaintiff to "fix" the problem with the turnaround time, but there was no

improvement. *Id.* ¶ 181. Next, Dr. Sampson identified Plaintiff's "poor working relationship with the medical examiners" as another reason for her negative assessment of Plaintiff's performance. *Id.* ¶ 183.

Defendants also point to the deposition testimony of Dr. Jason Graham, the First Deputy Chief Medical Examiner and one of Plaintiff's former supervisors, who testified that "the medical examiners generally had a hesitation to approach [Plaintiff] with cases because of the interaction that was involved and the function that she was playing was less of a forensic toxicology consultant than that of a technician. There was - - it seemed an adversarial relationship with the lab being led by [Plaintiff] amongst many of the medical examiners and this was affecting casework." *Id.* ¶ 184.

Finally, Defendants point to Dr. Sampson's testimony that "medical examiner fellows, medical doctors participating in an advanced training program . . . reported a negative experience with plaintiff." *Id.* ¶ 186. Finally, an additional "factor" identified by Dr. Sampson was that, in Dr. Sampson's view, Plaintiff "failed to make the FTL more efficient," including by failing to pursue a specific grant. *Id.* ¶ 187.

Plaintiff denies each reason set forth by Defendants for Dr. Sampson's negative assessment of her performance. According to Plaintiff, the record shows, among other things, that Dr. Sampson never told Plaintiff "that there was anything wrong with her performance or that she needed to improve," even though Dr. Sampson's normal practice is to do so. *Id.* ¶ 176. In addition, Plaintiff contends that Dr. Sampson "never consulted with OCME's human resources department about [Plaintiff's] purported performance problems" and Dr. Sampson never told Plaintiff's direct supervisor to document Plaintiff's performance problems or to counsel Plaintiff to improve. *Id.* Further, Plaintiff maintains that she "never received a performance review, warning, memorandum, email, or other writing reflecting that OCME's leadership was dissatisfied with her management of the laboratory," and she was never told by her supervisors that they were "dissatisfied with her job performance." *Id.*

Additionally, even though Dr. Sampson testified at her deposition that Plaintiff's "deficient job performance was regularly discussed at executive team meetings," Plaintiff points out that, "according to Dina Maniotis, OCME's executive deputy commissioner for administration and finance, [Plaintiff's] performance was not discussed at executive team meetings." *Id.*; *see also id.* ¶¶ 177, 178. Regarding the "major increase in the turnaround time" cited by Defendants, Plaintiff maintains that she and OCME management "had for many years sought to improve the turnaround time of the toxicology laboratory, but this issue had nothing to do with [Plaintiff's] dismissal. For approximately 10 years before OCME dismissed [Plaintiff], she had requested more resources for the Toxicology Laboratory to reduce turnaround times. Sampson, Graham and Kupferschmid had agreed with [Plaintiff] that the laboratory should be allocated more resources, but they said there was not sufficient money in the budget to do so. Moreover, the turnaround times for the toxicology laboratory had substantially improved well before [Plaintiff] was fired; indeed, Sampson regarded the toxicology turnaround times in 2014 and 2015 as acceptable." *Id.* ¶ 179.

### K. The "Straw that Broke the Camel's Back"

According to Defendants, Dr. Sampson's view of Plaintiff was most affected by Plaintiff's reaction to one of the significant events that prompted a root cause analysis in the FTL. Pl.'s 56.1 ¶ 189. A root cause analysis is a process for investigating the causal factors of significant events that focuses primarily on systems and processes, not on individual performance or error, and identifies appropriate corrective action, including strategies to prevent the reoccurrence of a significant event or potential improvements in systems or processes that will decrease the likelihood of a significant event occurring in the future. *Id.* ¶ 141. A "significant event" is "an occurrence in [the OCME] involving the significant likelihood of an act, error or omission that affects the accuracy, reliability or integrity of the reported results of evidence examination or reported results of analysis." *Id.* ¶ 142.

When a non-conforming event, or error, occurred in any of the laboratories of the OCME, the Quality Assurance Director would prepare a summary for the CME and make a

recommendation as to whether a root cause analysis was warranted. *Id.* ¶ 143. According to Plaintiff, the CME had the ultimate authority to determine if an error rose to the level of being a "significant event" warranting a root cause analysis. *Id.*

The parties agree that five significant events occurred in the OCME's FTL that warranted root cause analyses. *Id.* ¶ 144. They dispute, however, the relationship between those significant events and the decision to terminate Plaintiff's employment.

According to Defendants, one of these significant events, and, in particular, Plaintiff's reaction to it, constituted the "straw that broke the camel's back" for Dr. Sampson. During her deposition, Dr. Sampson testified as follows:

> We had a root cause analysis that involved a case where there was clearly a white powder at the scene, very suspicious for drugs, and the toxicology came back essentially negative. The medical examiner questioned this because of the scene, didn't make sense. There was no other good cause of death. And when the lab looked again indeed, there was cocaine in the specimen. So obviously, to me obviously a root cause analysis had to be performed because we had a report that did not contain the positive cocaine result when indeed subsequent testing showed that there was cocaine in that specimen. I called Dr. Stajic about this and asked for an explanation and she said well, you know that she didn't really think this needed a root cause analysis and I said what do you mean. This is clearly an incorrect report went out and she said well, it is not really incorrect. I said what do you mean? There was cocaine in his system. It is not in the report. And she said well, it doesn't say there is no cocaine in the system. It just doesn't report the cocaine that that was in fact there. And when I hear that my jaw dropped and it became absolutely clear to me that with that kind of attitude to think that a report like that didn't need a root cause analysis, that I could not go forward with her as the head of the toxicology laboratory. There was – I needed transparency there. I needed willingness to adhere to this root cause analysis which was producing such great results in the forensic biology lab and also in the toxicology lab. So much improvement in our system and really that was what, you know, was like I said the straw that broke the camel's back that we could not work together and move the agency in the direction which I needed it to go.

Declaration of Kevin Mintzer (Dkt. No. 108), Ex. B, at 49-50. According to Defendants, "[a]lthough the errors made by the FTL that were the subject of the root cause analyses were not, in and of themselves, the reason that defendant Sampson terminated plaintiff's employment, defendant Sampson testified that '[i]n the root cause analysis [sic] there are discussion [sic] of these problems

some of which are reflected in the – or reflect on the culture that existed between the toxicology lab and the medical examiners themselves." Pl.'s 56.1 ¶ 189. Dr. Sampson also testified that "[w]hat bothered me so much was her telling me that that report was not really incorrect. You have a piece of paper that doesn't say that cocaine is present that would—if the medical examiner had not questioned that that would have gone out incorrectly the cause of death would have been entirely missed." *Id.* ¶ 192.

According to Plaintiff, however, Dr. Sampson's description of their conversation is "false[]." *Id.* ¶ 176. Plaintiff maintains that the evidence shows that (i) the conversation described by Dr. Sampson did not occur until after Dr. Sampson had already decided to fire Plaintiff; and (ii) that Plaintiff did not suggest to Dr. Sampson during their conversation that the initial report was accurate; rather, she only noted that the laboratory "did not make a scientific error because its initial testing did find that cocaine was present in the sample" so the error was only in the laboratory's failure to schedule a confirmatory test for cocaine. *Id.* ¶ 191.[5] Plaintiff further asserts that "the

_____

[5] Defendants argue that the Court should strike or disregard Plaintiff's assertions at Pl.'s 56.1 ¶¶ 191-192, which are based on Plaintiff's declaration in opposition to summary judgment, under the "sham issue of fact" doctrine. Reply (Dkt. No. 119), at 2. The sham issue of fact doctrine "prohibits a party from defeating summary judgment simply by submitting an affidavit that contradicts the party's previous sworn testimony." *In re Fosamax Prod. Liab. Litig.*, 707 F.3d 189, 193 (2d Cir. 2013). The Second Circuit has been clear that it does not "suggest that district courts should routinely engage in searching, skeptical analyses of parties' testimony in opposition to summary judgment." *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 106 (2d Cir. 2011). To apply the doctrine, the contradiction must be "real, unequivocal, and inescapable." *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 23 (2d Cir. 2014). "[I]f there is a plausible explanation for discrepancies in a party's testimony, the court considering a summary judgment motion should not disregard the later testimony because an earlier account was ambiguous, confusing, or simply incomplete." *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir. 2005). Here, Plaintiff offered an explanation in her declaration for her deposition testimony that she did not recall the "straw that broke the camel's back" discussion with Dr. Sampson. According to Plaintiff's declaration, she became aware after her deposition that Dr. Sampson testified about the conversation and she "now recall[s] having a telephone conversation about this issue with Dr. Sampson after the toxicology laboratory issued its amended report, but it was not as Dr. Sampson described it." Stajic Decl. (Dkt. No. 109), ¶ 22. She then proceeds to give her version of the conversation, which Defendants contend should be stricken or ignored by the Court. The Court declines to find that Plaintiff's explanation for the discrepancy is not plausible and will consider her version of the relevant facts, as appropriate.

missing cocaine finding was not reported out of the agency because the medical examiner had noted the possible discrepancy and ordered re-testing." *Id.* Finally, Plaintiff contends that Dr. Sampson "did not express any concern with any of Stajic's comments during the call" and was not "upset" or "bothered" during this discussion. *Id.* ¶¶ 191-92.

**L. The Aftermath of Plaintiff's Termination**

On April 10, 2015, Mr. Kupferschmid telephoned Brian Gestring of the CFS and advised him that Plaintiff had retired. Pl.'s 56.1 ¶ 193. According to Mr. Gestring, Mr. Kupferschmid stated that Plaintiff's retirement "means [Plaintiff] is not on the Commission any more, right?" *Id.* ¶ 194.

Five days later, on April 15, 2015, Mr. Gestring called Mr. Kupferschmid and advised him that the CFS wished to speak in Executive Session with representatives of the OCME about Plaintiff. *Id.* ¶ 195. A CFS meeting was held on April 15, 2015, during which the CFS entered Executive Session. *Id.* ¶ 196. Mr. Kupferschmid and Florence Hutner, the General Counsel of OCME, attended the Executive Session on behalf of the OCME. *Id.* ¶ 197. Plaintiff, who remained a CFS member until December 2015, also attended the April 15, 2015 Executive Session and spoke about the termination of her employment. *Id.* ¶¶ 198, 203. She does not recall whether she told her fellow CFS members her belief as to why her employment was terminated. *Id.* ¶ 199.

During the April 15, 2015 Executive Session, CFS members questioned Mr. Kupferschmid and Ms. Hutner about the circumstances of Plaintiff's termination. *Id.* ¶ 200. The OCME informed the CFS that it was not going to discuss personnel matters and that the termination of Plaintiff's employment had nothing to do with the quality of the work product of FTL. *Id.* ¶ 201.

The next month, in May 2015, Dr. Gail Cooper applied for the position of Director of the OCME's FTL. *Id.* ¶ 204. She was one of four applicants that Mr. Kupferschmid interviewed for the position. *Id.* ¶ 205. According to her resume, Dr. Cooper received a Ph.D. in Forensic Toxicology in 1999. *Id.* ¶ 206. Her resume further reflects that she had approximately 15 years of post-Ph.D. experience in forensic toxicology when she applied for the position, including experience in

International Organization for Standardization accreditation.  *Id.* ¶ 207.  According to Defendants, Dr. Cooper was approximately 42 years old when she applied for the position; according to Plaintiff, she was approximately 41 years old.  *Id.* ¶ 208.  Dr. Cooper was offered the position of Director of the FTL on July 15, 2015.  *Id.* ¶ 209.  She accepted the offer on July 17, 2015, and started working at the FTL in February 2016.  *Id.* ¶¶ 209-10.  According to Plaintiff, Dr. Cooper is qualified for the position "on paper" but lacks "extensive experience in postmortem toxicology."  *Id.* ¶ 211.

## III.    LEGAL STANDARD

Defendants are entitled to summary judgment on a claim if they can "show[ ] that there is no genuine dispute as to any material fact and [they are] entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" (quoting former Fed. R. Civ. P. 56(c))). A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," while a fact is material if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "Factual disputes that are irrelevant or unnecessary will not be counted."  *Id.*

To defeat a motion for summary judgment, a plaintiff "must come forward with 'specific facts showing that there is a genuine issue for trial.'"  *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting former Fed. R. Civ. P. 56(e)).  "[M]ere speculation or conjecture as to the true nature of the facts" will not suffice.  *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks and citations omitted).  A plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita*, 475 U.S. at 586.

In determining whether a genuine dispute as to a material fact exists, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against

whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (internal quotation marks and citation omitted). The Court's job is "not to weigh the evidence or resolve issues of fact." *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 254 (2d Cir. 2002); *see also Hayes v. N.Y. City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) ("In applying th[e] [summary judgment] standard, the court should not weigh evidence or assess the credibility of witnesses."). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys v. City of New York*, 426 F.3d 549, 553-54 (2d Cir. 2005) (citation omitted). "[T]he judge must ask . . . not whether . . . the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Id.* at 553 (alterations in original) (quoting *Anderson*, 477 U.S. at 252); *see also Battino v. Cornelia Fifth Ave., LLC*, 861 F. Supp. 2d 392, 400 (S.D.N.Y. 2012) ("To avoid summary judgment, all that is required of the non-moving party is a showing of sufficient evidence supporting the claimed factual dispute as to require a . . . jury's resolution of the parties' differing versions of the truth." (citing *Kessler v. Westchester Cty. Dep't of Soc. Servs.*, 461 F.3d 199, 206 (2d Cir. 2006))).

## IV.   DISCUSSION

### A.  Federal Claims Against the City

It is well settled that "a municipality cannot be made liable [under § 1983] by application of the doctrine of *respondeat superior*," *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986), but rather the plaintiff must "demonstrate that, through its deliberate conduct, the municipality was the moving force behind the alleged injury," *Roe v. City of Waterbury*, 542 F.3d 31, 37 (2d Cir. 2008) (internal quotation marks omitted). Therefore, "[t]o hold a city liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007) (quoting *Batista v.*

*Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983)); *see Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978).

A plaintiff may satisfy the "policy or custom" prong in one of four ways:  by proving the existence of (1) a formal policy, *see Monell*, 436 U.S. at 690; (2) actions taken or decisions made by final municipal policymakers that caused the violation of plaintiff's rights, *see Pembaur*, 475 U.S. at 483-84; (3) a practice so persistent and widespread that it constitutes a "custom or usage" and implies the constructive knowledge of policymakers, *see Monell*, 436 U.S. at 690-91; or (4) a failure to properly train or supervise municipal employees that amounts to "deliberate indifference to the rights of those with whom municipal employees will come into contact," *City of Canton v. Harris*, 489 U.S. 378, 388 (1989); *see also Moray v. City of Yonkers*, 924 F. Supp. 8, 12 (S.D.N.Y. 1996).

Here, Plaintiff's *Monell* claim is based on her contention that Dr. Sampson, as the CME, was the final policymaker with respect to employment at the OCME.  As set forth below, that contention is supported by the record, and, therefore, summary judgment must be denied as to the *Monell* claim.

Where the contention is not that the defendants' actions were taken pursuant to a formal policy, but rather that they were taken or caused by an official whose decisions represent official policy, the court must determine whether that official had final policymaking authority in the particular area involved.  *See Jeffes v. Barnes*, 208 F.3d 49, 57-58 (2d Cir. 2000) ("Where a plaintiff relies not on a formally declared or ratified policy, but rather on the theory that the conduct of a given official represents official policy, it is incumbent on the plaintiff to establish that element as a matter of law."); *see also Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 737 (1989); *City of St. Louis v. Praprotnik,* 485 U.S. 112, 123–25 (1988).  It is not enough that the official has been granted discretion in the performance of his duties.  *See, e.g., Praprotnik*, 485 U.S. at 127.  "[O]nly those municipal officials who have 'final policymaking authority' may by their actions subject the government to Section 1983 liability."  *Id.* at 123 (quoting *Pembaur,* 475 U.S. at 483).

Whether the official in question had final policymaking authority is a legal question, which is to be answered on the basis of state law. *McMillian v. Monroe County,* 520 U.S. 781, 787 (1997) (explaining a proper "understanding of the actual function of a governmental official, in a particular area, will necessarily be dependent on the definition of the official's functions under relevant state law"); *Jett,* 491 U.S. at 737; *Praprotnik,* 485 U.S. at 123-24. "[T]he relevant legal materials[] includ[e] state and local positive law, as well as custom or usage having the force of law." *Jett,* 491 U.S. at 737 (quoting *Praprotnik*, 485 U.S. at 124 n.1) (internal quotation marks omitted). The determination of whether the official is a final policymaker under state law is "to be resolved by the trial judge *before* the case is submitted to the jury." *Id.*

The relevant law in this case is the New York City Charter (the "Charter"), which provides that the commissioner of the Department of Citywide Administrative Services ("DCAS") is "responsible for citywide personnel matters." N.Y., Charter § 811, New York City, N.Y. Nonetheless, the heads of city agencies retain "such powers, duties and responsibilities for personnel management as they shall require to administer their agencies effectively," including the power to appoint and remove their employees, subject to the provisions of the civil service law. *Id.* § 812; *see also id.* § 815(f). The CME is also authorized under a separate provision of the Charter to "appoint and remove such deputy chief medical examiners, medical examiners, medical investigators, lay medical investigators, scientific experts and other officers and employees as may be provided for in the budget." N.Y., Charter § 557(c), New York City, N.Y. The parties do not dispute that the CME has the power to terminate Plaintiff's employment under this provision. Reply, at 4 ("The parties agree that as a matter of law, the Chief Medical Examiner of the City of New York has the authority under New York City Charter § 557(b) to make certain employment decisions, including terminating plaintiff's employment."). They dispute, however, whether the CME is a final policymaker.

"Where a city official 'has final authority over significant matters involving the exercise of discretion,' his choices represent government policy." *Gronowski v. Spencer*, 424 F.3d 285, 296 (2d

Cir. 2005) (quoting *Rookard v. Health & Hosps. Corp.,* 710 F.2d 41, 45 (2d Cir. 1983)). As a result, "municipal liability may be imposed for a single decision by municipal policymakers." *Pembaur,* 475 U.S. at 480. Defendants argue that the CME's authority to terminate Plaintiff's employment is so constrained by the Charter that she is not the final policymaker with respect to Plaintiff's termination. In making this argument, Defendants rely on two provisions of the Charter: § 818, which provides that the DCAS has the power to investigate "all matters touching the enforcement and effect of the provisions of the civil service law insofar as it applies to the city and the rules and regulations prescribed thereunder" as well as "the actions of . . . any officer or employee of the city . . . in respect to the execution of the civil service law"; and § 814(b)(4), which permits the DCAS Commissioner "to reverse or rescind any agency personnel action or decision pursuant to an assignment or delegation of authority in this chapter." The chapter of the Charter to which this refers is Chapter 35, in which § 814 appears. Significantly for purposes of this motion, however, the CME's power to terminate Plaintiff's employment is derived from § 557(c), which is contained in Chapter 22 of the Charter.

With respect to § 818, the power of the DCAS is clearly limited to matters implicating the civil service law. Here, however, the unrebutted evidence shows that Plaintiff was not subject to the civil service law. On March 30, 2015, Ms. Maniotis sent an email to Ms. Romero, the Assistant Commissioner of Human Resources, asking, "What is Marina's underlying civil service title?" Defs.' 56.1 ¶ 323. The following day, Ms. Romero responded, "[Plaintiff] has no underlying title. I contacted DCAS. They said you can move forward with the plan. [Plaintiff] is a manager at will and has no rights." Defs.' 56.1 ¶ 325. Consequently, on the record before the Court, the DCAS lacked authority under § 818 of the Charter to "investigate" the decision to fire Plaintiff.

Furthermore, with respect to § 814(b)(4), the DCAS Commissioner's authority "to reverse or rescind any agency personnel action" is limited to personnel actions or decisions made "pursuant to an assignment or delegation of authority in this chapter," which was Chapter 35 of the Charter.

However, the CME's power to terminate Plaintiff's employment is derived from Chapter 22 of the Charter (§ 557(c)), not Chapter 35. Accordingly, § 814(b)(4) also does not confer authority on the DCAS to reverse the CME's decision to terminate Plaintiff. As a result, the Court concludes that the CME is the final policymaker with respect to Plaintiff's employment.

This is consistent with other cases in this District in which courts have found that the heads of city agencies enjoy final policymaking authority for purposes of municipal liability. *See, e.g.*, *Walton v. Safir*, 122 F. Supp. 2d 466, 477 (S.D.N.Y. 2000) (internal citations omitted) ("Although the New York City Charter also vests 'general authority to make final City policy' in the Mayor and City Council and decision-making authority for personnel management in the Commissioner of the [DCAS], these general provisions do not diminish the specific and authoritative responsibility of the Police Commissioner as 'chief executive' of the Police Department, with 'cognizance and control of the government, administration, disposition and discipline of the department,' to terminate the employment of a police officer."). Accordingly, summary judgment is denied as to Defendant City of New York.

## B. Retaliation Claims

To determine whether speech by a public employee is protected by the First Amendment, courts in this Circuit conduct a two-step inquiry.[6] First, the court determines "whether the [public] employee spoke as a citizen on a matter of public concern.'" *Matthews v. City of New York*, 779 F.3d 167, 172 (2d Cir. 2015) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)). "Speech involves matters of public concern 'when it can be fairly considered as relating to any matter of political,

---

[6] Free speech retaliation claims asserted pursuant to Article I, § 8 of the New York State Constitution are governed by the same principles applicable to federal First Amendment claims. *See Dotson v. Farrugia*, No. 11CIV1126PAE, 2012 WL 996997, at *9 (S.D.N.Y. Mar. 26, 2012); *Colandrea v. Town of Orangetown*, 490 F. Supp. 2d 342, 351 (S.D.N.Y. 2007).

social, or other concern to the community, or when it 'is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.'" *Lane v. Franks*, 134 S. Ct. 2369, 2380 (2014) (quoting *Snyder v. Phelps,* 562 U.S. 443, 444 (2011) (internal quotations and citation omitted)). "The inquiry turns on the 'content, form, and context' of the speech. *Id.* at 2373 (quoting *Connick v. Myers,* 461 U.S. 138, 147-48 (1983)). "This step one inquiry in turn encompasses two separate subquestions: '(1) whether the subject of the employee's speech was a matter of public concern and (2) whether the employee spoke 'as a citizen' rather than solely as an employee.'" *Matthews¸* 779 F.3d at 172 (quoting *Jackler v. Byrne,* 658 F.3d 225, 235 (2d Cir. 2011)). "If . . . both questions are answered in the affirmative, the court then proceeds to the second step of the inquiry, commonly referred to as the *Pickering* analysis: whether the relevant government entity 'had an adequate justification for treating the employee differently from any other member of the public based on the government's needs as an employer.'" *Id.* (quoting *Lane*, 134 S. Ct. at 2380).

With respect to the second step of the first question, there is "a tension in public employment free speech cases between an employee's First Amendment rights and the 'common sense realization that government offices could not function if every employment decision became a constitutional matter.'" *Id.* (quoting *Connick,* 461 U.S. at 143). "Government employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services." *Garcetti*, 547 U.S. at 418. Therefore, "[w]hen a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom." *Id.* (citing *Waters v. Churchill,* 511 U.S. 661, 671(1994) (plurality opinion)).

At the same time, however, "a citizen who works for the government is nonetheless a citizen." *Id.* at 419. Consequently, beginning with *Pickering v. Board of Education*, 391 U.S. 563 (1968), the Supreme Court has "made clear that public employees do not automatically surrender all their rights of free expression at the office door." *Montero v. City of Yonkers, New York*, 890 F.3d 386, 395

(2d Cir. 2018); *see also Garcetti*, 547 U.S. at 417 ("Public employees do not surrender all their First Amendment rights by reason of their employment.").  Instead, "[a]n employee may be protected from retaliation even when speaking in the workplace" so long as "she is speaking 'as a citizen . . . upon matters of public concern.'"  *Montero*, 890 F.3d at 395 (quoting *Garcetti*, 547 U.S. at 416).  Whether the employee spoke as an employee or as a citizen is "largely a question of law for the court."  *Jackler*, 658 F.3d at 237; *accord Connick,* 461 U.S. at 148 n.7 ("The inquiry into the protected status of speech is one of law, not fact.") (citation omitted).

A public employee does not speak as an employee when her speech is not pursuant to her official job duties.  *Garcetti*, 547 U.S. at 422.  However, "speech can be 'pursuant to' a public employee's official job duties even though it is not required by, or included in, the employee's job description, or in response to a request by the employer."  *Weintraub v. Bd. of Educ. of City Sch. Dist. of City of New York*, 593 F.3d 196, 203 (2d Cir. 2010).  "Ultimately, the question . . . is whether the employee's speech was 'part-and-parcel of [the employee's] concerns about his ability to properly execute his duties.'"  *Montero*, 890 F.3d at 398 (quoting *Weintraub*, 593 F.3d at 203).

Additionally, "[w]hen a public employee speaks pursuant to employment responsibilities . . . there is no relevant analogue to speech by citizens who are not government employees."  *Garcetti*, 547 U.S. at 424.  Such an analogue exists "if it is made through 'channels available to citizens generally.'"  *Matthews*, 779 F.3d at 175 (quoting *Jackler*, 658 F. at 238).  "Employees who make public statements outside the course of performing their official duties retain some possibility of First Amendment protection because that is the kind of activity engaged in by citizens who do not work for the government.  The same goes for writing a letter to a local newspaper, or discussing politics with a co-worker."  *Garcetti*, 547 U.S. at 423-24 (internal citations omitted).  "We do not consider the relative degree of [citizen] access to be material; rather what matters is whether the same or a similar channel exists for the ordinary citizen."  *Matthews*, 779 F.3d at 176.  However, while "the presence or lack of a civilian analogue may be of some help in determining whether one spoke as a citizen," it is

not dispositive. *Montero*, 890 F.3d at 397 (citing *Lane*, 134 S.Ct. at 2379); *Weintraub*, 593 F.3d at 203, 204.

Here, Defendants do not contest, for purposes of this motion, that the 2013 Statement to Dr. Sampson and the CFS Statements constitute speech on matters of public concern. The parties dispute, however, whether Plaintiff spoke as a citizen with respect to both the 2013 Statement and the CFS Statements.

### i. 2013 Statement to Dr. Sampson[7]

To determine whether Plaintiff spoke as a citizen when she made the 2013 Statement to Dr. Sampson, the Court must "examine the nature of the plaintiff's job responsibilities, the nature of the speech, and the relationship between the two." *Ross v. Breslin*, 693 F.3d 300, 306 (2d Cir. 2012).

A public employee may engage in citizen speech in any number of contexts, including in a private meeting with an employer. *See Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410, 415-16 (1979) ("Neither the Amendment itself nor our decisions indicate that this freedom is lost to the public employee who arranges to communicate privately with his employer rather than to spread his views before the public."). Similarly, "the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech." *Lane*, 134 S.Ct. at 2379. Instead, the critical question is whether the speech is within the scope of an employee's job duties. *See id.* at 2373 ("The critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties."); *see also Montero*, 890 F.3d at 395 (quoting *Pickering*, 391

---

[7] Plaintiff argues that Defendants should be precluded from seeking summary judgment with respect to the 2013 Statement to Dr. Sampson because "defendants previously stated in open court that they do not dispute for purposes of summary judgment that Stajic's comments were protected by the First Amendment." Plaintiff's Mem. of Law in Opp. to Defs.' Mot. for Summ. J. (Dkt. No. 111) ("Pl.'s Br."), at 11. This argument was advanced by Plaintiff in a separate motion, Dkt. No. 98, and was rejected by the Court. Dkt. No. 131. The Court will not reconsider it here.

U.S. at 568) ("An employee may be protected from retaliation even when speaking in the workplace when he or she is speaking 'as a citizen . . . upon matters of public concern.'"). But "[t]he proper inquiry is a practical one. Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes." *Garcetti*, 547 U.S. at 424-25. "[S]peech can be 'pursuant to' a public employee's official job duties even though it is not required by, or included in, the employee's job description, or in response to a request by the employer." *Weintraub*, 593 F.3d at 203.

The Court recognizes the breadth of this rule, and that, Plaintiff, a senior-level official engaged in discussions with the CME, could be expected to discuss and provide opinions regarding important issues related to the management of the OCME. Here, however, the record does not support an inference that office management was actually part of Plaintiff's job. When considering a motion for summary judgment, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson*, 680 F.3d at 236. Drawing all inferences in favor of Plaintiff, the record does not establish that the 2013 Statement was "part and parcel" of Plaintiff's job duties.

In addition, the record establishes that there was a "channel" through which civilians could communicate with Dr. Sampson, which—although not dispositive—also weighs in favor of finding that the 2013 Statement was not employee speech. In *Matthews*, a police officer raised concerns about his precinct's arrest quota system to commanding officers at the precinct. The Second Circuit found that there was a civilian analogue for the plaintiff's complaints because the precinct commanders to whom the plaintiff complained had "an open door to community comments and complaints." *Matthews*, 779 F.3d at 176. The precinct held monthly "Community Council meetings" in which the public "was invited to raise concerns about policing practices." *Id.* at 171. In addition

to routinely attending those meetings, one of the captains to whom the plaintiff complained met with members of the public "one to three times per month" to "discuss policing issues in the Precinct." *Id.* Therefore, the court concluded, the plaintiff "chose a path that was available to ordinary citizens who are regularly provided the opportunity to raise issues with the Precinct commanders." *Id.* at 176; *see also id.* ("Matthews reported his concerns about the arrest quota system to the same officers who regularly heard civilian complaints about Precinct policing issues.").

Here, although civilians are unable to "freely enter" the CME's office to discuss the operation or practices of the OCME, Defs.' Mem. of Law in Support of Mot. for Summ. J. (Dkt. No. 97) ("Defs.' Br."), at 12, it is undisputed that Dr. Sampson "has been available to discuss concerns about OCME's operations with members of the community," and any "citizen" or "any person or entity in the world" may send Dr. Sampson a message through the City of New York's website. Defs.' 56.1 ¶¶ 238, 239. As in *Matthews*, Plaintiff raised her concerns by communicating with the CME—a "path" available to ordinary citizens, who also have the ability to raise issues with the CME through meetings or by sending a message through the City's website.

As a result, the Court concludes that, on this record, the 2013 Statement to Dr. Sampson was not employee speech. Defendants raise no other bases on which summary judgment is warranted with respect to this claim. Accordingly, the motion for summary judgment as to the retaliation claim concerning Plaintiff's 2013 Statement to Dr. Sampson is denied.

### ii. Statements made at CFS Executive Session

Plaintiff also alleges that she was retaliated against for the CFS Statements. The relevant speech consists of the five statements Plaintiff made during the appearance by Ms. Butcher, and the three statements she made during the appearance by Dr. Prinz. Again, Defendants assume that the statements addressed matters of public concern. They argue, however, that the CFS Statements "blend[ed]" Plaintiff's "two sets of official duties, for OCME and for the CFS," such that that the

CFS Statements are employee speech. Defs.' Br. at 14. Defendants also argue that Plaintiff's speech is not citizen speech because, as a CFS commissioner, she was a "public official." *Id.*

These arguments are misplaced. The relevant inquiry is whether Plaintiff's statements were made pursuant to her employment duties. It is undisputed that Plaintiff was employed by the OCME, not the CFS. Furthermore, the fact that Plaintiff's position at the OCME was a qualification for her appointment to the CFS does not mean that the two roles were "blended." In fact, the record demonstrates otherwise. It is undisputed that Plaintiff's appointment and reappointment to the CFS occurred independently of the OCME. Defs.' 56.1 ¶¶ 240-42. No one from the OCME ever suggested to Plaintiff that she should recuse herself from participating in CFS matters that concerned the OCME. *Id.* ¶ 248. There is also no evidence that Plaintiff's CFS Statements were made for, or on behalf of, the OCME. In fact, the CFS Statements were designed to elicit information from OCME employees for the benefit of the CFS, in a manner that, the record shows, was perceived by those OCME employees as adverse to the OCME's interests. Consequently, the evidence shows that Plaintiff's role on the CFS was a separate and voluntary undertaking, akin to participation in a labor union or bar association. *See Montero*, 890 F.3d at 398 (finding speech was not employee speech where, among other things, Plaintiff "made his remarks as union vice president, a role in which he was not required to serve.").

Similarly, the fact that Plaintiff's statements were based on information she learned by virtue of her position at the OCME is, without more, insufficient to connect Plaintiff's separate roles or otherwise render her speech employee speech. *See Lane*, 134 S. Ct. at 2379 ("the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee . . . speech").

Finally, the Court does not find that a clear civilian analogue exists with respect to the CFS Statements. Under the New York Public Officers Law § 102(3), Executive Sessions are not open to the general public. *See* Reply at 8. However, this fact is not dispositive; the law is clear that the

absence of a civilian analogue alone is not sufficient to establish that a plaintiff has engaged in employee speech. *Montero*, 890 F.3d at 398. And although Defendants initially argued that the tangential relationship between Plaintiff's employment at the OCME and her role on the CFS, combined with the absence of a civilian analogue, was sufficient to establish that Plaintiff's statements were unprotected, that argument was rejected in *Montero* and, as Defendants now acknowledge, is no longer valid. *See* Dkt. No. 136, at 1. Therefore, the absence of a civilian analogue further weighs in favor of finding that the CFS Statements constituted citizen speech.

Accordingly, the Court concludes that the CFS Statements constituted citizen speech. Because Defendants raise no other bases on which summary judgment is warranted with respect to this claim, Defendants' motion for summary judgment as to the retaliation claim concerning Plaintiff's CFS Statements is denied.

### C. Qualified Immunity

"Qualified immunity shields government officials from liability for civil damages as a result of their performance of discretionary functions, and serves to protect government officials from the burdens of costly, but insubstantial, lawsuits." *Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir. 1995). Government actors are entitled to qualified immunity on a § 1983 claim if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "On summary judgment, the judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred." *Id.* "Qualified immunity is an affirmative defense on which the defendant has the burden of proof, either at trial or on a motion for summary judgment." *Johnson v. Perry*, 859 F.3d 156, 170 (2d Cir. 2017).

Further, "[e]ven where the plaintiff's federal rights and the scope of the official's permissible conduct are clearly established, the qualified immunity defense protects a government actor if it was 'objectively reasonable' for him to believe that his actions were lawful at the time of the challenged

act." *Lennon*, 66 F.3d at 420 (quoting *Anderson*, 483 U.S. at 641); *see also Weyant v. Okst*, 101 F.3d 845, 857 (2d Cir. 1996) ("[P]ublic officials are entitled to qualified immunity if (1) their conduct does not violate clearly established constitutional rights, or (2) it was objectively reasonable for them to believe their acts did not violate those rights."). "The objective reasonableness test is met—and the defendant is entitled to immunity—if 'officers of reasonable competence could disagree' on the legality of the defendant's actions." *Lennon*, 66 F.3d at 420 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

"It is not necessary, of course, that 'the very action in question has previously been held unlawful.'" *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1866-67 (2017) (quoting *Anderson*, 483 U.S. at 640). Rather, "the need for 'clearly established' law is satisfied if the law on the subject was defined at the time with reasonable clarity or clearly foreshadowed in rulings of the Supreme Court or the Second Circuit, so that the defendant should have understood that her conduct was unlawful." *Montero*, 890 F.3d at 402; *see also Lynch v. Ackley*, 811 F.3d 569, 578-79 (2d Cir. 2016).[8]

Defendants' qualified immunity argument assumes that Plaintiff was terminated in retaliation for the 2013 Statement to Sampson, the CFS Statements, and the CFS Votes.[9] Thus, the relevant questions for qualified immunity purposes are whether Dr. Sampson and Mr. Kupferschmid could reasonably have believed, at the time Plaintiff was fired on April 9, 2015, that a government employer could lawfully fire an employee on the basis of (i) her statement to a supervisor during a private meeting regarding a potential conflict of interest with respect to a hiring decision; (ii) statements made in her capacity as an appointed member of a separate and independent

---

[8] Notably, unlike in *Montero*, where specific case law predating *Garcetti* called into question the status of union speech, there is no such question here.

[9] Defendants contest that they did not terminate her because of her statements. *See supra* § II (J).

governmental body; or (iii) votes cast in her capacity as an appointed member of a separate and independent governmental body. Each question is addressed in turn below.

### i. 2013 Statement to Dr. Sampson

Dr. Sampson and Mr. Kupferschmid are entitled to qualified immunity with respect to Plaintiff's 2013 Statement to Dr. Sampson because it was "objectively reasonable" for them to believe that the 2013 Statement constituted employee speech and, therefore, that terminating Plaintiff's employment in response to the 2013 Statement was lawful.

As the Director of one of the OCME's four laboratories, Plaintiff occupied a high-level position at the OCME, which she had held for many years. And, although she was not part of the executive committee, unlike in *Matthews*, she regularly met with the CME to discuss a variety of topics. Indeed, the 2013 Statement was made during the course of one such meeting, in response to information obtained directly from the CME. Given these facts, "officers of reasonable competence could disagree" on the question of whether Plaintiff's 2013 Statement to Dr. Sampson constituted employee speech. *Malley*, 475 U.S. at 341. Consequently, Dr. Sampson and Mr. Kupferschmid are entitled to qualified immunity with respect to the 2013 Statement.

### ii. CFS Statements

Defendants are not entitled to qualified immunity with respect to Plaintiff's CFS Statements, however. At the outset, Defendants formulate the issue too narrowly, arguing that "neither the Supreme Court nor the Second Circuit had ruled in a case in which the speech at issue was made by someone whose membership on a governmental body was dependent upon employment by a separate governmental entity, and who spoke pursuant to her official duties for both entities, via a channel for which no civilian analogue exists." Defs.' Br., at 17. "The operation of the 'clearly established' standard 'depends substantially upon the level of generality at which the relevant legal rule is to be identified.'" *Johnson*, 859 F.3d at 170 (quoting *Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (internal quotation omitted)).

"A right is 'clearly established' if 'it would be clear to a reasonable [person in the position of the defendant] that his conduct was unlawful in the situation he confronted.'" *Colvin v. Keen*, No. 16-3650, 2018 WL 3865295, at *8 (2d Cir. Aug. 15, 2018) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). "This inquiry turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *Id.* (quoting *Pearson v. Callahan*, 555 U.S. 223, 244) (internal quotation marks omitted). "We do not require a case directly on point, but existing precedent must have placed the . . . constitutional question beyond debate." *Golodner v. Berliner*, 770 F.3d 196, 206 (2d Cir. 2014) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). "Even if neither the Supreme Court nor this Court has explicitly held a course of conduct to be unconstitutional, the law may still be considered 'clearly established so long as this circuit's decisions clearly foreshadow a particular ruling on the issue.'" *Spencer v. Philemy*, 540 F. App'x 69, 71 (2d Cir. 2013) (quoting *Tellier v. Fields,* 280 F.3d 69, 84 (2d Cir. 2000) (internal quotation marks omitted)).

In *Matthews*, which was decided on February 26, 2015—just less than two months before Plaintiff's employment was terminated—the Second Circuit held that "when a public employee whose duties do not involve formulating, implementing, or providing feedback on a policy that implicates a matter of public concern engages in speech concerning that policy, and does so in a manner in which ordinary citizens would be expected to engage, he or she speaks as a citizen, not as a public employee." 779 F.3d at 174. Here, as in *Matthews*, Plaintiff was a public employee whose "duties d[id] not involve formulating, implementing, or providing feedback" on FBL employment decisions or the OCME's conflict of interest policies. Also like *Matthews*, Plaintiff engaged in speech concerning those decisions and policies. *Matthews*, established Second Circuit law at the time of Dr. Stajic's termination, was on all fours with the situation presented to Defendants in this case. Accordingly, they are not entitled to qualified immunity on the basis that the law was not clearly established at the time.

Defendants suggest that *Matthews* established a carve-out for public employees engaged in citizen speech, but who do not speak as "ordinary citizens." This argument stems from the following language in *Matthews*: "when a public employee whose duties do not involve formulating, implementing, or providing feedback on a policy that implicates a matter of public concern engages in speech concerning that policy, and does so *in a manner in which ordinary citizens would be expected to engage, he or she speaks as a citizen, not as a public employee*." *Matthews*, 779 F.3d at 174 (emphasis added). Defendants construe this turn of phrase to mean that it was not clear at the time Plaintiff was fired that a public employee, engaged in citizen speech, could not be terminated if she spoke not merely as an "ordinary citizen," but using the platform of a special role. Following the logic of this argument, it was not clear at the time that a citizen running for public office would be entitled to the same protection for comments made from the candidates' podium as an "ordinary" citizen speaking from her front yard. Or, as here, that Dr. Stajic, speaking in her role as a member of the commission, was entitled to less protection than when speaking to her employer.

The Court appreciates Defendants' nuanced reading of *Matthews*. However, the qualified immunity inquiry "turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *Colvin v. Keen*, No. 16-3650, 2018 WL 3865295, at *8 (2d Cir. Aug. 15, 2018) (quoting *Pearson v. Callahan*, 555 U.S. 223, 244) (internal quotation marks omitted). In light of the Circuit and Supreme Court precedent, it was not objectively legally reasonable at the time to conclude that Dr. Stajic was entitled to less protection because she spoke when wearing her hat as a commissioner, as opposed to speaking as an "ordinary citizen." [10]

---

[10] Although it was decided several years after Plaintiff's termination, the Court sees support for the fact that this language was not intended as a limitation in the Second Circuit's opinion in *Montero*. In *Montero*, the plaintiff was both a Yonkers police officer and a union official in the Yonkers Police

Defendants also argue that they are entitled to qualified immunity with respect to the CFS Statements because the Second Circuit held in *Montero* that, between February 2015 and May 2018, it was not clearly established that a public employee's speech that lacks a civilian analogue may be protected. Dkt. No. 136, at 2. But the confusion surrounding the question of the civilian analogue was whether a civilian analogue was required in addition to speech pursuant to one's job duties. As described above, it was not objectively reasonable for Defendants to conclude that Plaintiff was not speaking as a citizen. Therefore, regardless of any confusion surrounding the civilian analogue requirement at the time Plaintiff was fired, Defendants are not entitled to qualified immunity with respect to Plaintiff's CFS Statements. *Compare Montero*, 890 F.3d at 390 (granting qualified immunity where the law was unclear as to both the question of whether speech made in a union capacity is citizen speech and as to the civilian analogue requirement).

---

Benevolent Association (the "Yonkers PBA"). 890 F.3d at 390. The plaintiff alleged that his First Amendment rights were violated when the City of Yonkers retaliated against him for criticizing management decisions by Yonkers police officials at two Yonkers PBA meetings. *Id.* The Second Circuit concluded that the plaintiff's remarks were citizen speech—even though he was speaking as a PBA official and not as an "ordinary citizen."

It seems likely that the language from *Matthews* discussed above describes a "manner" of engaging in speech "in which ordinary citizens would be expected to engage." *Id.* at 174. The court did not discuss speech by ordinary citizens as opposed to citizens speaking using the platform of a unique public role. In fact, the court did not use the term "ordinary citizens" again until the "Civilian Analogue" section of the opinion, in which it explains that the plaintiff "chose a path that was available to *ordinary citizens* who are regularly provided the opportunity to raise issues with the Precinct commanders" and that "what matters is whether the same or a similar channel exists for the *ordinary citizen*." *Id.* at 176 (emphases added). Further, the Matthews court concluded that its finding that the plaintiff spoke as a citizen, rather than as a public employee, was "reinforce[d]" because the plaintiff had "pursued the same avenue to complain . . . as would a concerned civilian." *Id.* As a result, it appears that the Second Circuit in Matthews was not creating a carve-out for ordinary citizens—it was simply describing the "civilian analogue" element of the analysis.

iii.    **CFS Votes**[11]

Finally, with respect to the CFS Votes, Defendants are not entitled to qualified immunity. Here too Defendants raise several distinctions without a difference. First, they argue that it was not clearly established that a vote by an appointed member of a government body is protected speech. Defs.' Br. at 17. Next, they argue that, in any event, the CFS Votes here are not "political expression" and therefore are not entitled to constitutional protection. *Id.* at 17-18.[12] Protected speech does not lose its protection simply because it is expressed as a vote, however. *See, e.g.*, *Camacho v. Brandon*, 317 F.3d 153, 160 (2d Cir. 2003) ("Voting on public policy matters coming before a legislative body is an exercise of expression long protected by the First Amendment.").

As the Second Circuit made clear in *Matthews*, only two inquiries govern whether a public employee speaks as a citizen: "(A) did the speech fall outside of the employee's 'official responsibilities,' and (B) does a civilian analogue exist?" *Id.*, 779 F.3d at 173 (citing *Weintraub*, 593 F.3d at 203-04). Notably, the Second Circuit did not consider whether the speech in question constituted "political expression," as Defendants ask the Court to do here.

---

[11] Plaintiff argues that Defendants should be precluded from seeking summary judgment with respect to the votes because "defendants previously represented to the Court that they would not be moving for summary judgment with respect to plaintiff's claims related to her votes on the Commission." Pl.'s Br., at 18. Again, this argument was advanced by Plaintiff in a separate motion, Dkt. No. 98, and was rejected by the Court. Dkt. No. 131. The Court will not reconsider it here.

[12] Defendants point to decisions in other circuits applying *Garcetti* to speech by public officials (or not). However, "when neither the Supreme Court nor [the Second Circuit] has recognized a right, the law of our sister circuits and the holdings of district courts cannot act to render that right clearly established within the Second Circuit." *Pabon v. Wright*, 459 F.3d 241, 255 (2d Cir. 2006) (citing *Anderson v. Recore*, 317 F.3d 194, 197 (2d Cir. 2003)). In any event, as Plaintiff points out, only one of those cases addressed a scenario similar to the one before the Court here—namely, whether a public agency may retaliate against one of its employees on the basis of that employee's expression in performing separate duties for a different public entity. *Santos v. Pabey*, No. 2:10-CV-203 JVB, 2011 WL 6141115, at *2 (N.D. Ind. Dec. 9, 2011) ("The Court concludes that the speech for which Plaintiffs claim protection—their votes in the Council—does constitute speech protected by the First Amendment. Because their Council votes were not statements made pursuant to their official duties as employees of the City of East Chicago or the East Chicago Public Library, they were speaking as private citizens, albeit private citizens who are Common Council members.").

As set forth above, the clearly established law at the time Plaintiff was fired, as articulated in *Matthews*, was that speech that was not part of a public employee's job description, or part of the practical reality of her everyday work, was citizen speech, not employee speech. Here, Plaintiff's votes were in no way related to her job functions at the OCME. In fact, the votes were in favor of positions that the OCME found objectionable. To the extent that the votes reflected knowledge that Plaintiff gained in the course of her employment, the law was also clear at the time of her termination that the fact that speech reflects knowledge gained through employment is not sufficient to transform citizen speech into employee speech. *See Lane*, 134 S. Ct. at 2373. Accordingly, Defendants are not entitled to qualified immunity with respect to the CFS Votes.

### D. Age Discrimination Claim

Plaintiff's age discrimination claim arises under the NYCHRL, which provides that it is an unlawful discrimination practice for an employer to discharge a person from employment "because of the actual or perceived age" of that person. New York City, N.Y., Code § 8-107, § 8-107(1)(a)(2). Although NYCHRL claims had for many years "been treated as coextensive with state and federal counterparts," the New York City Council, in passing the Local Civil Rights Restoration Act of 2005 (the "Restoration Act"), "rejected such equivalence" in favor of a broader remedial scope. *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009). The Restoration Act established two new rules of construction for the NYCHRL: (1) "a 'one-way ratchet,' by which interpretations of state and federal civil rights statutes can serve only 'as a *floor* below which the City's Human Rights law cannot fall'"; and (2) a requirement that the NYCHRL provisions "be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York State civil and human rights laws, including those laws with provisions comparably-worded to provisions of this title[,] have been so construed." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013) (quoting Restoration Act §§ 1, 7). The Second Circuit has clarified that these amendments to the Restoration Act require courts to analyze NYCHRL claims

"separately and independently from any federal and state law claims." *See id.* Further, NYCHRL must be construed "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible." *Id.* (quoting *Albunio v. City of New York,* 16 N.Y.3d 472, 477–78 (2011)).

The NYCHRL "does not require 'a connection between the discriminatory conduct and a materially adverse employment action.'" *Garrigan v. Ruby Tuesday, Inc.*, No. 14-cv-155 (LGS), 2014 WL 2134613, at *3 (S.D.N.Y. May 22, 2014) (quoting *Mihalik*, 715 F.3d at 113). Instead, the proper inquiry under the NYCHRL is whether the plaintiff "was treated 'less well' because of her [membership in a protected class]." *Pena-Barrero v. City of New York*, No. 14-cv-9550 (VEC), 2017 WL 1194477, at *15 (S.D.N.Y. Mar. 30, 2017) (quoting *Mihalik*, 715 F.3d at 111).

Courts "must be mindful that the NYCHRL is not a 'general civility code,'" however. *Mihalik*, 715 F.3d at 110 (citing *Williams v. N.Y.C. Housing Auth.*, 872 N.Y.S. 2d 27, 40-41 (1st Dep't 2009)). "The plaintiff still bears the burden of showing that the conduct is caused by a discriminatory motive. It is not enough that a plaintiff has an overbearing or obnoxious boss. [He] must show that [he] has been treated less well at least in part 'because of [his protected characteristic].'" *Id.* (citing *Williams*, 872 N.Y.S. 2d at 39, 40 n.27).

In connection with motions for summary judgment concerning claims arising under the NYCHRL, "the plaintiff must establish a prima facie case, and the defendant then has the opportunity to offer legitimate reasons for its actions." *Ya-Chen Chen v. City Univ. of New York*, 805 F.3d 59, 75–76 (2d Cir. 2015) (citing *Bennett v. Health Mgmt. Sys.*, 936 N.Y.S.2d 112 (1st Dep't 2011)). "If the defendant satisfies that burden, summary judgment is appropriate if no reasonable jury could conclude either that the defendant's 'reasons were pretextual,' or that the defendant's stated reasons were not its sole basis for taking action, and that its conduct was based at least 'in part on discrimination.'" *Id.* (quoting *Melman v. Montefiore Med. Ctr.,* 946 N.Y.S.2d 27, 35, 41 (1st Dep't 2012)). In other words, "summary judgment is appropriate if no reasonable jury could conclude

either that the defendant's reasons were pretextual, or that the defendant's stated reasons were not its sole basis for taking action, and that its conduct was based at least in part on discrimination." *Id.* (internal citations and quotations omitted); *see also Thelwell v. City of New York*, No. 17-1767, 2018 WL 2123242, at *1 (2d Cir. May 9, 2018) (quoting *Mihalik*, 715 F.3d at 110) ("[S]ummary judgment is appropriate only if the record establishes as a matter of law that discrimination play[ed] no role in its actions.").

To determine whether an NYCHRL claim survives summary judgment, courts in this Circuit reviewing discrimination claims arising under the NYCHRL consider the totality of circumstances and "overall context" of the challenged conduct. *Mihalik*, 715 F.3d at 111, 113 (internal quotations and citations omitted). "[E]ven a single comment may be actionable in the proper context." *Id.* at 113; *see also Seabrook v. New York City Health & Hosps. Corp.*, No. 13 CIV. 4164 NRB, 2015 WL 273652, at *9 (S.D.N.Y. Jan. 20, 2015) ("stray remarks are routinely dismissed unless accompanied by further indicia of age-related animus").

Here, there is sufficient evidence that, taken together, could support a finding that age discrimination played at least some role in the decision to terminate Plaintiff's employment.

First, it is undisputed that Plaintiff was replaced with a younger scientist, Dr. Cooper. Pl.'s 56.1 ¶ 208.

Second, Mr. Kupferschmid's query about Plaintiff's plans for retirement was made three months before Plaintiff's dismissal and "within approximately one month" of his recommendation to Dr. Sampson that Plaintiff should be fired. Pl.'s Br., at 24 (citing Pl.'s 56.1 ¶¶ 308-316).[13] *Compare McGuire-Welch v. House of the Good Shepherd*, 219 F. Supp. 3d 330, 344 (N.D.N.Y. 2016), *aff'd*, 720 F. App'x 58 (2d Cir. 2018) (fact that supervisor's question about retirement was "made almost two

---

[13] According to Plaintiff, Mr. Kupferschmid's question about retirement was the "very first topic" he raised with Dr. Stajic and her deputies. Pl.'s Br., at 24. However, as Defendants point out, there is no evidence in the record to support this assertion, and Defendants dispute it. Defs.' Reply, at 11.

years prior to plaintiff's termination" weighed against finding discriminatory bias in case arising under the Age Discrimination in Employment Act and New York State Human Rights Law).

Third, it is undisputed that, with respect to Plaintiff, Dr. Sampson did not adhere to her usual practice of communicating her dissatisfaction to employees before terminating their employment. Pl.'s 56.1 ¶ 331. Plaintiff contends that this was the result of Dr. Sampson's "age-based stereotypes"—namely, her "assumption that an older employee is resistant to change." Pl.'s Br. at 24, 25 (citing Pl.'s 56.1 ¶ 332).

Finally, the record is inconsistent regarding Dr. Sampson's account of her decision to terminate Plaintiff, which may be an indicator of a false explanation designed to obscure age discrimination. Dr. Sampson testified at her deposition in this case that she decided to dismiss Plaintiff because of her "attitude, culture and the direction that the agency was going in." Pl.'s 56.1 ¶ 332. But this is inconsistent with Dr. Sampson's other explanation for Plaintiff's dismissal—her deficient job performance. *Id.* Plaintiff also challenges Defendants' assertion that Dr. Sampson decided to fire Plaintiff in response to the discussion about the root cause analysis that was the "straw that broke the camel's back," *id.* ¶¶ 176, 191, because, among other things, Dr. Sampson testified both that the discussion about the root cause analysis occurred a "few months" before Plaintiff was fired, and that she did not decide to fire Plaintiff until March 2015, when the executive team had reached consensus about it. *Id.* ¶¶ 191, 317-19. In light of these inconsistencies, and drawing all reasonable inferences in Plaintiff's favor, a reasonable juror could conclude that Dr. Sampson's explanations signal pretext. *See E.E.O.C. v. Ethan Allen, Inc.*, 44 F.3d 116, 120 (2d Cir. 1994) ("from such discrepancies a reasonable juror could infer that the explanations given by [the defendant] at trial were pretextual, developed over time to counter the evidence suggesting age discrimination uncovered by the state investigation."); *see also Cadet-Legros v. New York Univ. Hosp. Ctr.*, 21 N.Y.S.3d 221, 225-26 (1st Dep't 2015) (quoting *Bennett*, 92 A.D.3d at 45) ("One way for a

plaintiff to defeat summary judgment is by offering 'some evidence that at least one of the reasons proffered by defendant is false, misleading, or incomplete.'").

Viewing these factors together, and considering the totality of circumstances in the light most favorable to Plaintiff, the Court concludes that there is sufficient evidence in the record for a reasonable juror to conclude that the decision to terminate Plaintiff was based at least in part on age discrimination. Accordingly, Defendants' motion for summary judgment on the age discrimination claim must be denied.

### E. N.Y. Executive Law 995-a(6) – Private Right of Action

Finally, Defendants are entitled to summary judgment with respect to Plaintiff's claim under Section 995-a(6) of the New York Executive Law. Given the plain language of the subsection, and context in which it appears—a statutory provision creating and defining the CFS—there is no textual reading to support the conclusion that § 995-a(6) was intended by the legislature to provide broad protection against retaliation for actions taken as a CFS member.

Section 995-a(6) of the New York Executive Law provides that:

> No member of the commission on forensic science shall be disqualified from holding any public office or employment, nor shall he or she forfeit any such office or employment, by reason of his or her appointment hereunder, and members of the commission shall not be required to take and file oaths of office before serving on the commission.

The parties dispute whether this provision implicitly creates a private right of action. "In the absence of an express private right of action, plaintiffs can seek civil relief in a plenary action based on a violation of the statute only if a legislative intent to create such a right of action is fairly implied in the statutory provisions and their legislative history." *Cruz v. TD Bank, N.A.*, 22 N.Y.3d 61, 70 (2013). This determination is based on three factors:

> (1) whether the plaintiff is one of the class for whose particular benefit the statute was enacted; (2) whether recognition of a private right of action would promote the legislative purpose; and (3) whether creation of such a right would be consistent with the legislative scheme.

*Id.* (quoting *Sheehy v. Big Flats Community Day*, 73 N.Y.2d 629, 633 (1989)). Of these, the third is the most significant because "the Legislature has both the right and the authority to select the methods to be used in effectuating its goals, as well as to choose the goals themselves." *Id.* (internal citation omitted). "Thus, regardless of its consistency with the basic legislative goal, a private right of action should not be judicially sanctioned if it is incompatible with the enforcement mechanism chosen by the Legislature or with some other aspect of the over-all statutory scheme." *Id.* at 70-71. Furthermore, "a statute's goal may not necessarily be enhanced by adding a private enforcement mechanism." *Uhr ex rel. Uhr v. E. Greenbush Cent. Sch. Dist.*, 94 N.Y.2d 32, 40 (1999); *see also id.* at 38 ("A statutory command . . . does not necessarily carry with it a private right of enforcement by means of tort litigation.").

The critical concern is whether legislative intent to create a private right of action may be fairly implied from the statute. Indeed, in certain circumstances, the New York Court of Appeals has required that there must be "clear evidence" of such legislative intent. *Id.* at 42.

With respect to the first requirement, Plaintiff, who was a public official and served as a CFS commissioner, is clearly "one of the class" for whose benefit § 995-a(6) was enacted.

With respect to the legislative purpose of the provision, the context in which it appears is telling. The first subsection of § 995-a creates the CFS and describes its makeup: it "shall consist of the following fourteen members: (a) the commissioner of the division of criminal justice services . . . ; [and] (b) twelve members appointed by the governor." § 995-a(1). The second subsection further defines the membership of the CFS, mandating that the members appointed by the governor include, for example, one member who is "the director of a forensic laboratory located in New York state," and two members who are scientists with "experience in the areas of laboratory standards or quality assurance regulation and monitoring and [who] shall be appointed upon the recommendation of the commissioner of health." § 995-a(2). Other subsections set forth the length of members' terms, § 995-a(3), procedures for filling vacancies that are "created otherwise than by expiration of

term," § 995-a(4), the number of meetings that the CFS is required to hold each year, § 995-a(5), and the fact that CFS members will not be compensated for their services, but are allowed their actual and necessary expenses incurred in the performance of their CFS functions. § 995-a(7). In other words, the statute creates and defines the CFS—including who its members will be, how they will be selected and appointed, how long they will serve, and how they will be compensated (or not).

The provision in question here, § 995-a(6), is no different. It describes qualifications for CFS commissioners. Specifically, it advises members of the CFS that they need not forfeit other public office or employment because of their appointment to the Commission, and that they are not required to "take and file oaths of office before serving" on the Commission. § 995-a(6).

In addition, the Court recognizes that no enforcement mechanism exists under the statute, and that the absence of an enforcement mechanism may, in some cases, reflect the legislature's intent to create a private right of action. *Martinez v. Capital One, N.A.*, 863 F. Supp. 2d 256, 263 (S.D.N.Y. 2012), *aff'd and remanded sub nom. Cruz v. TD Bank, N.A.*, 742 F.3d 520 (2d Cir. 2013) ("courts have recognized that a private right of action may be implied if there are no enforcement mechanisms or express remedies available, such that without an implied private cause of action, plaintiffs would have no remedy to the legislatively recognized harm."). But the absence of an enforcement mechanism does not always indicate legislative intent to create a private right of action. *See Sheehy*, 73 N.Y.2d at 634-35 ("a private right of action should not be judicially sanctioned if it is incompatible with the enforcement mechanism . . . or with some other aspect of the over-all statutory scheme"); *see also Uhr ex rel. Uhr*, 94 N.Y.2d at 42 ("If we are to imply such a right, we must have clear evidence of the Legislature's willingness to expose the governmental entity to liability that it might not otherwise incur.").

This is particularly true here, where Plaintiff would have the Court infer a private right of action for retaliation claims, even though New York State law already protects citizens' rights of speech. *See Sheehy*, 73 N.Y.2d at 636 ("where the Legislature has not been completely silent but has

instead made express provision for civil remedy . . . the courts should ordinarily not attempt to fashion a different remedy, with broader coverage, on the basis of a different statute, at least where, as here, the two statutes address the same wrong.").  Therefore, rather than filling a gap, as Plaintiff contends, a private right of action of the sort she endorses would create a remedy that is cumulative of the remedy provided by the New York State Human Rights Law.

Having considered the factors set forth in *Sheehy*, the Court declines to find an implied private right of action in § 995-a(6).  Consequently, Defendants' motion for summary judgment is granted with respect to Plaintiff's § 995-a claim.

## V.    CONCLUSION

For the foregoing reasons, summary judgment is DENIED as to the *Monell* claim, the retaliation claims with respect to the CFS Statements and the CFS Votes, and the age discrimination claim.  Summary judgment is GRANTED as to the § 995-a claim and the retaliation claim concerning the 2013 Statement to Dr. Sampson.

The Clerk of Court is directed to terminate the motion pending at Dkt. No. 94.

SO ORDERED.

Dated:  September 27, 2018
New York, New York

_____
GREGORY L. WOODS
United States District Judge